John Robertelli, Esq.
Gene Y. Kang, Esq.
Timothy J. Bang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Steven Henesy, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
25 Main Street, Suite 501
Court Plaza North
Hackensack, New Jersey 07601
(201) 287-2460
john.robertelli@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,<br><br>Plaintiffs,<br><br>-against-<br><br>SEUNG MOCK LEE, D.C. a/k/a RYAN LEE, CHOICE TOTAL PAIN CLINIC, P.C., CHANG HEE LEE, L.Ac., DO YOUNG AN, JIN HYUN PARK, L.Ac., A PLUS THERAPY CENTER, P.C., HYUNSEOK LEE, P.T., THE ONE THERAPY & ACUPUNCTURE CLINIC, P.C., SUHI HONG L.Ac., PRIME TOTAL PAIN CLINIC, P.C., MINJAE YOO, D.C., JAEDOO LEE, D.C., DONGHOON KANG, L.Ac., MYUNG YU, L.Ac., RICHARD J. KIM, L.Ac., HYEO YEOUNG PARK, P.T., JIGNYASA DESAI, D.O., FORT LEE PAIN MANAGEMENT, L.L.C., PRIME PAIN MANAGEMENT, P.C., HAEBITNA CHONG, N.P.,<br><br>Defendants. | Case No.: _____( )<br><br>**Plaintiffs Demand a Trial by Jury** |

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover more than $2,270,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted:

    (i)      thousands of fraudulent no-fault insurance charges through Choice Total Pain Clinic, P.C. ("Choice Total Pain"), The One Therapy & Acupuncture Clinic, P.C. ("The One Acupuncture"), Prime Total Pain Clinic, P.C. ("Prime Total Pain"), and A Plus Therapy Center, P.C. ("A Plus Therapy") for purported initial examinations, follow-up examinations, chiropractic treatment, physical therapy treatment, and acupuncture services; and

    (ii)     thousands of fraudulent no-fault insurance charges through Fort Lee Pain Management, L.L.C. ("Fort Lee Pain") and Prime Pain Management P.C. ("Prime Pain Management") for initial examinations, follow-up examinations, electrodiagnostic ("EDX") testing, trigger point injections, manipulation under anesthesia ("MUA") services, and pain management injections (the purported initial examinations, follow-up examinations, chiropractic treatment, physical therapy treatment, and acupuncture services, EDX testing, trigger point injections, MUA services, and pain management injections are collectively referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that Choice Total Pain, The One Acupuncture, Prime Total Pain, A Plus Therapy, Fort Lee Pain, and Prime Pain Management were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, because:

    (i)      the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)     Choice Total Pain, The One Acupuncture, and A Plus Therapy were engaged in an unlawful self-referral scheme;

(iii)    The One Acupuncture had an illegal corporate structure;

(iv)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.      The Defendants fall into the following categories:

(i)     Defendant Seung Mock Lee, D.C. a/k/a Ryan S. Lee ("S. Lee") is a chiropractor licensed to practice chiropractic in New Jersey, owned and controlled Choice Total Pain, The One Acupuncture, Prime Total Pain, and A Plus Therapy, and purported to perform many of the Fraudulent Services.

(ii)    Defendant Choice Total Pain is a New Jersey chiropractic professional corporation, through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(iii)   Defendant The One Acupuncture is a New Jersey acupuncture professional corporation, through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(iv)    Defendant Prime Total Pain is a New Jersey chiropractic professional corporation, through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(v)     Defendant A Plus Therapy is a New Jersey physical therapy professional corporation, through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(vi)    Defendant Suhi Hong, L.Ac. ("Hong") is an acupuncturist licensed to practice acupuncture in New Jersey, was employed by or associated with The One Acupuncture and purported to perform many of the Fraudulent Services on behalf of The One Acupuncture, at the direction of S. Lee.

(vii)   Defendant Hyunseok Lee, P.T. ("H. Lee") is a physical therapist licensed to practice physical therapy in New Jersey, was employed by or associated with A

3

Plus Therapy and purported to perform many of the Fraudulent Services on behalf of A Plus Therapy, at the direction of S. Lee.

(viii)   Defendants Chang Hee Lee, L.Ac. ("C. Lee") and Jin Hyun Park, L.Ac. ("J. Park") are acupuncturists licensed to practice acupuncture in New Jersey, were employed by or associated with Choice Total Pain and purported to perform many of the Fraudulent Services on behalf of Choice Total Pain, at the direction of S. Lee.

(ix)   Defendant Do Young An ("An") is former acupuncturist who was employed by or associated with Choice Total Pain, and purported to perform many of the Fraudulent Services on behalf of Choice Total Pain, at the direction of S. Lee.

(x)   Defendants Minjae Yoo, D.C. ("Yoo") and Jaedoo Lee, D.C. (J. Lee) are chiropractors licensed to practice chiropractic in New Jersey, were employed by or associated with Prime Total Pain and purported to perform many of the Fraudulent Services on behalf of Prime Total Pain.

(xi)   Defendant Richard J. Kim, L.Ac. ("Kim") is an acupuncturist licensed to practice acupuncture in New Jersey, was employed by or associated with Choice Total Pain and Prime Total Pain and purported to perform many of the Fraudulent Services on behalf of Choice Total Pain and Prime Total Pain, at the direction of S. Lee.

(xii)   Myung Yu, L.Ac. ("Yu") and Donghoon Kang, L.Ac. ("Kang") are acupuncturists licensed to practice acupuncture in New Jersey, were employed by or associated with Prime Total Pain and purported to perform many of the Fraudulent Services on behalf of Prime Total Pain, at the direction of S. Lee.

(xiii)   Defendant Hyeo Young Park, P.T. ("H. Park") is a physical therapist licensed to practice physical therapy in New Jersey, was employed by or associated with Prime Total Pain and purported to perform many of the Fraudulent Services on behalf of Prime Total Pain, at the direction of S. Lee.

(xiv)   Defendant Jignyasa Desai, D.O. ("Desai") is a physician licensed to practice medicine in New Jersey, owned and controlled Fort Lee Pain and Prime Pain Management, and purported to perform many of the Fraudulent Services.

(xv)   Defendant Fort Lee Pain is a New Jersey medical professional limited liability company through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(xvi)   Defendant Prime Pain Management is a New Jersey medical professional corporation company through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(xvii)  Defendant Haebitna Chong, N.P. ("Chong") is a licensed nurse practitioner, was employed by or associated with Prime Pain Management, and purported to perform many of the Fraudulent Services on behalf of Prime Pain Management.

5.      As discussed below, the Defendants at all relevant times have known that:

(i)     the Defendants paid and received unlawful compensation in exchange for patient referrals;

(ii)    Choice Total Pain, The One Acupuncture, and A Plus Therapy were engaged in an unlawful self-referral scheme;

(iii)   The One Acupuncture had an illegal corporate structure;

(iv)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(v)     in many cases, the Fraudulent Services never were provided in the first instance; and

(vi)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The charts annexed hereto as Exhibits "1" – "6" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the United States mail.

7.      The Defendants' fraudulent scheme began as early as 2012 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $2,270,000.00.

**THE PARTIES**

**I.      Plaintiffs**

8.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

## II.      **Defendants**

9.      Defendant S. Lee resides in and is a citizen of New Jersey. S. Lee was licensed to practice chiropractic in New Jersey on January 27, 2009, but is not and never has been licensed to practice acupuncture in New Jersey. S. Lee was the principal and owner of Choice Total Pain, A Plus Therapy, The One Acupuncture, and Prime Total Pain, purported to perform many of the Fraudulent Services, and unlawfully referred Insureds to Fort Lee Pain and Prime Pain Management for many of the Fraudulent Services in exchange for unlawful compensation from Desai, Fort Lee Pain, and Prime Pain Management.

10.     Defendant Choice Total Pain is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Choice Total Pain was incorporated in New Jersey on or about December 20, 2011, was owned and controlled by S. Lee, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.     Defendant C. Lee resides in and is a citizen of New Jersey. C. Lee was licensed to practice acupuncture in New Jersey on November 9, 2015, and purported to perform many of the Fraudulent Services at Choice Total Pain.

12.     Defendant An resides in and is a citizen of New Jersey. Between December 13, 2005 and June 30, 2017, An was licensed to practice acupuncture in New Jersey. An purported to

perform many of the Fraudulent Services at Choice Total Pain. An's license to practice acupuncture expired on or about June 30, 2017.

13.     Defendant J. Park resides in and is a citizen of New Jersey. J. Park was licensed to practice acupuncture in New Jersey on February 10, 2012, and purported to perform many of the Fraudulent Services at Choice Total Pain.

14.     Defendant A Plus Therapy is a New Jersey physical therapy professional corporation with its principal place of business in New Jersey. A Plus Therapy was incorporated in New Jersey on or about August 1, 2014, was owned and controlled by S. Lee, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

15.     Defendant H. Lee resides in and is a citizen of New Jersey. H. Lee was licensed to practice physical therapy in New Jersey on August 9, 2014, and purported to perform many of the Fraudulent Services at A Plus Therapy.

16.     Defendant The One Acupuncture is a New Jersey acupuncture professional corporation with its principal place of business in New Jersey. The One Acupuncture was incorporated in New Jersey on or about March 3, 2014, was owned and controlled by S. Lee, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

17.     Defendant Hong resides in and is a citizen of New Jersey. Hong was licensed to practice acupuncture in New Jersey on January 7, 2013, and purported to perform many of the Fraudulent Services at The One Acupuncture.

18.     Defendant Prime Total Pain is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Prime Total Pain was organized in New Jersey on or about May 18, 2017, was owned and controlled by S. Lee, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

19.     Defendant Yoo resides in and is a citizen of New Jersey. Yoo was licensed to practice chiropractic in New Jersey on December 30, 2016, and purported to perform many of the Fraudulent Services at Prime Total Pain.

20.     Defendant J. Lee resides in and is a citizen of New Jersey. J. Lee was licensed to practice chiropractic in New Jersey on January 11, 2016, and purported to perform many of the Fraudulent Services at Prime Total Pain.

21.     Defendant Kim resides in and is a citizen of New Jersey. Kim was licensed to practice acupuncture in New Jersey on August 9, 2006, and purported to perform many of the Fraudulent Services at both Choice Total Pain and Prime Total Pain.

22.     Defendant Kang resides in and is a citizen of New York. Kang was licensed to practice acupuncture in New Jersey on July 25, 2006, and purported to perform many of the Fraudulent Services at Prime Total Pain.

23.     Defendant Yu resides in and is a citizen of New Jersey. Yu was licensed to practice acupuncture in New Jersey on May 8, 2014, and purported to perform many of the Fraudulent Services at Prime Total Pain.

24.     Defendant H. Park resides in and is a citizen of New Jersey. H. Park was licensed to practice physical therapy in New Jersey on August 8, 2000, and purported to perform many of the Fraudulent Services at Prime Total Pain.

25.     Defendant Desai resides in and is a citizen of New Jersey. Desai was licensed to practice medicine in New Jersey on September 21, 2011, was the principal and owner of Fort Lee Pain, and Prime Pain Management, purported to perform many of the Fraudulent Services, and unlawfully referred Insureds to Choice Total Pain, A Plus Therapy, The One Acupuncture,

and Prime Total Pain for many of the Fraudulent Services in exchange for unlawful compensation from S. Lee, Choice Total Pain, and Prime Total Pain.

26.     Defendant Fort Lee Pain is a New Jersey medical professional limited liability company with its principal place of business in New Jersey. Fort Lee Pain was organized in New Jersey on or about May 7, 2015, was owned and controlled by Desai, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

27.     Defendant Prime Pain Management is a New Jersey medical professional corporation with its principal place of business in New Jersey. Prime Pain Management was incorporated in New Jersey on or about May 18, 2017, was owned and controlled by Desai, and was used as a vehicle to submit fraudulent billing to GEICO and other insurers.

28.     Defendant Chong resides in and is a citizen of New Jersey. Chong was licensed as a nurse practitioner in New Jersey on May 11, 2018, and purported to perform many of the Fraudulent Services at Prime Pain Management.

**III.    Interstate, Zaitsev, Cliffside MRI, and the Davits**

29.     Although they have not been named as Defendants in this action, Interstate Multi-Specialty Medical Group, P.C. ("Interstate"), its owner Alexandr Zaitsev, M.D. ("Zaitsev"), Cliffside Park Imaging & Diagnostic Center, L.L.C. ("Cliffside MRI"), its owners, Samuel Davit, Michael Davit, and Esther Davit (collectively "the Davits"), and Alexander Dimeo ("Dimeo") are relevant to understanding the claims in this action.

**A.     Cliffside MRI and the Davits**

30.     Cliffside MRI is a New Jersey limited liability company that was licensed as an "ambulatory care facility", as that term is defined under N.J.A.C. 8:43A-1.3.

31.     Cliffside MRI was, at all relevant times, owned and/or controlled by the Davits.

32.     Before he became one of the owners of Cliffside MRI, Samuel Davit had been licensed to practice medicine in New Jersey. However, Samuel Davit's medical license was revoked in 2002 by the New Jersey State Board of Medical Examiners (the "Board of Medical Examiners"). The Board of Medical Examiners revoked Samuel Davit's license to practice medicine following an administrative complaint filed by the Attorney General of New Jersey, alleging that, from 1996 to 2002, Samuel Davit engaged in an extensive scheme to commit healthcare fraud.

33.     Specifically, Samuel Davit was alleged to have provided medically unnecessary tests, made representations regarding the results of those tests that were "grossly incompetent and/or fraudulent", issued improper diagnoses based on the purported "results" of those tests, and claimed to have performed tests that were not actually performed.

34.     Following a review of the allegations in the Attorney General's complaint, the Board of Medical Examiners revoked Samuel Davit's license to practice medicine in New Jersey, imposed civil penalties, costs, and fees totaling more than $100,000.00, and imposed numerous other penalties and restrictions on Samuel Davit.

35.     Cliffside MRI purported to radiology services, including x-rays and magnetic resonance imaging ("MRIs"), to GEICO Insureds, pursuant to referrals from other healthcare providers, including S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management.

36.     Cliffside MRI and the Davits' ability to bill GEICO and other New Jersey automobile insurers for radiology services depended on Cliffside MRI's ability to gain access to Insureds.

10

37.     Accordingly, the Davits and Cliffside MRI devised a fraudulent kickback and referral scheme whereby they would pay illegal kickbacks to healthcare providers – including, upon information and belief, S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management – in exchange for patient referrals to Cliffside MRI.

38.     The payment of kickbacks in exchange for patient referrals was the regular way in which the Davits operated Cliffside MRI. For example, on or about May 20, 2016, in a case entitled State of New Jersey v. Alexander Dimeo, Docket Nos. 16-05-000251 and 16-05-000252, a chiropractor named Alexander Dimeo, D.C. ("Dimeo") pleaded guilty to various insurance fraud-related crimes. As part of his plea agreement, Dimeo provided sworn testimony regarding his receipt of kickbacks from various healthcare providers in New Jersey, including Cliffside MRI and Samuel Davit.

39.     Specifically, Dimeo testified that, from 2009 to late 2015, he received kickbacks from Samuel Davit in the amount of $100.00 for each patient whom he referred to Cliffside MRI or another MRI facility owned by the Davits, Ironbound M.R.I., L.L.C. ("Ironbound MRI"). Dimeo further testified that the aggregate amount of the kickbacks was approximately $50,000.00.

  (i)    In 2009, Dimeo was approached by Samuel Davit and Michael Davit, who offered to pay Dimeo $100.00 each time Dimeo referred a patient to Cliffside MRI or Ironbound MRI for an MRI.

  (ii)   Between 2009 and 2015, Dimeo referred patients to Cliffside MRI or Ironbound MRI in exchange for kickbacks from Samuel Davit, Michael Davit, Cliffside MRI, and Ironbound MRI.

  (iii)  Samuel Davit would deliver the kickbacks to Dimeo on a monthly basis, in the form of $100.00 bills contained in an envelope.

  (iv)   All told, between 2009 and 2015, Samuel Davit, Michael Davit, Cliffside MRI, and Ironbound MRI paid Dimeo approximately $50,000.00 in kickbacks in exchange for patient referrals to Cliffside MRI and Ironbound MRI.

**B.**     **Interstate and Zaitsev**

40.     Interstate is a New Jersey medical professional corporation owned and operated by Zaitsev.

41.     Interstate and Zaitsev's ability to bill GEICO and other New Jersey automobile insurers for radiology services depended on Interstate's ability to gain access to Insureds.

42.     Accordingly, Interstate and Zaitsev devised a fraudulent kickback and referral scheme whereby they would pay illegal kickbacks to healthcare providers – including, upon information and belief, S. Lee, Choice Total Pain, and Prime Total Pain  – in exchange for patient referrals to Interstate.

43.     The payment of kickbacks in exchange for patient referrals was the regular way in which Zaitsev operated Interstate. For instance, as part of Dimeo's plea allocution, Dimeo also provided sworn testimony indicating that Zaitsev had caused kickback payments to be made to him in exchange for patient referrals to Interstate.

44.     In particular, Dimeo testified that, beginning in 2012, Zaitsev directed an intermediary to provide between $150.00 and $250.00 per patient to Dimeo in exchange for patient referrals to Interstate.

45.     All told, Dimeo testified that he accepted more than $37,000.00 in kickbacks from Zaitsev in exchange for patient referrals between 2012 and 2015.

<u>**JURISDICTION AND VENUE**</u>

46.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

47.    This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

48.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

49.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.    An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.    The New Jersey No-Fault Laws**

50.    New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

51.    Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA–1500 form").

**B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice**

52.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

53.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at *4 – *5 (App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515–519 (App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the State Board Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

54.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all relevant laws and

regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs.,

supra; Orthopedic Evaluations, Inc., supra.

55.     By extension, insurers such as GEICO are not obligated to make any payments of

PIP Benefits to healthcare services providers that are not in compliance with all applicable

statutory and regulatory requirements governing healthcare practice in New Jersey.

56.     Furthermore, insurers such as GEICO are not obligated to make any payments of

PIP Benefits for healthcare services that are not rendered in compliance with all applicable

statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.     Pertinent New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

57.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or

receiving compensation, either directly or indirectly, in exchange for patient referrals.

58.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a healthcare service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the healthcare service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

59.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed

broadly to effectuate its remedial intent."

60.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

> A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space.

61.     Similarly, pursuant to N.J.A.C. 13:44E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

62.     Therefore, physicians, chiropractors, medical practices, and chiropractic practices that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

## D.     New Jersey Law Prohibiting Self-Referrals

63.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a healthcare practice in which they have a "significant beneficial interest".

64.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest ….

65.     Pursuant to N.J.S.A. 45:9–22.4:

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health care agency, rehabilitation facility, nursing home, hospital, or a facility

which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

66. However, pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

67. Chiropractors and chiropractic practices in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

**E.   No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

68. Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

69. Pursuant to N.J.S.A. 39:6A–2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)      is not primarily for the convenience of the injured person or provider;

(ii)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)    does not involve unnecessary diagnostic testing.

70.     Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3–4.6.

71.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)      cervical spine strains, sprains, and contusions;

(ii)     cervical herniated disks or radiculopathies;

(iii)    thoracic spine strains, sprains, and contusions;

(iv)     thoracic herniated disks or radiculopathies;

(v)      lumbar–sacral spine strains, sprains, and contusions; and

(vi)     lumbar–sacral herniated disks or radiculopathies.

72.     The Care Paths generally provide for an initial, four–week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

73.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

74.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**F.      The Fee Schedule and Current Procedural Terminology Codes**

75.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

76.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

77.     The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

78.     The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

79.     Additionally, healthcare providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

80.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3–29.4.

81.     With respect to unbundling, N.J.A.C. 11:3–29.4 provides that:

Artificially separating or partitioning what is inherently one total Procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

82.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

83.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the Procedure represents a 'separate Procedure.' The inclusion of this statement indicates that the Procedure, while possible to perform separately, is generally included in a more comprehensive Procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

**G.     New Jersey Law Regarding the Ownership and Corporate Structure of Acupuncture Practices**

84.     Under New Jersey law, acupuncture professional corporations may be owned only by individuals "duly licensed or otherwise legally authorized to render" acupuncture services. See N.J.S.A.14A:17-10(a).

85.     Under New Jersey law, besides licensed acupuncturists, only licensed physicians and licensed dentists are permitted to practice acupuncture in New Jersey, and even then only if they have completed an extensive course of study in acupuncture. See N.J.S.A. 45:2C-7-8.

86.     Chiropractors are not duly licensed or otherwise legally authorized to practice acupuncture in New Jersey and, by extension, may not own acupuncture professional corporations. See id.

87.     Therefore, an acupuncture professional corporation that unlawfully is owned by a chiropractor is ineligible to receive PIP benefits.

**H.     The New Jersey Insurance Fraud Prevention Act**

88.     New Jersey has a strong public policy against insurance fraud. This policy is

manifested in a series of statutes, including the Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A–1 et seq. A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A–4.

89. A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

90. Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A–7(a).

91. A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A–7(b).

92. The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A–3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A–3.

II.     **The Defendants' Fraudulent Scheme**

93.     Beginning in 2012, and continuing through the present day, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed GEICO millions of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services.

A.      **The One Acupuncture's Illegal Corporate Structure**

94.     As set forth above, insurers such as GEICO are not obligated to make any payments of PIP Benefits to acupuncture professional corporations that are unlawfully owned by chiropractors without acupuncture licenses.

95.     On or about March 3, 2014, S. Lee caused The One Acupuncture to be incorporated in New Jersey as an acupuncture professional corporation, despite his lack of an acupuncture license.

96.     Thereafter, S. Lee operated The One Acupuncture as an acupuncture practice that purported to provide acupuncture services to automobile accident victim patients in New Jersey.

97.     S. Lee – a chiropractor – was never duly licensed or otherwise legally authorized to practice acupuncture in New Jersey.

98.     Between March 2014 and January 2016, S. Lee and The One Acupuncture billed GEICO hundreds of thousands of dollars for Fraudulent Services purportedly provided through The One Acupuncture, and GEICO paid S. Lee and The One Acupuncture at least $100,000.00 in reliance on those charges, despite the fact that – during this period – The One Acupuncture had S. Lee, a chiropractor not licensed or legally authorized to practice acupuncture, as its sole owner.

99.     All the billing that S. Lee and The One Acupuncture submitted to GEICO through The One Acupuncture falsely represented that The One Acupuncture and the underlying Fraudulent Services were in compliance with all applicable statutory and regulatory requirements

governing healthcare practice in New Jersey.

100.    In fact, neither The One Acupuncture nor the Fraudulent Services billed through The One Acupuncture to GEICO were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, because The One Acupuncture – an acupuncture professional corporation – had a S. Lee, a chiropractor not licensed or legally authorized to practice acupuncture, as its sole owner.

**B.      The Illegal Kickback and Referral Schemes**

**1.      The Illegal Referrals to Cliffside MRI**

101.    As set forth above, chiropractors and physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

102.    Even so, S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management received illegal kickbacks in exchange for patient referrals to Cliffside MRI.

103.    For example, and as set forth above, the payment of kickbacks in exchange for patient referrals to Cliffside MRI was the regular way in which the Davits operated Cliffside MRI.

104.    In fact, one chiropractor who referred patients to Cliffside MRI, namely Dimeo, already pleaded guilty to various insurance fraud-related crimes and – in his plea allocution and in a subsequent, April 28, 2018 affidavit – swore that he received tens of thousands of dollars in kickbacks from Samuel Davit and Michael Davit in exchange for patient referrals to Cliffside MRI over the course of at least three years.

105.     S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management were among the healthcare services providers who received illegal kickbacks from the Davits in exchange for patient referrals to Cliffside MRI.

106.     The amount of kickbacks that the Davits paid to S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management was based on the volume of patients that S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management referred to Cliffside MRI.

107.     In exchange for kickbacks from the Davits, S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management routinely referred patients to Cliffside MRI for MRI services, regardless of the Insureds' individual symptoms or presentation.

108.     Because S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management received illegal kickbacks in exchange for patient referrals, they never were eligible to collect PIP Benefits from GEICO and other insurers.

109.     Even so, in each of the claims identified in Exhibits "1", "4", "5", and "6", S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management falsely represented that S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits, when in fact they were not.

110.     What is more, in each of the claims identified in Exhibits "1", "4", "5", and "6", S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management fraudulently concealed the fact that they received kickbacks in exchange for patient referrals,

thereby rendering S. Lee, Choice Total Pain, Prime Total Pain, Desai, Fort Lee Pain, and Prime Pain Management ineligible for PIP reimbursement.

**2.      The Illegal Referrals to Interstate**

111.     Similarly, S. Lee, Choice Total Pain, and Prime Total Pain received kickbacks in exchange for patient referrals to Interstate.

112.     For example, and as set forth above, the payment of kickbacks in exchange for patient referrals to Interstate was the regular way in which Zaitsev operated Interstate.

113.     Indeed, and as set forth above, Dimeo swore that he received tens of thousands of dollars in kickbacks from Zaitsev in exchange for patient referrals.

114.     The amount of kickbacks that Zaitsev caused to be paid to S. Lee, Choice Total Pain, and Prime Total Pain was based on the volume of patients that S. Lee, Choice Total Pain, and Prime Total Pain referred to Interstate.

115.     In exchange for kickbacks from Zaitsev, S. Lee, Choice Total Pain, and Prime Total Pain routinely referred patients to Interstate, regardless of the Insureds' individual symptoms or presentation.

116.     Because S. Lee, Choice Total Pain, and Prime Total Pain received illegal kickbacks in exchange for patient referrals, they never were eligible to collect PIP Benefits from GEICO and other insurers.

117.     Even so, in each of the claims identified in Exhibits "1", and "4", S. Lee, Choice Total Pain, and Prime Total Pain falsely represented that S. Lee, Choice Total Pain, and Prime Total Pain were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits, when in fact they were not.

118.    What is more, in each of the claims identified in Exhibits "1" and "4", "S. Lee, Choice Total Pain, and Prime Total Pain fraudulently concealed the fact that they received kickbacks in exchange for patient referrals, thereby rendering S. Lee, Choice Total Pain, and Prime Total Pain ineligible for PIP reimbursement.

**3.     The Payment and Receipt of Unlawful Compensation in Exchange for Patient Referrals Between and Among the Defendants**

119.    In order to bill GEICO and other automobile insurers for initial examinations, follow up examinations, EDX testing, and pain management injections, Desai, Chong, Fort Lee Pain, and Prime Pain Management needed to obtain patient referrals from other healthcare providers.

120.    At the same time, S. Lee, Hong, Yoo, J. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain wanted to submit as much billing as possible to GEICO and other insurers, without regard for whether the underlying chiropractic, physical therapy, and acupuncture treatment services were medically necessary.

121.    However, to the extent that the Insureds in the claims set forth in Exhibits "1" – "6" suffered any injuries at all in their automobile accidents, they virtually always were garden-variety soft tissue injuries such as sprains or strains.

122.    Ordinary soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths require healthcare services providers to demonstrate why continued treatment is necessary beyond the four–week, eight–week, and 13–week marks.

123.    As a result, S. Lee, Hong, Yoo, J. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain knew that their ability to submit and obtain payment on large amounts of chiropractic, physical therapy and acupuncture billing to GEICO and other automobile insurers

would be limited by the Care Paths, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic, physical therapy, and/or acupuncture services beyond the first four or eight weeks of treatment, much less the 13–week mark.

124.    S. Lee, Hong, Yoo, J. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain also knew that – pursuant to the Care Paths – it would be much easier for them to obtain payment on large amounts of No-Fault insurance billing for medically unnecessary chiropractic, physical therapy and/or acupuncture services if a licensed physician or physicians were to: (i) generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains; and/or (ii) recommend the continued provision of chiropractic, physical therapy, and/or acupuncture treatment services beyond the first four, eight, or 13 weeks of treatment.

125.    Accordingly, S. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain entered into a secret agreement with Desai, Fort Lee Pain, and Prime Pain Management, whereby S. Lee, Hong, Yoo, J. Lee,  Choice Total Pain, The One Acupuncture, and Prime Total Pain would refer Insureds to Desai, Chong, Fort Lee Pain, and Prime Pain Management for expensive and medically unnecessary examinations, EDX testing, and pain management injections, despite the Insureds' total lack of any genuine presenting problems that would warrant the examinations, EDX testing, and pain management injections.

126.    In exchange for the medically unnecessary referrals, Desai, Fort Lee Pain, and Prime Pain Management paid unlawful compensation to S. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain.

127.    The unlawful compensation was provided in the form of: (i) ostensibly legitimate payments to "lease" space and personnel at Choice Total Pain, The One Acupuncture, and Prime

Total Pain's offices, actually were disguised kickbacks paid in exchange for patient referrals; and (ii) return referrals back from Desai, Chong, Fort Lee Pain, and Prime Pain Management to Choice Total Pain, The One Acupuncture, and Prime Total Pain for the continued provision of medically unnecessary chiropractic, physical therapy, and acupuncture treatment services.

128.    In reality, these were "pay–to–play" arrangements that caused S. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain provide access to Insureds and to refer Insureds to Desai, Chong, Fort Lee Pain, and Prime Pain Management for medically unnecessary examinations, EDX testing, and pain management injections.

129.    In keeping with the fact that Desai, Chong, Fort Lee Pain, and Prime Pain Management's return referrals to Choice Total Pain, The One Acupuncture, and Prime Total Pain were not predicated on medical necessity, and in fact constituted unlawful compensation to S. Lee, Choice Total Pain, The One Acupuncture, and Prime Total Pain for the initial referrals of the Insureds, S. Lee, Hong, Yoo, J. Lee,  Choice Total Pain, The One Acupuncture, Prime Total Pain, Desai, Chong, Fort Lee Pain, and Prime Pain Management's own records indicated that the prior chiropractic, physical therapy, and/or acupuncture treatment services had not been effective in resolving the Insureds' supposed complaints.

130.    For example:

(i)      On November 30, 2014, an Insured named HJ was involved in an automobile accident. Thereafter, HJ sought treatment from S. Lee, Choice Total Pain, Hong, and The One Acupuncture, who provided HJ with chiropractic, physical therapy, and acupuncture treatment between December 2014 and July 2015. In July 2015, S. Lee, Choice Total Pain, Hong, and The One Acupuncture caused HJ to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on July 22, 2015, Desai purported to examine HJ on behalf of Fort Lee Pain. In her July 22, 2015 examination report, Desai falsely contended that HJ continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – HJ had received more than seven months of chiropractic, physical therapy, and acupuncture services from S. Lee, Choice Total Pain, Hong, and The

One Acupuncture. Though the chiropractic and acupuncture treatment that S. Lee, Choice Total Pain, Hong, and The One Acupuncture purportedly had provided supposedly had been ineffective in resolving HJ's putative symptoms, Desai nonetheless referred HJ back to S. Lee, Choice Total Pain, Hong, and The One Acupuncture for continued chiropractic, physical therapy, and acupuncture treatment at the conclusion of the July 22, 2015 – nearly eight months after the accident, and long after any legitimate symptoms HJ may have experienced had resolved. The medically unnecessary return referral to Choice Total Pain and The One Acupuncture was unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(ii)    On November 30, 2014, an Insured named JK was involved in an automobile accident. Thereafter, JK sought treatment from S. Lee, Choice Total Pain, Hong, and The One Acupuncture, who provided JK with chiropractic, physical therapy treatment, and acupuncture between December 2015 and July 2015. In July 2015, S. Lee, Choice Total Pain, Hong, and The One Acupuncture caused HJ to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on July 22, 2015, Desai purported to examine JK on behalf of Fort Lee Pain. In her on July 22, 2015 examination report, Desai falsely contended that JK continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – JK had received more than seven months of chiropractic, physical therapy treatment, and acupuncture services from S. Lee, Choice Total Pain, Hong, and The One Acupuncture. Though the chiropractic, physical therapy treatment, and acupuncture treatment that S. Lee, Choice Total Pain, Hong, and The One Acupuncture purportedly had provided supposedly had been ineffective in resolving JK's putative symptoms, Desai nonetheless referred JK back to S. Lee, Choice Total Pain, Hong, and The One Acupuncture for continued chiropractic, physical therapy treatment, and acupuncture treatment at the conclusion of the July 22, 2015 examination, as well as the conclusion of follow-up examinations on August 5, 2015, September 9, 2015, October 7, 2015, and November 25, 2015. This, despite the fact that the return referrals to S. Lee, Choice Total Pain, Hong, and The One Acupuncture occurred between eight months and one year after the accident, long after any legitimate symptoms JK may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain and The One Acupuncture were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(iii)   On January 30, 2015, an Insured named YC was involved in an automobile accident. Thereafter, YC sought treatment from S. Lee, Choice Total Pain, Hong, and The One Acupuncture, who provided YC with chiropractic, physical therapy, and acupuncture treatment between October 2015 and October 2015. In October 2015, S. Lee, Choice Total Pain, Hong, and The One Acupuncture caused YC to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on

October 7, 2015, Desai purported to examine YC on behalf of Fort Lee Pain. In her October 7, 2015 examination report, Desai falsely contended that YC continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – YC had received more than two months of chiropractic, physical therapy treatment, and acupuncture services from S. Lee, Choice Total Pain, Hong, and The One Acupuncture. Though the chiropractic, physical therapy treatment, and acupuncture treatment that S. Lee, Choice Total Pain, Hong, and The One Acupuncture purportedly had provided supposedly had been ineffective in resolving YC's putative symptoms, Desai nonetheless referred YC back to S. Lee, Choice Total Pain, Hong, and The One Acupuncture for continued chiropractic, physical therapy treatment, and acupuncture treatment at the conclusion of the October 7, 2015 examination, as well as the conclusion of follow-up examinations on November 18, 2015, December 18, 2015, and January 20, 2016. This, despite the fact that the return referrals to S. Lee, Choice Total Pain, Hong, and The One Acupuncture occurred between nine and eleven months after the accident, long after any legitimate symptoms YC may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain and The One Acupuncture were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(iv)     On December 24, 2014, an Insured named SL was involved in an automobile accident. Thereafter, SL sought treatment from S. Lee and Choice Total Pain, who provided SL with chiropractic and physical therapy treatment between March 2015 and June 2015. In June 2015, S. Lee and Choice Total Pain caused SL to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on June 10, 2015, Desai purported to examine SL on behalf of Fort Lee Pain. In her June 10, 2015 examination report, Desai falsely contended that SL continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – SL had received more than three months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving SL's putative symptoms, Desai nonetheless referred SL back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the June 10, 2015 examination, as well as at the conclusion of follow-up examinations on July 8, 2015, September 25, 2015, December 18, 2015, February 24, 2016, March 4, 2016, June 29, 2016, and July 24, 2016. This, despite the fact that the return referrals back to S. Lee and Choice Total Pain occurred between six and 18 months after the accident, and long after any legitimate symptoms SL may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(v)     On January 16, 2015, an Insured named JL was involved in an automobile accident. Thereafter, JL sought treatment from S. Lee, Choice Total Pain, Hong, and The One Acupuncture who provided JL with chiropractic, physical therapy, and acupuncture treatment between March 2015 and June 2015. In June 2015, S. Lee, Choice Total Pain, Hong, and The One Acupuncture caused JL to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on June 10, 2015, Desai purported to examine JL on behalf of Fort Lee Pain. In her June 10, 2015 examination report, Desai falsely contended that JL continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – JL had received more than five months of chiropractic, physical therapy, and acupuncture services from S. Lee, Choice Total Pain, Hong, and The One Acupuncture. Though the chiropractic, physical therapy, and acupuncture treatment that S. Lee, Choice Total Pain, Hong, and The One Acupuncture purportedly had provided supposedly had been ineffective in resolving JL's putative symptoms, Desai nonetheless referred JL back to S. Lee, Choice Total Pain, Hong, and The One Acupuncture for continued chiropractic, physical therapy, and acupuncture treatment at the conclusion of the June 10, 2015 examination, as well as examinations on June 24, 2015, and August 12, 2015. This, despite the fact that the return referrals to S. Lee, Choice Total Pain, Hong, and The One Acupuncture occurred between four and six months after the accident, long after any legitimate symptoms JL may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain and The One Acupuncture were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(vi)    On February 19, 2015, an Insured named EK was involved in an automobile accident. Thereafter, EK sought treatment from S. Lee and Choice Total Pain, who provided EK with chiropractic and physical therapy treatment between March 2015 and November 2015. In November 2015, S. Lee and Choice Total Pain caused EK to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on November 11, 2015, Desai purported to examine EK on behalf of Fort Lee Pain. In her November 11, 2015, examination report, Desai falsely contended that EK continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – EK had received more than eight months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving EK's putative symptoms, Desai nonetheless referred EK back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of on November 11, 2015 examination, as well as at the conclusion of a follow-up examination on November 25, 2015. This despite the fact that the return referrals back to S. Lee and Choice Total Pain occurred nine months after the accident, long after any legitimate symptoms EK may have experienced as the result of the accident had resolved. These medically

31

unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(vii)    On March 3, 2015, an Insured named YL was involved in an automobile accident. Thereafter, YL sought treatment from S. Lee, Choice Total Pain, Hong, and The One Acupuncture, who provided YL with chiropractic, physical therapy, and acupuncture treatment between March 2015 and June 2015. In June 2015, S. Lee, Choice Total Pain, Hong, and The One Acupuncture caused YL to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on June 10, 2015 Desai purported to examine YL on behalf of Fort Lee Pain. In her June 10, 2015 examination report, Desai falsely contended that YL continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – YL had received more than three months of chiropractic, physical therapy, and acupuncture services from S. Lee, Choice Total Pain, Hong, and The One Acupuncture. Though the chiropractic and physical therapy treatment that S. Lee, Choice Total Pain, Hong, and The One Acupuncture purportedly had provided supposedly had been ineffective in resolving YL's putative symptoms, Desai nonetheless referred YL back to S. Lee, Choice Total Pain, Hong, and The One Acupuncture for continued chiropractic, physical therapy, and acupuncture treatment at the conclusion of the June 10, 2015 examination, as well as at the conclusion of follow-up examinations on July 8, 2015 and September 25, 2015. This despite the fact that the return referrals to S. Lee, Choice Total Pain, Hong, and The One Acupuncture occurred between three and six months after the accident, long after any legitimate symptoms YL may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain and The One Acupuncture were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(viii)    On April 23, 2016, an Insured named JL was involved in an automobile accident. Thereafter, JL sought treatment from S. Lee and Choice Total Pain, who provided JL with chiropractic and physical therapy treatment between April 2016 and July 2016. In July 2016, S. Lee and Choice Total Pain caused JL to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on July 20, 2016, Desai purported to examine JL on behalf of Fort Lee Pain. In her July 20, 2016 examination report, Desai falsely contended that JL continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – JL had received more than three months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving JL's putative symptoms, Desai nonetheless referred JL back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the July 20, 2016 examination, as well as at the conclusion of follow-up examinations on August 24, 2016 and September 21, 2016. This despite the fact that the return referral to

S. Lee and Choice Total Pain occurred between three and five months after the accident, long after any legitimate symptoms JL may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(ix)     On September 17, 2016, an Insured named BC was involved in an automobile accident. Thereafter, BC sought treatment from S. Lee and Choice Total Pain, who provided BC with chiropractic and physical therapy treatment between September 2016 and February 2016. In February 2016, S. Lee and Choice Total Pain caused BC to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on February 8, 2017, Desai purported to examine BC on behalf of Fort Lee Pain. In her February 8, 2017 examination report, Desai falsely contended that BC continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – BC had received more than five months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving BC's putative symptoms, Desai nonetheless referred BC back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the February 8, 2017 examination, as well as the conclusion of follow-up examinations on February 22, 2017, March 22, 2017, May 3, 2017, and June 21, 2017. This, despite the fact that the return referrals to S. Lee and Choice Total Pain occurred between five and nine months after the accident, long after any legitimate symptoms BC may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(x)      On March 25, 2017, an Insured named TL was involved in an automobile accident. Thereafter, TL sought treatment from S. Lee and Choice Total Pain, who provided TL with chiropractic and physical therapy treatment between March 2017 and May 2017. In May 2017, S. Lee and Choice Total Pain caused TL to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on May 31, 2017, Desai purported to examine TL on behalf of Fort Lee Pain. In her May 31, 2017 examination report, Desai falsely contended that TL continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – TL had received more than two months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving TL's putative symptoms, Desai nonetheless referred TL back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the May 31, 2017 examination, as well as the conclusion of follow-

up examinations on June 21, 2017 and December 20, 2017. This, despite the fact that the return referrals to S. Lee and Choice Total Pain occurred between two and nine months after the accident, long after any legitimate symptoms TL may have experienced had resolved. These medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(xi)  On April 27, 2017, an Insured named MK was involved in an automobile accident. Thereafter, MK sought treatment from S. Lee and Choice Total Pain, who provided MK with chiropractic and physical therapy treatment between April 2017 and August 2017. In August 2017, S. Lee and Choice Total Pain caused MK to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on August 9, 2017, Desai purported to examine MK on behalf of Fort Lee Pain. In her August 9, 2017 examination report, Desai falsely contended that MK continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – MK had received more than four months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving MK's putative symptoms, Desai nonetheless referred MK back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the August 9, 2017 examination, as well as on the follow-up examination on August 23, 2017. This, despite the fact that the return referrals to S. Lee and Choice Total Pain occurred four months after the accident, long after any legitimate symptoms MK may have experienced had resolved. These medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(xii)  On May 15, 2017, an Insured named XS was involved in an automobile accident. Thereafter, XS sought treatment from S. Lee and Choice Total Pain, who provided XS with chiropractic and physical therapy treatment between May 2017 and September 2017. In September 2017, S. Lee and Choice Total Pain caused XS to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on September 20, 2017, Desai purported to examine XS on behalf of Fort Lee Pain. In her September 20, 2017 examination report, Desai falsely contended that XS continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – XS had received more than six months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving XS's putative symptoms, Desai nonetheless referred XS back to S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the September 20, 2017 examination, as well as the conclusion of follow-up examinations on October 11, 2017 and December 6,

2017. This, despite the fact that the return referrals to S. Lee and Choice Total Pain occurred between four and seven months after the accident, long after any legitimate symptoms XS may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(xiii)   On April 10, 2017, an Insured named WK was involved in an automobile accident. Thereafter, WK sought treatment from Kang, Yoo, and Prime Total Pain, who provided WK with chiropractic, physical therapy, and acupuncture treatment between June 2017 and October 2017. In October 2017, S. Lee, Kang, Yoo, and Prime Total Pain caused WK to be referred to Prime Pain Management in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain. Thereafter, on October 2, 2017, Desai purported to examine WK on behalf of Prime Pain Management. In her October 2, 2017 examination report, Desai falsely contended that WK continued to suffer from high levels of pain the result of her accident, despite the fact that – by that point – WK had received more than three months of chiropractic, physical therapy, and acupuncture services from Kang, Yoo, and Prime Total Pain. Though the chiropractic, physical therapy, and acupuncture treatment that Kang, Yoo, and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving WK's putative symptoms, Desai nonetheless referred WK back to Kang, Yoo, and Prime Total Pain for continued chiropractic, physical therapy, and acupuncture treatment at the conclusion of the October 2, 2017 examination – nearly six months after the accident, and long after any legitimate symptoms WK may have experienced had resolved. This medically unnecessary return referral to Prime Total Pain was unlawful compensation for the initial, medically unnecessary referral to Prime Pain Management.

(xiv)   On June 6, 2017, an Insured named HO was involved in an automobile accident. Thereafter, HO sought treatment from S. Lee and Choice Total Pain, who provided HO with chiropractic and physical therapy treatment between June 2017 and September 2017. In September 6, 2017, S. Lee and Choice Total Pain caused HO to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Fort Lee Pain provided to S. Lee and Choice Total Pain. Thereafter, on September 6, 2017, Desai purported to examine HO on behalf of Fort Lee Pain. In her September 6, 2017 examination report, Desai falsely contended that HO continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – HO had received more than two months of chiropractic and physical therapy services from S. Lee and Choice Total Pain. Though the chiropractic and physical therapy treatment that S. Lee and Choice Total Pain purportedly had provided supposedly had been ineffective in resolving HO's putative symptoms, Desai nonetheless referred IK back to from S. Lee and Choice Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the September 6, 2017 examination, as well as

examinations on October 11, 2017, and November 8, 2017. This, despite the fact that the return referrals to S. Lee and Choice Total Pain occurred between three and five months after the accident, long after any legitimate symptoms HO may have experienced as the result of the accident had resolved. The medically unnecessary return referrals to Choice Total Pain were unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(xv)  On October 29, 2017, an Insured named HK was involved in an automobile accident. Thereafter, HK sought treatment from S. Lee, Yoo, and Prime Total Pain, who provided HK with chiropractic and physical therapy treatment between November 2017 and February 2018. In February 2018, S. Lee, Yoo, and Prime Total Pain caused HK to be referred to Fort Lee Pain in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain.  Thereafter, on February 5, 2018, Desai purported to examine HK on behalf of Prime Pain Management. In her February 5, 2018 examination report, Desai falsely contended that HK continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – HK had received more than two months of chiropractic and physical therapy services from S. Lee, Yoo, and Prime Total Pain. Though the chiropractic and physical therapy treatment that S. Lee, Yoo, and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving HK's putative symptoms, Desai nonetheless referred HK back to S. Lee, Yoo, and Prime Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the February 5, 2018 examination – more than three months after the accident, and long after any legitimate symptoms HK may have experienced had resolved. This medically unnecessary return referral to Prime Total Pain was unlawful compensation for the initial, medically unnecessary referral to Fort Lee Pain.

(xvi)  On November 14, 2017, an Insured named SH was involved in an automobile accident. Thereafter, SH sought treatment from Yoo, Kang, and Prime Total Pain, who provided SH with chiropractic, physical therapy, and acupuncture treatment between November 2017 and March 2018. In March 2018, S. Lee, Yoo, Kang, and Prime Total Pain caused SH to be referred to Prime Pain Management in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain.  Thereafter, on March 5, 2018, Desai purported to examine SH on behalf of Prime Pain Management. In her March 5, 2018 examination report, Desai falsely contended that SH continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – SH had received more than three months of chiropractic, physical therapy, and acupuncture services from Yoo, Kang, and Prime Total Pain. Though the chiropractic, physical therapy, and acupuncture treatment that Yoo, Kang and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving SH's putative symptoms, Desai nonetheless referred SH back to Yoo, Kang, and Prime Total Pain continued chiropractic, physical therapy, and acupuncture treatment at the conclusion of the March 5, 2018 examination, as well as the conclusion of follow-up examinations on April 2,

2018, and September 12, 2018. This, despite the fact that the return referrals to Prime Total Pain occurred between four and nine months after the accident, long after any legitimate symptoms SH may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Prime Total Pain were unlawful compensation for the initial, medically unnecessary referral to Prime Pain Management.

(xvii)   On November 17, 2017, an Insured named MY was involved in an automobile accident. Thereafter, MY sought treatment from Yoo and Prime Total Pain, who provided MY with chiropractic and physical therapy treatment between December 2017 and April 2018. In April 2018, S. Lee, Yoo, and Prime Total Pain caused MY to be referred to Prime Pain Management in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain. Thereafter, on April 30, 2018, Desai purported to examine MY on behalf of Prime Pain Management. In her April 30, 2018 examination report, Desai falsely contended that MY continued to suffer from high levels of pain as the result of her accident, despite the fact that – by that point – MY had received more than four months of chiropractic and physical therapy services from Yoo and Prime Total Pain. Though the chiropractic and physical therapy treatment that Yoo and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving MY's putative symptoms, Desai nonetheless referred MY back to Yoo and Prime Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the April 30, 2018 examination, as well as at the conclusion of a follow-up examination on May 14, 2018. This, despite the fact that the return referrals to Prime Total Pain occurred between five and six months after the accident, long after any legitimate symptoms MY may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Prime Total Pain were unlawful compensation for the initial, medically unnecessary referral to Prime Pain Management.

(xviii)   On June 10, 2018, an Insured named SR was involved in an automobile accident. Thereafter, SR sought treatment from S. Lee, Yoo, and Prime Total Pain, who provided SR with chiropractic and physical therapy treatment between June 2018 and October 2018. In October 2018, S. Lee, Yoo, and Prime Total Pain caused HK to be referred to Prime Pain Management in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain. Thereafter, on October 3, 2018, Chong purported to examine HK on behalf of Fort Lee Pain. In her October 3, 2018 examination report, Chong falsely contended that SR continued to suffer from high levels of pain as the result of his accident, despite the fact that – by that point – SR had received more than three months of chiropractic and physical therapy services from S. Lee, Yoo, and Prime Total Pain. Though the chiropractic and physical therapy treatment that S. Lee, Yoo, and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving SR's putative symptoms, Chong – at Desai's direction – nonetheless referred SR back to S. Lee, Yoo, and Prime Total Pain for continued

chiropractic and physical therapy treatment at the conclusion of the October 3, 2018 examination – nearly four months after the accident, long after any legitimate symptoms SR may have experienced as the result of the accident had resolved. These medically unnecessary return referrals to Prime Total Pain were unlawful compensation for the initial, medically unnecessary referral to Prime Pain Management.

(xix)   On August 4, 2018, an Insured named HC was involved in an automobile accident. Thereafter, HC sought treatment from S. Lee, Yoo, and Prime Total Pain, who provided HC with chiropractic, physical therapy, and acupuncture treatment between August 2018 and October 2018. In October 2018, S. Lee, Yoo, and Prime Total Pain caused HC to be referred to Prime Pain Management in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain. Thereafter, on October 17, 2018, Chong purported to examine HC on behalf of Prime Pain Management. In her October 17, 2018 examination report, Chong falsely contended that HC continued to suffer from high levels of pain the result of his accident, despite the fact that – by that point – HC had received more than two months of chiropractic, physical therapy, and acupuncture services from S. Lee, Yoo, and Prime Total Pain. Though the chiropractic, physical therapy, and acupuncture treatment that Yoo and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving HC's putative symptoms, Chong – at Desai's direction – nonetheless referred HC back to Yoo and Prime Total Pain for continued chiropractic, physical therapy, and acupuncture treatment at the conclusion of the October 17, 2018 examination. This medically unnecessary return referral to Prime Total Pain was unlawful compensation for the initial, medically unnecessary referral to Prime Pain Management.

(xx)   On September 15, 2018, an Insured named IK was involved in an automobile accident. Thereafter, IK sought treatment from J. Lee, Yoo, and Prime Total Pain, who provided IK with chiropractic and physical therapy treatment between September 2018 and December 2018. In December 2018, S. Lee, J. Lee, Yoo, and Prime Total Pain caused IK to be referred to Prime Pain Management in exchange for the purported "rent" payments that Desai and Prime Pain Management provided to S. Lee and Prime Total Pain. Thereafter, on December 12, 2018, Chong purported to examine IK on behalf of Prime Pain Management. In her December 12, 2018 examination report, Chong falsely contended that IK continued to suffer from high levels of neck pain, shoulder, and back as the result of his accident, despite the fact that – by that point – IK had received more than two months of chiropractic and physical therapy services from J. Lee, Yoo, and Prime Total Pain. Though the chiropractic and physical therapy treatment that J. Lee, Yoo, and Prime Total Pain purportedly had provided supposedly had been ineffective in resolving IK's putative symptoms, Chong – at Desai's direction – nonetheless referred IK back to from J. Lee, Yoo, and Prime Total Pain for continued chiropractic and physical therapy treatment at the conclusion of the December 12, 2018 examination. This medically unnecessary return referral to

Prime Total Pain was unlawful compensation for the initial, medically unnecessary referral to Prime Pain Management.

131.    These are only representative examples. In the claims identified in Exhibits "1" – "6", ", S. Lee, Hong, Yoo, J. Lee, Choice Total Pain, The One Acupuncture, Prime Total Pain routinely referred Insureds to Fort Lee Pain and Prime Pain Management, or caused them to be referred, in exchange for unlawful compensation from Fort Lee Pain, and Prime Pain Management.

132.    In the claims identified in Exhibits "1" – "6", S. Lee, Hong, Yoo, J. Lee, Choice Total Pain, The One Acupuncture, Prime Total Pain, Desai, Chong, Fort Lee Pain, and Prime Pain Management falsely represented that they were in compliance with all relevant laws governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits in the first instance.

133.    In fact, S. Lee, Hong, Yoo, J. Lee, Choice Total Pain, The One Acupuncture, Prime Total Pain, Desai, Chong, Fort Lee Pain, and Prime Pain Management were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they paid and received unlawful compensation in exchange for patient referrals.

**C.    The Unlawful Self-Referrals**

134.    Not only did the Defendants provide and/or receive illegal compensation in exchange for patient referrals, but S. Lee, Choice Total Pain, The One Acupuncture, and A Plus Therapy routinely engaged in illegal self-referrals for electrodiagnostic testing in violation of the Codey Law.

135.    As set forth above, in New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a healthcare practice in which they have a "significant beneficial interest". <u>See</u> N.J.S.A. 45:9-22.5.

136.    However, the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a Procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

137.    S. Lee, as a licensed chiropractor, was a "practitioner" as defined by the Codey Law. <u>See</u> N.J.S.A. 45:9-22.4.

138.    The One Acupuncture and A Plus Therapy – as business entities that purported to provide healthcare services – were "healthcare services" as defined by the Codey Law. <u>See</u> N.J.S.A. 45:9-22.4.

139.    S. Lee, as the owner of The One Acupuncture and A Plus Therapy, had a "significant beneficial interest" in The One Acupuncture and A Plus Therapy. <u>See</u> N.J.S.A. 45:9-22.4.

140.    As a result, S. Lee could not lawfully refer – or cause to be referred – Insureds to The One Acupuncture and A Plus Therapy from Choice Total Pain unless the resulting bills were submitted in either S. Lee and/or Choice Total Pain's name.

141.    Even so, in the claims identified in Exhibits "1", "2", and "3", S. Lee routinely and unlawfully referred – or caused to be referred – Insureds from Choice Total Pain to The One Acupuncture and A Plus Therapy for Fraudulent Services billed in the name of The One Acupuncture and A Plus Therapy rather than directly in S. Lee and/or Choice Total Pain's name.

142.    For example:

(i)     On March 25, 2014, S. Lee caused an Insured named JC to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The

40

referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(ii)     On March 28, 2014, S. Lee caused an Insured named MH to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(iii)    On July 24, 2014, S. Lee caused an Insured named SC to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(iv)     On July 29, 2014, S. Lee caused an Insured named SG to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(v)      On or about January 5, 2015, S. Lee caused an Insured named JB to be referred from Choice Total Pain to A Plus Therapy for putative physical therapy services. The referral violated the Codey Law because the resulting bills for the putative physical therapy services were submitted in the name of A Plus Therapy, rather than in S. Lee and/or Choice Total Pain's name.

(vi)     On or about May 4, 2015, S. Lee caused an Insured named YC to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(vii)    On or about June 25, 2015, S. Lee caused an Insured named JB to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(viii)   On or about July 24, 2015, S. Lee caused an Insured named HC to be referred from Choice Total Pain to The One Acupuncture for putative acupuncture services. The referral violated the Codey Law because the resulting bills for the putative acupuncture services were submitted in the name of The One Acupuncture, rather than in S. Lee and/or Choice Total Pain's name.

(ix)     On or about August 10, 2015, S. Lee caused an Insured named LG to be referred from Choice Total Pain to A Plus Therapy for putative physical therapy services. The referral violated the Codey Law because the resulting bills for the putative physical therapy services were submitted in the name of A Plus Therapy, rather than in S. Lee and/or Choice Total Pain's name.

(x)      On or about August 12, 2015, S. Lee caused an Insured named HJ to be referred from Choice Total Pain to A Plus Therapy for putative physical therapy services. The referral violated the Codey Law because the resulting bills for the putative physical therapy services were submitted in the name of A Plus Therapy, rather than in S. Lee and/or Choice Total Pain's name.

143.     These are only representative examples. In the claims identified in Exhibits "1", "2", and "3", S. Lee routinely and unlawfully referred – or caused to be referred – Insureds from Choice Total Pain to The One Acupuncture and A Plus Therapy for Fraudulent Services billed in the name of The One Acupuncture and A Plus Therapy rather than directly in S. Lee and/or Choice Total Pain's name.

144.     In the claims identified in Exhibits "1", "2", and "3", S. Lee, Choice Total Pain, The One Acupuncture, and A Plus Therapy falsely represented that they were in compliance with all relevant laws governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits in the first instance.

145.     In fact, S. Lee, Choice Total Pain, The One Acupuncture, and A Plus Therapy were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they were engaged in an illegal self-referral scheme.

**D.     The Defendants' Fraudulent Treatment and Billing Protocol**

**1.      The Fraudulent Charges for Initial Examinations at Choice Total Pain, The  One Acupuncture, Prime Total Pain, Fort Lee Pain, and Prime Pain Management**

146.     As a first step in their fraudulent treatment and billing protocol, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Desai, Fort Lee Pain, and

42

Prime Pain Management purported to provide virtually every Insured in the claims identified in Exhibits "1", "2", "4", "5", and "6" with an initial examination.

147.    As set forth in Exhibit "1", S. Lee purported to perform the majority of the putative initial examinations at Choice Total Pain, which were then billed to GEICO under: (i) CPT code 99203, typically resulting in a charge of between $150.00 and $200.00 for each purported initial examination; or (ii) CPT code 99204, typically resulting in a charge of between $180.00 and $200.00 for each purported initial examination.

148.    As set forth in Exhibit "2", Hong purported to perform virtually all of the putative initial examinations at The One Acupuncture, which were then billed to GEICO under CPT code 99203, typically resulting in a charge of $150.00 for each purported initial examination.

149.    As set forth in Exhibit "4", Yoo purported to perform many of the putative initial examinations at Prime Total Pain, which were then billed to GEICO under CPT code 99203, typically resulting in charges between $126.87 and $360.00 for each purported initial examination.

150.    As set forth in Exhibits "5" and "6", Desai purported to perform the majority of the initial examinations at Fort Lee Pain and Prime Pain Management, virtually all of which were then billed to GEICO under CPT code 99204, typically resulting in a charge of $295.00 for each purported initial examination.

151.    In the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", the charges for the initial examinations were fraudulent in that they misrepresented Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, and Prime Pain Management's eligibility to collect PIP Benefits in the first instance.

152.    In fact, Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, and Prime Pain Management never were eligible to collect PIP Benefits in the claims for initial examinations that are identified in Exhibits "1", "2", "4", "5", and "6", because – as a result of the fraudulent scheme described herein – neither they nor the examinations was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

153.    Moreover, and as set forth below, the charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and reimbursable amount for the initial examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

154.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99204 to bill for an initial patient examination typically requires that the Insured present with problems of moderate to high severity.

155.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

156.    For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)    Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

44

(iv)     Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)      Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)     Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)    Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

157.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

158.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

159.    The CPT Assistant also provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT codes 99203 to bill for an initial patient examination.

160.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

45

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)   Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)   Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

161.   Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

162.   By contrast, to the extent that the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

163.   For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6" either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, in the substantial majority of the claims identified in Exhibits "1", "2", "4", "5", and "6" the Insureds did not seek treatment at any hospital as the result of their accidents.

164.   To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis and/or similar soft-tissue injuries.

165.    Furthermore, in many cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

166.    Even so, in the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Desai, Fort Lee Pain, and Prime Pain Management routinely billed for their putative initial examinations using CPT codes 99204 and 99203, and thereby falsely represented that the Insureds presented with problems of moderate or moderate to high severity.

167.    For example:

(i)    On October 8, 2012, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of SH on October 12, 2012, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(ii)    On December 16, 2012, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that LK's vehicle was drivable following the accident. The police report further indicated that, although LK complained of neck pain, LK refused medical attention at the scene. In keeping with the fact that LK was not seriously injured, LK did not visit any hospital emergency room following the accident. To the extent that LK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of LK on December 17, 2012, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

47

(iii)   On May 10, 2013, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of SL on May 16, 2013, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(iv)   On June 14, 2013, an Insured named PK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that PK's vehicle was drivable following the accident. The police report further indicated that PK was not injured and did not complain of any pain at the scene. In keeping with the fact that PK was not seriously injured, PK did not visit any hospital emergency room following the accident. To the extent that PK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of PK on June 25, 2013, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(v)   On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of YL on December 20, 2013, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(vi)   On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and would have completely resolved within two to three months of the accident. Even so, following a purported initial

48

examination of YL on March 27, 2014 – more than four months after the accident – Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii) On January 2, 2014, an Insured named HK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that HK's vehicle was drivable following the accident. The police report further indicated that HK was not injured and did not complain of any pain at the scene. In keeping with the fact that HK was not seriously injured, HK did not visit any hospital emergency room following the accident. To the extent that HK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of HK on January 9, 2014, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(viii) On January 2, 2014, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JC on March 26, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix) On February 1, 2014, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MH on March 10, 2014, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(x) On February 7, 2014, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

49

low-speed, rear-end collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of YM on May 15, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi)     On February 3, 2014, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JL on March 26, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii)    On May 19, 2014, an Insured named BK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that BK's vehicle was drivable following the accident. The police report further indicated that BK was not injured and did not complain of any pain at the scene. In keeping with the fact that BK was not seriously injured, BK did not visit any hospital emergency room following the accident. To the extent that BK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of BK on May 21, 2014, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xiii)   On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that, although SG complained of pain, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of SG on July 30, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and

thereby falsely represented that the initial examination involved moderately severe presenting problems.

(xiv) On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision. The police report further indicated that, although SG complained of neck and back pain at the scene, SG was not taken by ambulance to any hospital emergency room, and never visited any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of SG on August 28, 2015 – more than one year after the accident – Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xv) On June 22, 2014, an Insured named YJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured and did not complain of any pain at the scene. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of YJ on July 3, 2014, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvi) On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of SL on March 3, 2015, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xvii) On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not

complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of SL on June 10, 2015 – more than five months after the accident – Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xviii)   On January 30, 2015, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of YC on October 7, 2015 – more than eight months after the accident – Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xix)   On February 19, 2015, an Insured named EK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that EK's vehicle was drivable following the accident. The police report further indicated that EK was not injured and did not complain of any pain at the scene. In keeping with the fact that EK was not seriously injured, EK did not visit any hospital emergency room following the accident. To the extent that EK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of EK on March 6, 2015, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xx)   On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. The police report further indicated that although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity.

Even so, following a purported initial examination of YL on May 28, 2015, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xxi)    On July 16, 2015, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JK on July 17, 2015, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxii)   On July 16, 2015, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JK on September 30, 2015, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxiii)  On August 12, 2015, an Insured named HY was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that HY's vehicle was drivable following the accident. The police report further indicated that HY was not injured and did not complain of any pain at the scene. In keeping with the fact that HY was not seriously injured, HY did not visit any hospital emergency room following the accident. To the extent that HY experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of HY on September 14, 2015, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxiv)   On April 24, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

53

rear-end collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene.  In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JL on April 25, 2016, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxv)   On May 7, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JL on May 25, 2016, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved moderately severe presenting problems.

(xxvi)   On May 7, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JL on July 13, 2016, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxvii) On July 28, 2016, an Insured named DK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DK's vehicle was drivable following the accident. The police report further indicated that DK was not injured and did not complain of any pain at the scene. In keeping with the fact that DK was not seriously injured, DK did not visit any hospital emergency room following the accident. To the extent that DK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of DK on July 29, 2016, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxviii) On August 16, 2016, an Insured named GP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that GP's vehicle was drivable following the accident. The police report further indicated that GP was not injured and did not complain of any pain at the scene. In keeping with the fact that GP was not seriously injured, GP did not visit any hospital emergency room following the accident. To the extent that GP experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of GP on October 12, 2016, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxix) On September 2, 2016, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of MK on January 25, 2017 – more than five months after the accident – Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxx) On November 16, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured and did not complain of any pain at the scene. In keeping with the fact that KS was not seriously injured, KS did not visit any hospital emergency room following the accident. To the extent that KS experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of KS on January 25, 2017, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxxi) On December 27, 2016, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured,

HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of HC on January 9, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxxii) On February 13, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain of any pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of EL on February 17, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved moderately severe presenting problems.

(xxxiii) On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene.  In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of TL on March 27, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxxiv) On April 27, 2017, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene.  In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MK on May 19, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxxv) On May 8, 2017, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that, although DL complained of neck pain, DL refused medical attention at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. To the extent that DL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of DL on July 19, 2017, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxxvi) On May 15, 2017, an Insured named XS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that XS's vehicle was drivable following the accident. The police report further indicated that XS was not injured and did not complain of any pain at the scene. In keeping with the fact that XS was not seriously injured, XS did not visit any hospital emergency room following the accident. To the extent that XS experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of XS on May 24, 2017, S. Lee and Choice Total Pain billed for the putative examination using CPT code 99204, and thereby falsely represented that XS presented with problems of moderate to high severity.

(xxxvii) On June 8, 2017, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of SH on June 9, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xxxviii) On June 21, 2017, an Insured named HO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HO's vehicle was drivable following the accident. The police report further indicated that HO was not injured and did not complain of any pain at the scene. In keeping with the fact that HO was not seriously injured, HO did not visit any hospital emergency room following the accident. To the extent that HO experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported

initial examination of HO on August 16, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved moderately severe presenting problems.

(xxxix) On July 6, 2017, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of IK on October 18, 2017 – more than three months after the accident – Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xl) On July 19, 2017, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured and did not complain of any pain at the scene. In keeping with the fact that ES was not seriously injured, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of ES on October 16, 2017 – more than two months after the accident – Desai and Prime Pain Management billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xli) On July 30, 2017, an Insured named OK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that OK's vehicle was drivable following the accident. The police report further indicated that OK was not injured and did not complain of any pain at the scene. In keeping with the fact that OK was not seriously injured, OK did not visit any hospital emergency room following the accident. To the extent that OK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of OK on August 23, 2017, Yoo and Prime Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xlii)   On December 6, 2017, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene. In keeping with the fact that EC was not seriously injured, EC did not visit any hospital emergency room following the accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of EC on December 18, 2017, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xliii)  On January 6, 2018, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of CS on January 24, 2018, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved presenting problems of moderate to high severity.

(xliv)   On March 27, 2018, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not seriously injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of WL on March 30, 2018, Yoo and Prime Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xlv)    On November 10, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the

result of the accident, they were of low severity. Even so, following a purported initial examination of MB on November 12, 2018, Yoo and Prime Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

168.     These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Desai, Fort Lee Pain, and Prime Pain Management falsely represented that the Insureds presented with problems of moderate or moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

169.     In the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity.

170.     In the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Desai, Fort Lee Pain, and Prime Pain Management also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Purported Examinations**

171.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician, chiropractor, or acupuncturist who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

172.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the physician, chiropractor, or acupuncturist who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

173.    As set forth in Exhibits "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, submitted many of their bills for initial examinations under CPT code 99203, and thereby represented that the chiropractors and acupuncturist who purported to perform the initial examinations spent 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

174.    Moreover, as set forth in Exhibits "1", "5", and "6", Choice Total Pain, S. Lee, Desai, Fort Lee Pain, and Prime Pain Management submitted many of their bills for initial examinations under CPT code 99204, and thereby represented that the physician and chiropractor who purported to perform the initial examinations spent 45 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

175.    In fact, in the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", neither S. Lee, Hong, Yoo, Desai, or any other physician, chiropractor, or acupuncturist associated with Choice Total Pain, Prime Total Pain, The One Acupuncture, Fort Lee Pain, or Prime Pain Management ever spent 30 minutes – much less 45 minutes – of face-to-face time with the Insureds or their families when conducting the examinations and consultations.

61

176.    Rather, in the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", the initial examinations did not entail more than 15 minutes of face-to-face time between the examining physician, chiropractor, acupuncturist and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

177.    For instance, and in keeping with the fact that the initial examinations allegedly provided by S. Lee, Hong, Yoo, and Desai through Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, and Prime Pain Management did not entail more than 15 minutes of face-to-face time with the Insureds or their families, S. Lee, Hong, Yoo, and Desai used template forms in purporting to conduct the initial examinations.

178.    The template forms that S. Lee, Hong, Yoo, and Desai used to document the putative examinations set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

179.    All that was required to complete the template forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and other basic forms of chiropractic testing.

180.    These interviews and examinations did not require any chiropractor, acupuncturist, or physician associated with Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, or Prime Pain Management to spend more than 15 minutes of face-to-face time with the Insureds during the putative initial examinations.

181.    In the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Desai, Fort Lee Pain, and Prime Pain Management falsely represented that the examinations and

62

consultations involved between 30 and 45 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99204 and 99203 because examinations and consultations billable under CPT codes 99204 and 99203 are reimbursable at a higher rate than examinations and consultations that require less time to perform.

**c.     Misrepresentations Regarding "Comprehensive" Patient Histories**

182.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial patient examination represents that the chiropractor who performed the examination took a "comprehensive" patient history.

183.    Pursuant to the CPT Assistant, a patient history does not qualify as "comprehensive" unless the chiropractor has conducted a "complete" review of the patient's systems.

184.    Pursuant to the CPT Assistant, a chiropractor has not conducted a "complete" review of a patient's systems unless the chiropractor has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

185.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (<u>e.g.</u>, fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

    (vi)     gastrointestinal;

    (vii)    genitourinary;

    (viii)   musculoskeletal;

    (ix)     integumentary (skin and/or breast);

    (x)      neurological;

    (xi)     psychiatric;

    (xii)    endocrine;

    (xiii)   hematologic/lymphatic; and

    (xiv)   allergic/immunologic.

186.    Though Choice Total Pain and S. Lee billed for many of their putative initial examinations in the claims identified in Exhibits "1" using CPT code 99204, and thereby represented that they took "comprehensive" histories of the Insureds during the examinations, neither S. Lee, nor any other chiropractor associated with Choice Total Pain, ever documented a review of 10 organ systems unrelated to the history of the Insureds' present illnesses.

187.    Rather, to the extent that Choice Total Pain and S. Lee documented any review of the Insureds' systems at all in the claims identified in Exhibit "1", the documentation was contained in Choice Total Pain and S. Lee's basic, template initial examination forms.

188.    To the extent that Choice Total Pain and S. Lee's basic, template initial examinations forms contained any documentation at all regarding any review of the Insureds' systems, the documentation was limited to – at most – a partial review of the Insureds' organ systems.

189.     Pursuant to the CPT Assistant, a patient history also does not qualify as "comprehensive" unless the examining chiropractor has taken a "complete" past, family, and social history from the patient.

190.     Pursuant to the CPT Assistant, a chiropractor has not taken a "complete" past, family, and social history from the patient unless the physician has documented:

(i)      at least one specific item with respect to the patient's past history – e.g., the patient's past experiences with illnesses, operations, injuries, and treatments;

(ii)     at least one specific item with respect to the patient's family history – e.g., a review of medical events in the patient's family, including diseases which may be hereditary or place the patient at risk; and

(iii)    at least one specific item with respect to the patient's social history – e.g., an age-appropriate review of past and current activities.

191.     Though Choice Total Pain and S. Lee billed for many of their putative initial examinations in the claims identified in Exhibit "1" under CPT code 99204 and thereby represented that they took "comprehensive" histories of the Insureds, neither S. Lee nor any other chiropractor associated with Choice Total Pain ever documented any information with respect to the Insureds' family histories.

192.     For example:

(i)      On October 12, 2012, S. Lee purported to provide an initial examination to an Insured named SH. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of SH's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SH's illnesses; or (ii) take a complete past, family, and social history from SH, inasmuch as he did not document any information with respect to SH's family history.

(ii)     On December 17, 2012, S. Lee purported to provide an initial examination to an Insured named LK. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of LK's

systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of LK's illnesses; or (ii) take a complete past, family, and social history from LK, inasmuch as he did not document any information with respect to LK's family history.

(iii)     On May 16, 2013, S. Lee purported to provide an initial examination to an Insured named SL. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of SL's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SL's illnesses; or (ii) take a complete past, family, and social history from SL, inasmuch as he did not document any information with respect to SL's family history.

(iv)     On June 25, 2013, S. Lee purported to provide an initial examination to an Insured named PK. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of PK's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of PK's illnesses; or (ii) take a complete past, family, and social history from PK, inasmuch as he did not document any information with respect to PK's family history.

(v)     On December 20, 2013, S. Lee purported to provide an initial examination to an Insured named YL. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of YL's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of YL's illnesses; or (ii) take a complete past, family, and social history from YL, inasmuch as he did not document any information with respect to YL's family history.

(vi)     On January 9, 2014, S. Lee purported to provide an initial examination to an Insured named JC. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of JC's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of JC's illnesses; or (ii) take a complete past, family, and social history from JC, inasmuch as he did not document any information with respect to JC's family history.

(vii)    On March 10, 2014, S. Lee purported to provide an initial examination to an Insured named MH. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of MH's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of MH's illnesses; or (ii) take a complete past, family, and social history from MH, inasmuch as he did not document any information with respect to MH's family history.

(viii)    On May 21, 2014, S. Lee purported to provide an initial examination to an Insured named BK. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of BK's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of BK's illnesses; or (ii) take a complete past, family, and social history from BK, inasmuch as he did not document any information with respect to BK's family history.

(ix)    On April 11, 2014, S. Lee purported to provide an initial examination to an Insured named SK. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of SK's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SK's illnesses; or (ii) take a complete past, family, and social history from SK, inasmuch as he did not document any information with respect to SK's family history.

(x)    On March 3, 2015, S. Lee purported to provide an initial examination to an Insured named SL. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of SL's systems during the examination, inasmuch as he did not document  review of 10 organ systems unrelated to the history of SL's illnesses; or (ii) take a complete past, family, and social history from SL, inasmuch as he did not document any information with respect to SL's family history.

(xi)    On September 14, 2015, S. Lee purported to provide an initial examination to an Insured named HY. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of HY's systems during the examination, inasmuch as he did not document a review of 10

organ systems unrelated to the history of HY's illnesses; or (ii) take a complete past, family, and social history from HY, inasmuch as he did not document any information with respect to HY's family history.

(xii)    On April 25, 2016, S. Lee purported to provide an initial examination to an Insured named JL. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of JL's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of JL's illnesses; or (ii) take a complete past, family, and social history from JL, inasmuch as he did not document any information with respect to JL's family history.

(xiii)    On July 29, 2016, S. Lee purported to provide an initial examination to an Insured named DK. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of DK's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of DK's illnesses; or (ii) take a complete past, family, and social history from DK, inasmuch as he did not document any information with respect to DK's family history.

(xiv)    On August 24, 2016, S. Lee purported to provide an initial examination to an Insured named GP. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of GP's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of GP's illnesses; or (ii) take a complete past, family, and social history from GP, inasmuch as he did not document any information with respect to GP's family history.

(xv)    On November 23, 2016, S. Lee purported to provide an initial examination to an Insured named KS. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of KS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of KS's illnesses; or (ii) take a complete past, family, and social history from KS, inasmuch as he did not document any information with respect to KS's family history.

(xvi)    On January 9, 2017, S. Lee purported to provide an initial examination to an Insured named HC. Though Choice Total Pain and S. Lee then billed the putative

examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of HC's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of HC's illnesses; or (ii) take a complete past, family, and social history from HC, inasmuch as he did not document any information with respect to HC's family history.

(xvii)   On May 24, 2017, S. Lee purported to provide an initial examination to an Insured named XS. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of XS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of XS's illnesses; or (ii) take a complete past, family, and social history from XS, inasmuch as he did not document any information with respect to XS's family history.

(xviii)   On June 9, 2017, S. Lee purported to provide an initial examination to an Insured named SH. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of SH's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SH's illnesses; or (ii) take a complete past, family, and social history from SH, inasmuch as he did not document any information with respect to SH's family history.

(xix)   On August 16, 2017, S. Lee purported to provide an initial examination to an Insured named HO. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of HO's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of HO's illnesses; or (ii) take a complete past, family, and social history from HO, inasmuch as he did not document any information with respect to HO's family history.

(xx)   On January 24, 2018, S. Lee purported to provide an initial examination to an Insured named CS. Though Choice Total Pain and S. Lee then billed the putative examination through Choice Total Pain to GEICO under CPT code 99204, and thereby falsely represented that S. Lee had taken a comprehensive patient history during the examination, S. Lee did not: (i) conduct a complete review of CS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of CS's illnesses; or (ii) take a complete

past, family, and social history from CS, inasmuch as he did not document any information with respect to CS's family history.

193.    These are only representative examples. In virtually all of the claims for initial examinations identified in Exhibit "1", Choice Total Pain and S. Lee falsely represented that they took "comprehensive" patient histories, and that their putative examinations therefore were billable under CPT code 99204, because examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations or examinations that do not require "comprehensive" patient histories.

**d.    Misrepresentations   Regarding   "Comprehensive"   or   "Detailed"   Physical Examinations**

194.    Moreover, in the claims identified in Exhibits "1", "2", and "4" for initial examinations under CPT codes 99203 or 99204, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo falsely represented the extent of the underlying physical examinations.

195.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the chiropractor or acupuncturist who performed the examination conducted a "detailed" physical examination.

196.    Pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the chiropractor or acupuncturist who performed the examination conducted a "comprehensive" physical examination.

197.    As set forth in Exhibits "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo virtually always billed for their putative initial examinations using either CPT code 99203 or 99204, and thereby represented that S. Lee, Hong, or Yoo conducted detailed or comprehensive physical examinations of the Insureds who

purportedly received the examinations.

198.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor or acupuncturist conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

199.    To the extent that the Insureds in the claims identified in Exhibits "1", "2", and "4" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

200.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor or acupuncturist has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor or acupuncturist has documented findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

201.    In the claims for initial examinations identified in Exhibits "1", "2", and "4", when Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo billed for the initial examinations under CPT code 99203, they falsely represented that S. Lee, Hong, and Yoo performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

202.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1", "2", and "4", neither S. Lee, Hong, and Yoo nor any other chiropractor or acupuncturist associated with Choice Total Pain, The One Acupuncture, or Prime Total Pain ever conducted an extended examination of the Insureds' musculoskeletal systems.

203.    For instance, in each of the claims under CPT code 99203 identified in Exhibits "1", "2", and "4", neither S. Lee, Hong, and Yoo nor any other chiropractor or acupuncturist associated with Choice Total Pain, The One Acupuncture, or Prime Total Pain ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)   examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)   examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)   examination of sensation.

204.   For example:

(i)   On March 26, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO under CPT code 99203 for an initial examination that Hong purported to perform on an Insured named JL, and thereby represented that they had provided a "detailed" physical examination to JL. However, Hong did not document an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)   On March 27, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO under CPT code 99203 for an initial examination that Hong purported to perform on an Insured named YL, and thereby represented that they had provided a "detailed" physical examination to YL. However, Hong did not document an extended examination of YL'S musculoskeletal system, despite the fact that – to the extent YL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)   On May 15, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO under CPT code 99203 for an initial examination that Hong purported to perform on an Insured named YM, and thereby represented that they had provided a "detailed" physical examination to YM. However, Hong did not document an extended examination of YM'S musculoskeletal system, despite the fact that – to the extent YM had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)   On May 28, 2015, Hong, S. Lee, and The One Acupuncture billed GEICO under CPT code 99203 for an initial examination that Hong purported to perform on an Insured named YL, and thereby represented that they had provided a "detailed" physical examination to YL. However, Hong did not document an extended examination of YL'S musculoskeletal system, despite the fact that – to the extent

YL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On July 30, 2014, Hong, S. Lee, and The One Acupuncture billed GEICO under CPT code 99203 for an initial examination that Hong purported to perform on an Insured named SG, and thereby represented that they had provided a "detailed" physical examination to SG. However, Hong did not document an extended examination of SG'S musculoskeletal system, despite the fact that – to the extent SG had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On March 24, 2016, S. Lee and Choice Total Pain billed GEICO under CPT code 99203 for an initial examination that S. Lee purported to perform on an Insured named JJ, and thereby represented that they had provided a "detailed" physical examination to JJ. However, S. Lee did not document an extended examination of JJ's musculoskeletal system, despite the fact that – to the extent JJ had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)   On May 25, 2016, S. Lee and Choice Total Pain billed GEICO under CPT code 99203 for an initial examination that S. Lee purported to perform on an Insured named JL, and thereby represented that they had provided a "detailed" physical examination to JL. However, S. Lee did not document an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)  On September 21, 2016, S. Lee and Choice Total Pain billed GEICO under CPT code 99203 for an initial examination that S. Lee purported to perform on an Insured named BC, and thereby represented that they had provided a "detailed" physical examination to BC. However, S. Lee did not document an extended examination of BC's musculoskeletal system, despite the fact that – to the extent BC had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On June 30, 2017, S. Lee and Choice Total Pain billed GEICO under CPT code 99203 for an initial examination that S. Lee purported to perform on an Insured named HK, and thereby represented that they had provided a "detailed" physical examination to HK. However, S. Lee did not document an extended examination of HK's musculoskeletal system, despite the fact that – to the extent HK had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(x)     On August 16, 2017, S. Lee and Choice Total Pain billed GEICO under CPT code 99203 for an initial examination that S. Lee purported to perform on an Insured named HO, and thereby represented that they had provided a "detailed" physical

examination to HO. However, S. Lee did not document an extended examination of HO's musculoskeletal system, despite the fact that – to the extent HO had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xi)     On September 27, 2017, S. Lee, Yoo, and Prime Total Pain billed GEICO under CPT code 99203 for an initial examination that Yoo purported to perform on an Insured named JL, and thereby represented that they had provided a "detailed" physical examination to JL. However, Yoo did not document an extended examination of JL's musculoskeletal system, despite the fact that – to the extent JL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xii)    On December 11, 2017, S. Lee, Yoo, and Prime Total Pain billed GEICO under CPT code 99203 for an initial examination that Yoo purported to perform on an Insured named MY, and thereby represented that they had provided a "detailed" physical examination to MY. However, Yoo did not document an extended examination of MY's musculoskeletal system, despite the fact that – to the extent MY had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiii)   On February 5, 2018, S. Lee, Yoo, and Prime Total Pain billed GEICO under CPT code 99203 for an initial examination that Yoo purported to perform on an Insured named HL, and thereby represented that they had provided a "detailed" physical examination to HL. However, Yoo did not document an extended examination of HL's musculoskeletal system, despite the fact that – to the extent HL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xiv)    On March 30, 2018, S. Lee, Yoo, and Prime Total Pain billed GEICO under CPT code 99203 for an initial examination that Yoo purported to perform on an Insured named WL, and thereby represented that they had provided a "detailed" physical examination to WL. However, Yoo did not document an extended examination of WL's musculoskeletal system, despite the fact that – to the extent WL had any complaints at all as the result of the automobile accident – they were limited to musculoskeletal complaints.

(xv)     On November 12, 2018, S. Lee, Yoo, and Prime Total Pain billed GEICO under CPT code 99203 for an initial examination that Yoo purported to perform on an Insured named MB, and thereby represented that they had provided a "detailed" physical examination to MB. However, Yoo did not document an extended examination of MB's musculoskeletal system, despite the fact that – to the extent MB had any complaints at all as the result of the automobile accident –they were limited to musculoskeletal complaints.

205.    Similarly, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

206.    Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a general examination of multiple patient organ systems unless the chiropractor or acupuncturist has documented findings with respect to at least eight organ systems.

207.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)     respiratory;

(vi)    gastrointestinal;

(vii)   genitourinary;

(viii)  musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)     neurological;

(xi)    psychiatric;

(xii)   endocrine;

(xiii)  hematologic/lymphatic; and

(xiv)  allergic/immunologic.

208. Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i) at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii) the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii) examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv) palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v) examination of gait and station;

(vi) examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii) inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii) coordination, deep tendon reflexes, and sensation; and

(ix) mental status, including orientation to time, place and person, as well as mood and affect.

209. In the claims for initial examinations identified in Exhibit "1", when S. Lee and Choice Total Pain billed for the initial examinations under CPT code 99204, they falsely represented that S. Lee performed "comprehensive" patient examinations on the Insureds he purported to treat during the initial examinations.

210. In fact, with respect to the claims for initial examinations under CPT code 99204 that are identified in Exhibit "1", neither S. Lee nor any other chiropractor associated with

Choice Total Pain ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

211.    For instance, in each of the claims under CPT code 99204 identified in Exhibit "1", neither S. Lee nor any other chiropractor associated with Choice Total Pain ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

212.    Furthermore, although S. Lee often purported to provide an examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibit "1", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

213.   For example:

(i)      On October 12, 2012, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named SH, and thereby represented that they had provided a "comprehensive" physical examination to SH. However, S. Lee did not document findings with respect to at least eight of SH's organ systems, nor did he document a "complete" examination of SH's musculoskeletal system or any of SH's other organ systems.

(ii)     On December 17, 2012, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named LK, and thereby represented that they had provided a "comprehensive" physical examination to LK. However, S. Lee did not document findings with respect to at least eight of LK's organ systems, nor did he document a "complete" examination of LK's musculoskeletal system or any of LK's other organ systems.

(iii)    On May 16, 2013, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named SL, and thereby represented that they had provided a "comprehensive" physical examination to SL. However, S. Lee did not document findings with respect to at least eight of SL's organ systems, nor did he document a "complete" examination of SL's musculoskeletal system or any of SL's other organ systems.

(iv)    On June 25, 2013, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named PK, and thereby represented that they had provided a "comprehensive" physical examination to PK. However, S. Lee did not document findings with respect to at least eight of PK's organ systems, nor did he document a "complete" examination of PK's musculoskeletal system or any of PK's other organ systems.

(v)     On December 20, 2013, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named YL, and thereby represented that they had provided a "comprehensive" physical examination to YL. However, S. Lee did not document findings with respect to at least eight of YL's organ systems, nor did he document a "complete" examination of YL's musculoskeletal system or any of YL's other organ systems.

(vi)    On January 2, 2014, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named JC, and thereby represented that they had provided a "comprehensive"

physical examination to JC. However, S. Lee did not document findings with respect to at least eight of JC's organ systems, nor did he document a "complete" examination of JC's musculoskeletal system or any of JC's other organ systems.

(vii)    On March 10, 2014, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named MH, and thereby represented that they had provided a "comprehensive" physical examination to MH. However, S. Lee did not document findings with respect to at least eight of MH's organ systems, nor did he document a "complete" examination of MH's musculoskeletal system or any of MH's other organ systems.

(viii)    On April 11, 2014, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named SK, and thereby represented that they had provided a "comprehensive" physical examination to SK. However, S. Lee did not document findings with respect to at least eight of SK's organ systems, nor did he document a "complete" examination of SK's musculoskeletal system or any of SK's other organ systems.

(ix)    On May 21, 2014, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named BK, and thereby represented that they had provided a "comprehensive" physical examination to BK. However, S. Lee did not document findings with respect to at least eight of BK's organ systems, nor did he document a "complete" examination of BK's musculoskeletal system or any of BK's other organ systems.

(x)    On July 3, 2014, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named YJ, and thereby represented that they had provided a "comprehensive" physical examination to YJ. However, S. Lee did not document findings with respect to at least eight of YJ's organ systems, nor did he document a "complete" examination of YJ's musculoskeletal system or any of YJ's other organ systems.

(xi)    On March 3, 2015, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named SL, and thereby represented that they had provided a "comprehensive" physical examination to SL. However, S. Lee did not document findings with respect to at least eight of SL's organ systems, nor did he document a "complete" examination of SL's musculoskeletal system or any of SL's other organ systems.

(xii)    On March 6, 2015, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named EK, and thereby represented that they had provided a "comprehensive" physical examination to EK. However, S. Lee did not document findings with respect to at least eight of EK's organ systems, nor did he document a "complete" examination of EK's musculoskeletal system or any of EK's other organ systems.

(xiii)   On March 9, 2015, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named YL, and thereby represented that they had provided a "comprehensive" physical examination to YL. However, S. Lee did not document findings with respect to at least eight of March 9, 2015's organ systems, nor did he document a "complete" examination of March 9, 2015's musculoskeletal system or any of March 9, 2015's other organ systems.

(xiv)   On March 16, 2016, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named KG, and thereby represented that they had provided a "comprehensive" physical examination to KG. However, S. Lee did not document findings with respect to at least eight of KG's organ systems, nor did he document a "complete" examination of KG's musculoskeletal system or any of KG's other organ systems.

(xv)   On April 25, 2016, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named JL, and thereby represented that they had provided a "comprehensive" physical examination to JL. However, S. Lee did not document findings with respect to at least eight of JL's organ systems, nor did he document a "complete" examination of JL's musculoskeletal system or any of JL's other organ systems.

(xvi)   On July 29, 2016, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named DK, and thereby represented that they had provided a "comprehensive" physical examination to DK. However, S. Lee did not document findings with respect to at least eight of DK's organ systems, nor did he document a "complete" examination of DK's musculoskeletal system or any of DK's other organ systems.

(xvii)   On June 9, 2017, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named SH, and thereby represented that they had provided a "comprehensive" physical examination to SH. However, S. Lee did not document findings with respect to at least eight of SH's organ systems, nor did he document a "complete" examination of SH's musculoskeletal system or any of SH's other organ systems.

(xviii)   On August 16, 2017, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named HO, and thereby represented that they had provided a "comprehensive" physical examination to HO. However, S. Lee did not document findings with respect to at least eight of HO's organ systems, nor did he document a "complete" examination of HO's musculoskeletal system or any of HO's other organ systems.

(xix)   On December 18, 2017, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an

Insured named EC, and thereby represented that they had provided a "comprehensive" physical examination to EC. However, S. Lee did not document findings with respect to at least eight of EC's organ systems, nor did he document a "complete" examination of EC's musculoskeletal system or any of EC's other organ systems.

(xx)   On January 24, 2018, S. Lee and Choice Total Pain billed GEICO under CPT code 99204 for an initial examination that S. Lee purported to perform on an Insured named CS, and thereby represented that they had provided a "comprehensive" physical examination to CS. However, S. Lee did not document findings with respect to at least eight of CS's organ systems, nor did he document a "complete" examination of CS's musculoskeletal system or any of HL's other organ systems.

214.   These are only representative examples. In all of the claims for initial examinations under CPT code 99203 or 99204 that are identified in Exhibit "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo falsely represented that they had provided "detailed" or "comprehensive" physical examinations, when in fact they had not.

215.   In all of the claims for initial examinations under CPT code 99203 or 99204 that are identified in Exhibit "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo falsely represented that they had provided "detailed" or "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203 or 99204, respectively, because examinations billable under CPT code 99203 or 99204 are reimbursable at higher rates than examinations that do not require the examining chiropractor to provide "detailed" or "comprehensive" physical examinations.

**e.     Misrepresentations Regarding the Extent of Medical Decision-Making**

216.    Furthermore, pursuant to the Fee Schedule, the use of CPT code 99204 to bill for a patient examination represents that the physician, chiropractor, or acupuncturist who performed the examination engaged in "moderate complexity" medical decision-making.

217.    Moreover, pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the physician, chiropractor, or acupuncturist who performed the examination engaged in "low complexity" medical decision-making.

218.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

219.    As set forth above, pursuant to the CPT Assistant, the presenting problems that could require highly or moderately complex medical decision-making, and therefore support the use of CPT code 99204 to bill for an initial examination, typically are problems that pose a threat to the patient's life or a serious threat to their health.

220.    Similarly, pursuant to the CPT Assistant, the presenting problems that could require low complexity medical decision-making, and therefore support the use of CPT code 99203 to bill for an initial examination, typically are chronic and relatively serious problems.

221.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6", had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

83

222.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity – much less moderate complexity – medical decision-making.

223.    First, in Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai's claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

224.    When the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6" presented to Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

225.    Furthermore, prior to the initial examinations, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai neither requested any medical records from any other providers, nor conducted any diagnostic tests.

226.    Second, in Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai's claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

227.    Nor, by extension, was there any risk of significant complications, morbidity, or

mortality from the diagnostic procedures or treatment options provided by Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai to the extent that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai provided any such diagnostic procedures or treatment options in the first instance.

228.    In almost every instance, any "treatments" that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai actually provided were limited to chiropractic treatment, physical therapy treatment, acupuncture treatment, electrodiagnostic testing, and pain management injections, none of which was health– or life–threatening if properly administered.

229.    Third, in Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai's claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

230.    Rather, to the extent that the initial examinations were conducted in the first instance, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai provided a phony series of objectively unverifiable soft tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially identical course of treatment for every Insured, regardless of the individual circumstances regarding the Insured's purported injuries and/or complaints of pain.

231.    Specifically, in the vast majority of claims identified in Exhibits "1", "2", "4",

"5", and "6", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

232.    Even so, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai prepared initial examination reports in which they provided a phony series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

233.    Then, based upon these phony "diagnoses", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai directed virtually every Insured to receive substantially identical, medically unnecessary chiropractic, physical therapy, and/or acupuncture treatments, regardless of the individual circumstances.

234.    For example:

(i)    On October 8, 2012, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SM's vehicle was drivable following the accident. The police report further indicated that SM was not injured and did not complain of any pain at the scene. In keeping with the fact that SM was not seriously injured, SM did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as the result of the accident, they were of low severity. On October 12, 2012, S. Lee purported to conduct an initial examination of SM at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided SM with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SM's presenting problems, nor the treatment plan provided to SM by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, which did not pose the least bit of risk to SM. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT

86

code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)     On December 16, 2012, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that LK's vehicle was drivable following the accident. The police report further indicated that although LK complained of neck pain, LK refused medical attention at the scene. In keeping with the fact that LK was not seriously injured, LK did not visit any hospital emergency room following the accident. To the extent that LK experienced any health problems at all as the result of the accident, they were of low severity. On December 17, 2012, S. Lee purported to conduct an initial examination of LK at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided LK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither LK's presenting problems, nor the treatment plan provided to LK by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, LK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to LK. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)     On February 3, 2014, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. On March 26, 2014, Hong purported to conduct an initial examination of JL at The One Acupuncture. Hong did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hong did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hong provided JL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by Hong and The One Acupuncture, presented any risk of significant complications,

morbidity, or mortality. To the contrary, JL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hong and The One Acupuncture consisted of medically unnecessary chiropractic, physical therapy, and acupuncture services, which did not pose the least bit of risk to JL. Even so, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hong engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On February 7, 2014, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the result of the accident, they were of low severity. On May 15, 2014, Hong purported to conduct an initial examination of YM at The One Acupuncture. Hong did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hong did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hong provided YM with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither YM's presenting problems, nor the treatment plan provided to YM by Hong and The One Acupuncture, presented any risk of significant complications, morbidity, or mortality. To the contrary, YM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hong and The One Acupuncture consisted of medically unnecessary chiropractic, physical therapy, and acupuncture services, which did not pose the least bit of risk to YM. Even so, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hong engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)    On May 10, 2013, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity. On May 16, 2013, S. Lee purported to conduct an initial examination of SL at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not

consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided SL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SL's presenting problems, nor the treatment plan provided to SL by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, SL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to SL. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)     On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity. On December 20, 2013, S. Lee purported to conduct an initial examination of YL at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided YL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YL's presenting problems, nor the treatment plan provided to YL by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, YL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, which did not pose the least bit of risk to YL. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On January 2, 2014, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the

accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low severity. On March 26, 2014, Hong purported to conduct an initial examination of JC at The One Acupuncture. Hong did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hong did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hong provided JC with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC by Hong and The One Acupuncture, presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hong and The One Acupuncture consisted of medically unnecessary chiropractic, physical therapy, and acupuncture services, which did not pose the least bit of risk to JC. Even so, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hong engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)   On February 1, 2014, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as the result of the accident, they were of low severity. On March 10, 2014, S. Lee purported to conduct an initial examination of MH at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided MH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MH's presenting problems, nor the treatment plan provided to MH by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, MH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, which did not pose the least bit of risk to MH. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)     On May 19, 2014, an Insured named BK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that BK's vehicle was drivable following the accident. The police report further indicated that BK was not injured and did not complain of any pain at the scene. In keeping with the fact that BK was not seriously injured, BK did not visit any hospital emergency room following the accident. To the extent that BK experienced any health problems at all as the result of the accident, they were of low severity. On May 21, 2014, S. Lee purported to conduct an initial examination of BK at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided BK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BK's presenting problems, nor the treatment plan provided to BK by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, BK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and physical therapy services, which did not pose the least bit of risk to BK. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that although SG complained of neck pain and body, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity. On July 30, 2014, Hong purported to conduct an initial examination of SG at The One Acupuncture. Hong did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hong did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Hong provided SG with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither SG's presenting problems, nor the treatment plan provided to SG by Hong and The One Acupuncture, presented any risk of significant complications, morbidity, or mortality. To the contrary, SG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hong and The One Acupuncture consisted of medically unnecessary chiropractic, physical therapy, and acupuncture services, which did not pose the

91

least bit of risk to SG. Even so, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hong engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)   On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision. The police report further indicated that, although SG complained of neck pain and lower-back, SG refused medical attention at the scene. However, in keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity. On August 28, 2015, Desai purported to conduct an initial examination of SG at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided SG with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither SG's presenting problems, nor the treatment plan provided to SG by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, SG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, as well as continued referrals for chiropractic and physical therapy treatments, which did not pose the least bit of risk to SG. Even so, Desai and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xii)   On October 31, 2014, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. The police report further indicated that although SK complained of head pain, SK refused medical attention at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low severity. On April 11, 2014, S. Lee purported to conduct an initial examination of SK at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided SK with the

substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SK's presenting problems, nor the treatment plan provided to SK by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, SK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, which did not pose the least bit of risk to SK. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiii)   On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity. On June 10, 2015, Desai purported to conduct an initial examination of SL at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided SL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither SL's presenting problems, nor the treatment plan provided to SL by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, SL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, EDX testing, and pain management injections, as well as continued referrals for medically unnecessary chiropractic and physical therapy treatments, which did not pose the least bit of risk to SL. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xiv)   On January 30, 2015, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the

accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low severity. On October 7, 2015, Desai purported to conduct an initial examination of YC at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided YC with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither YC's presenting problems, nor the treatment plan provided to YC by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, YC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, EDX testing, and pain management injections, as well as continued referrals for medically unnecessary physical therapy treatments, which did not pose the least bit of risk to YC. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xv)     On February 13, 2015, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity. On November 11, 2015, Desai purported to conduct an initial examination of SH at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided SH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither SH's presenting problems, nor the treatment plan provided to SH by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, SH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, EDX testing, and pain management injections, as well as continued referrals for medically unnecessary chiropractic and physical therapy treatments, which did not pose the least bit of risk to SH. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making

during the purported examination.

(xvi)  On February 19, 2015, an Insured named EK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EK's vehicle was drivable following the accident. The police report further indicated that EK was not injured and did not complain of any pain at the scene. In keeping with the fact that EK was not seriously injured, EK did not visit any hospital emergency room following the accident. To the extent that EK experienced any health problems at all as the result of the accident, they were of low severity. On March 6, 2015, S. Lee purported to conduct an initial examination of EK at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided EK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither EK's presenting problems, nor the treatment plan provided to EK by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, EK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic services, and EDX testing, which did not pose the least bit of risk to EK. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xvii)  On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. The police report further indicated that although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity. On March 9, 2015, S. Lee purported to conduct an initial examination of YL at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided YL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YL's presenting problems, nor the treatment plan provided to YL by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, YL did not

95

need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, and EDX testing, which did not pose the least bit of risk to YL. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xviii) On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that, although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity. On October 14, 2015, Desai purported to conduct an initial examination of YL at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided YL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither YL's presenting problems, nor the treatment plan provided to YL by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, YL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary and EDX testing, which did not pose the least bit of risk to YL. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xix) On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. The police report further indicated that although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity. On May 28, 2015, Hong purported to conduct an initial examination of YL at The One Acupuncture. Hong did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Hong did not consider any significant number of

diagnoses or management options in connection with the examination. Instead, Hong provided YL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither YL's presenting problems, nor the treatment plan provided to YL by Hong and The One Acupuncture, presented any risk of significant complications, morbidity, or mortality. To the contrary, YL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Hong and The One Acupuncture consisted of medically unnecessary chiropractic and acupuncture services, and EDX testing, which did not pose the least bit of risk to YL. Even so, Hong, S. Lee, and The One Acupuncture billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Hong engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx)  On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that, although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity. On June 10, 2015, Desai purported to conduct an initial examination of YL at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided YL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither YL's presenting problems, nor the treatment plan provided to YL by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, YL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, EDX testing, as well as continued referrals for medically unnecessary chiropractic, physical therapy, and/or acupuncture treatments, which did not pose the least bit of risk to YL. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxi)  On July 16, 2015, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. In keeping with the fact that JK was not seriously

injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity. On September 30, 2015, Desai purported to conduct an initial examination of JK at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided JK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JK's presenting problems, nor the treatment plan provided to JK by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, JK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, EDX testing, and pain management injections, as well as continued referrals for medically unnecessary chiropractic treatments, which did not pose the least bit of risk to JK. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxii) On April 24, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. On April 25, 2016, S. Lee purported to conduct an initial examination of JL at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided JL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, and EDX testing, which did not pose the least bit of risk to JL. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxiii)  On May 7, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity. On May 25, 2016, S. Lee purported to conduct an initial examination of JL at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided JL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JL's presenting problems, nor the treatment plan provided to JL by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, JL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, EDX testing, and pain management injections, and which did not pose the least bit of risk to JL. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that S. Lee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxiv)  On July 28, 2016, an Insured named DK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DK's vehicle was drivable following the accident. The police report further indicated that DK was not injured and did not complain of any pain at the scene. In keeping with the fact that DK was not seriously injured, DK did not visit any hospital emergency room following the accident. To the extent that DK experienced any health problems at all as the result of the accident, they were of low severity. On July 29, 2016, S. Lee purported to conduct an initial examination of DK at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided DK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DK's presenting problems, nor the treatment plan provided to DK by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, DK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and

acupuncture services, which did not pose the least bit of risk to DK. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxv)     On August 16, 2016, an Insured named GP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that GP's vehicle was drivable following the accident. The police report further indicated that GP was not injured and did not complain of any pain at the scene. In keeping with the fact that GP was not seriously injured, GP did not visit any hospital emergency room following the accident. To the extent that GP experienced any health problems at all as the result of the accident, they were of low severity. On August 24, 2016, S. Lee purported to conduct an initial examination of GP at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided GP with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GP's presenting problems, nor the treatment plan provided to GP by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, GP did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services, which did not pose the least bit of risk to GP. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxvi)    On September 17, 2016, an Insured named BC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BC's vehicle was drivable following the accident. The police report further indicated that BC was not injured and did not complain of any pain at the scene. In keeping with the fact that BC was not seriously injured, BC did not visit any hospital emergency room following the accident. To the extent that BC experienced any health problems at all as the result of the accident, they were of low severity. On September 21, 2016, S. Lee purported to conduct an initial examination of BC at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided BC with the substantially similar, phony list of objectively unverifiable soft tissue

injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BC's presenting problems, nor the treatment plan provided to BC by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, BC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic services, and EDX testing, which did not pose the least bit of risk to BC. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that S. Lee engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxvii) On November 16, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured and did not complain of any pain at the scene. In keeping with the fact that KS was not seriously injured, KS did not visit any hospital emergency room following the accident. To the extent that KS experienced any health problems at all as the result of the accident, they were of low severity. On November 23, 2016, S. Lee purported to conduct an initial examination of KS at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided KS with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KS's presenting problems, nor the treatment plan provided to KS by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, KS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic, physical therapy, and acupuncture services, and pain management injections, which did not pose the least bit of risk to KS. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxviii) On December 27, 2016, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured, HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as the result of the accident, they were of low severity. On January 9, 2017, S. Lee purported to conduct an initial examination of HC at Choice Total Pain. S. Lee did not retrieve, review, or

101

analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided HC with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HC's presenting problems, nor the treatment plan provided to HC by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, HC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic, physical therapy, and acupunctures services, follow-up examinations, EDX testing, and pain management injections, which did not pose the least bit of risk to HC. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxix)   On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the accident, they were of low severity. On March 27, 2017, S. Lee purported to conduct an initial examination of TL at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided TL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TL's presenting problems, nor the treatment plan provided to TL by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, TL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic and acupuncture services,  and EDX testing, which did not pose the least bit of risk to TL . Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxx)   On April 17, 2017, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed,

low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity. On October 30, 2017, Desai purported to conduct an initial examination of JK at Prime Pain Management. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided JK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither JK's presenting problems, nor the treatment plan provided to JK by Desai and Prime Pain Management, presented any risk of significant complications, morbidity, or mortality. To the contrary, JK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Prime Pain Management consisted of medically unnecessary follow-up examinations, as well as continued referrals for medically unnecessary chiropractic, physical therapy, and/or acupuncture treatments, which did not pose the least bit of risk to JK. Even so, Desai and Prime Pain Management billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxxi) On May 8, 2017, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that DL's vehicle was drivable following the accident. The police report further indicated that, although DL complained of neck pain, DL refused medical attention at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. To the extent that DL experienced any health problems at all as the result of the accident, they were of low severity. On July 19, 2017, Desai purported to conduct an initial examination of DL at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided DL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither DL's presenting problems, nor the treatment plan provided to DL by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, DL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, and EDX testing, as well as continued referrals for medically unnecessary chiropractic, physical therapy, and/or acupuncture treatments, which did not pose the least bit of risk to DL. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT

103

code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxxii) On June 21, 2017, an Insured named HO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HO's vehicle was drivable following the accident. The police report further indicated that HO was not injured and did not complain of any pain at the scene.  In keeping with the fact that HO was not seriously injured, HO did not visit any hospital emergency room following the accident. To the extent that HO experienced any health problems at all as the result of the accident, they were of low severity. On August 16, 2017, S. Lee purported to conduct an initial examination of HO at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided HO with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HO's presenting problems, nor the treatment plan provided to HO by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, HO did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to HO. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxxiii) On July 19, 2017, an Insured named ES was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that ES's vehicle was drivable following the accident. The police report further indicated that ES was not injured and did not complain of any pain at the scene. In keeping with the fact that ES was not seriously injured, ES did not visit any hospital emergency room following the accident. To the extent that ES experienced any health problems at all as the result of the accident, they were of low severity. On October 16, 2017, Desai purported to conduct an initial examination of ES at Prime Pain Management. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Desai provided ES with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither ES's presenting problems, nor the treatment plan provided to ES by Desai and Prime Pain Management, presented any risk of significant complications, morbidity, or mortality. To the

contrary, ES did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Prime Pain Management consisted of medically unnecessary follow-up examinations as well as continued referrals for medically unnecessary chiropractic, and acupuncture treatments, which did not pose the least bit of risk to ES. Even so, Desai and Prime Pain Management billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxxiv) On July 30, 2017, an Insured named OK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that OK's vehicle was drivable following the accident. The police report further indicated that OK was not injured and did not complain of any pain at the scene. In keeping with the fact that OK was not seriously injured, OK did not visit any hospital emergency room following the accident. To the extent that OK experienced any health problems at all as the result of the accident, they were of low severity. On August 23, 2017, Yoo purported to conduct an initial examination of OK at Prime Total Pain. Yoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoo provided OK with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither OK's presenting problems, nor the treatment plan provided to OK by Yoo and Prime Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, OK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Yoo and Prime Total Pain consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to OK. Even so, S. Lee, Yoo, and Prime Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxxv) On December 6, 2017, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene. In keeping with the fact that EC was not seriously injured, EC did not visit any hospital emergency room following the accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low severity. On March 14, 2018, Desai purported to conduct an initial examination of EC at Fort Lee Pain. Desai did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Desai did not consider any significant number of diagnoses or management options in

connection with the examination. Instead, Desai provided EC with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that she provided to virtually every other Insured. Furthermore, neither EC's presenting problems, nor the treatment plan provided to EC by Desai and Fort Lee Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, EC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Desai and Fort Lee Pain consisted of medically unnecessary follow-up examinations, EDX testing, and pain management injections, as well as continued referrals for medically unnecessary chiropractic, physical therapy, and/or acupuncture treatments, which did not pose the least bit of risk to EC. Even so, Desai and Fort Lee Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Desai engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxxvi) On January 6, 2018, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as the result of the accident, they were of low severity. On January 24, 2018, S. Lee purported to conduct an initial examination of CS at Choice Total Pain. S. Lee did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, S. Lee did not consider any significant number of diagnoses or management options in connection with the examination. Instead, S. Lee provided CS with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither CS's presenting problems, nor the treatment plan provided to CS by S. Lee and Choice Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, CS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by S. Lee and Choice Total Pain consisted of medically unnecessary chiropractic, physical therapy, and acupuncture services, follow-up examinations, EDX testing, and pain management injections which did not pose the least bit of risk to CS. Even so, S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that S. Lee engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(xxxvii)    On March 27, 2018, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured and did not

complain of any pain at the scene. In keeping with the fact that WL was not seriously injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the accident, they were of low severity. On March 30, 2018, Yoo purported to conduct an initial examination of WL at Prime Total Pain. Yoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoo provided WL with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WL's presenting problems, nor the treatment plan provided to WL by Yoo and Prime Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, WL did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Yoo and Prime Total Pain consisted of medically unnecessary chiropractic and acupuncture services, and EDX testing, which did not pose the least bit of risk to WL. Even so, S. Lee, Yoo, and Prime Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoo engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xxxviii)     On November 10, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low severity. On November 12, 2018, Yoo purported to conduct an initial examination of MB at Prime Total Pain. Yoo did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Yoo did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Yoo provided MB with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MB's presenting problems, nor the treatment plan provided to MB by Yoo and Prime Total Pain, presented any risk of significant complications, morbidity, or mortality. To the contrary, MB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Yoo and Prime Total Pain consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to MB. Even so, S. Lee, Yoo, and Prime Total Pain billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Yoo engaged in some legitimate, low complexity medical decision-making during the purported examination.

235.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

236.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

237.   As set forth above, in the claims identified in Exhibits "1", "2", and "4", virtually all of the Insureds whom Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

238.   It is extremely improbable that any two Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1", "2", and "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

239.   It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at Choice Total Pain, The One Acupuncture, or Prime Total Pain with substantially identical injuries on or about the exact same dates after their accidents.

240.   Even so, in keeping with the fact that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai frequently issued substantially identical, phony "diagnoses", on or about the same date, to more than one Insured involved in a single accident,

and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

241.    For example:

(i)     On January 1, 2012, two Insureds – JB and AH – were involved in the same automobile accident. Thereafter, JB and AH both presented – incredibly, on the exact same date, January 3, 2012 – to Choice Total Pain for purported initial examinations by S. Lee. JB and AH were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided JB and AH with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(ii)    On October 2, 2012, two Insureds – JK and AS – were involved in the same automobile accident. Thereafter, JK and AS both presented – incredibly, on the exact same date, October 19, 2012 – to Choice Total Pain for purported initial examinations by S. Lee. JK and AS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided JK and AS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(iii)   On April 21, 2013, two Insureds – BK and WK – were involved in the same automobile accident. Thereafter, BK and WK both presented – incredibly, on the exact same date, April 29, 2013 – to Choice Total Pain for purported initial examinations by S. Lee. BK and WK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided BK and WK with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(iv)    On May 10, 2013, two Insureds – SL and YS – were involved in the same automobile accident. Thereafter, SL and YS both presented – incredibly, on the exact same date, May 16, 2013 – to Choice Total Pain for purported initial examinations by S. Lee. SL and YS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations,

S. Lee provided SL and YS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(v)     On July 22, 2013, two Insureds – KH and JK – were involved in the same automobile accident. Thereafter, KH and JK both presented – incredibly, on the exact same date, July 29, 2013 – to Choice Total Pain for purported initial examinations by S. Lee. KH and JK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided KH and JK with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(vi)    On January 2, 2014, two Insureds – JC and HK – were involved in the same automobile accident. Thereafter, JC and HK both presented – incredibly, on the exact same date, January 9, 2014 – to Choice Total Pain for purported initial examinations by S. Lee. JC and HK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided JC and HK with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(vii)   On October 10, 2014, two Insureds – WS and HT – were involved in the same automobile accident. Thereafter, WS and HT both presented – incredibly, on the exact same date, October 10, 2014 – to Choice Total Pain for purported initial examinations by S. Lee. WS and HT were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided WS and HT with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(viii)  On November 30, 2014, two Insureds – HJ and JK – were involved in the same automobile accident. Thereafter, HJ and JK both presented – incredibly, on the exact same date, February 12, 2015 – to The One Therapy for purported initial examinations by Hong. HJ and JK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Hong provided HJ and JK with substantially identical "diagnoses", and

recommended a substantially identical course of medically unnecessary treatment for both of them.

(ix)     On January 17, 2015, two Insureds – MS and JB – were involved in the same automobile accident. Thereafter, MS and JB both presented – incredibly, on the exact same date, June 26, 2015 – to The One Therapy for purported initial examinations by Hong. MS and JB were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Hong provided MS and JB with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(x)      On July 3, 2015, two Insureds – SH and JS – were involved in the same automobile accident. Thereafter, SH and JS both presented – incredibly, on the exact same date, July 10, 2015 – to Choice Total Pain for purported initial examinations by S. Lee. SH and JS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided SH and JS with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xi)     On January 25, 2016, two Insureds – KL and JU – were involved in the same automobile accident. Thereafter, KL and JU both presented – incredibly, on the exact same date, January 27, 2016 – to Choice Total Pain for purported initial examinations by S. Lee. KL and JU were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided KL and JU with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xii)    On March 15, 2016, two Insureds – KG and BR – were involved in the same automobile accident. Thereafter, KG and BR both presented – incredibly, on the exact same date, March 16, 2016 – to Choice Total Pain for purported initial examinations by S. Lee. KG and BR were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided KG and BR with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xiii)   On September 2, 2016, two Insureds – MK and CL – were involved in the same automobile accident. Thereafter, MK and CL both presented – incredibly, on the exact same date, September 7, 2016 – to Choice Total Pain for purported initial examinations by S. Lee. MK and CL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided MK and CL with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xiv)   On November 7, 2016, two Insureds – NB and GP – were involved in the same automobile accident. Thereafter, NB and GP both presented – incredibly, on the exact same date, December 9, 2016 – to Choice Total Pain for purported initial examinations by S. Lee. NB and GP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided NB and GP with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xv)    On November 14, 2017, two Insureds – GH and SH – were involved in the same automobile accident. Thereafter, GH and SH both presented – incredibly, on the exact same date, November 15, 2017 – to Prime Total Pain for purported initial examinations by Yoo. GH and SH were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Yoo provided GH and SH with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xvi)   On June 25, 2017, two Insureds – ML and HP – were involved in the same automobile accident. Thereafter, ML and HP both presented – incredibly, on the exact same date, June 30, 2017 – to Choice Total Pain for purported initial examinations by S. Lee. ML and HP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided ML and HP with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xvii)   On September 24, 2017, two Insureds – SK and JL – were involved in the same automobile accident. Thereafter, SK and JL both presented – incredibly, on the exact same date, September 27, 2017 – to Prime Total Pain for purported initial examinations by Yoo. SK and JL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Yoo provided SK and JL with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xviii)   On March 23, 2018, two Insureds – SK and GP – were involved in the same automobile accident. Thereafter, SK and GP both presented – incredibly, on the exact same date, April 6, 2018 – to Choice Total Pain for purported initial examinations by S. Lee. SK and GP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided SK and GP with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xix)   On March 24, 2018, three Insureds – PS, MH, and JL – were all involved in the same automobile accident. Thereafter, PS  presented on March 27, 2018 to Choice Total Pain for purported initial examinations by S. Lee. MH and JL further presented on March 28, 2018 to Choice Total Pain for purported initial examinations by S. Lee. PS, MH, and JL were all different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, S. Lee provided PS, MH, and JL with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

(xx)   On April 10, 2018, two Insureds – HK and JK – were involved in the same automobile accident. Thereafter, HK presented on April 9, 2018 to Prime Total Pain for a purported initial examination by Yoo. Later, JK presented on April 11, 2018, to Prime Total Pain for a purported initial examination by Yoo. HK and JK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, at the conclusion of the putative initial examinations, Yoo provided HK and JK with substantially identical "diagnoses", and recommended a substantially identical course of medically unnecessary treatment for both of them.

242.   These are only representative examples. In the claims for initial examinations that

are identified in Exhibits "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and in any case did not require the treatment.

243.    Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, and Yoo routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

244.    In the claims for initial examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, For Lee Pain, Prime Pain Management, and Desai routinely falsely represented that the putative examinations involve medical decision making of low or moderate complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99203, because examinations billable under CPT codes 99204 and 99203 are reimbursable at a higher rate than examinations or examinations that do not require any complex medical decision-making at all.

**2.    The Fraudulent Charges for Follow-Up Examinations at Choice Total Pain, The One Acupuncture, and Prime Total Pain**

245.    In addition to the fraudulent initial examinations, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong typically purported to subject the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6" to multiple fraudulent follow-up examinations

during the course of the Defendants' fraudulent treatment and billing protocol.

246.    As set forth in Exhibit "1", S. Lee purported to perform virtually all of the putative follow-up examinations at Choice Total Pain, which were then billed to GEICO under CPT codes 99213, typically resulting in charges $120.00 for each purported follow-up examination.

247.    As set forth in Exhibit "2", Hong purported to perform virtually all of the putative follow-up examinations at The One Acupuncture, which were then billed to GEICO under CPT codes 99213, typically resulting in charges $120.00 for each purported follow-up examination.

248.    As set forth in Exhibit "4", Yoo and J. Lee purported to perform virtually all of the putative follow-up examinations at Prime Total Pain, which were then billed to GEICO under CPT code 99213, in charges between $100.00 and $120.00 for each purported follow-up examination.

249.    As set forth in Exhibits "5" and "6", Desai and Chong purported to perform virtually all of the putative follow-up examinations at Fort Lee Pain and Prime Pain Management, which were then billed to GEICO under: (i) CPT code 99214, virtually always resulting in a charge of $125.71 for each putative follow-up examination; or (ii) CPT code 99213, virtually always resulting in a charge of $85.01 for each putative follow-up examination.

250.    All of Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong's billing for their purported follow-up examinations was fraudulent because it misrepresented Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong's eligibility to collect PIP Benefits in the first instance.

251.    In fact, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong never were eligible to collect PIP Benefits in the claims for follow-up examinations that are identified in Exhibits "1", "2", "4", "5", and "6", because they engaged in unlawful and fraudulent conduct as described herein.

252.    Moreover, and as set forth below, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong's charges for the putative follow-up examinations identified in Exhibits "1", "2", "4", "5", and "6" were fraudulent in that they misrepresented the nature, extent, and reimbursability of the examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

253.    For instance, in the claims for follow-up examinations that are identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely misrepresented the severity of the Insureds' presenting problems.

254.    Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

255.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination, specifically:

(i)    Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)   Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)   Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)   Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

256.   Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

257.   Similarly, pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

258.   The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

259.   For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for a follow-up patient examination:

(i)   Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)   Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

117

(iii)    Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)    Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)    Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/ Internal Medicine/Family Medicine)

(viii)    Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

260.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for an follow-up patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

261.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6" suffered any injuries at all in their minor automobile accidents, the injuries virtually always were garden-variety soft tissue injuries such as sprains and strains.

262.    As set forth above, strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

263.   By the time the Insureds in the claims identified in Exhibits "1", "2", "4", "5", and "6" presented to Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, and Prime Pain Management for the putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were minimal.

264.   Even so, in the claims for follow-up examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely billed for their putative follow-up examinations under CPT codes 99213 and 99214, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate or moderate to high severity, despite the fact that the purported examinations were provided many months after the Insureds' minor automobile accidents, and long after any soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

265.   For example:

(i)   On December 16, 2012, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that LK's vehicle was drivable following the accident. The police report further indicated that although LK complained of neck pain, LK refused medical attention at the scene. The police report further indicated that although LK complained of neck pain, LK refused medical attention at the scene. In keeping with the fact that LK was not seriously injured, LK did not visit any hospital emergency room following the accident. To the extent that LK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of LK by S. Lee on March 5, 2013 – nearly four months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that LK presented with problems of low to moderate severity.

(ii)   On February 3, 2014, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on August 14, 2014 – more than six months after the accident – Hong, S. Lee, and The One Acupuncture billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HL presented with problems of low to moderate severity.

(iii)    On February 7, 2014, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on August 27, 2014 – more than six months after the accident – Hong, S. Lee, and The One Acupuncture billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HL presented with problems of low to moderate severity.

(iv)    On May 10, 2013, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SL by S. Lee on November 12, 2013 – more than six months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that SL presented with problems of low to moderate severity.

(v)     On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured,

YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YL by S. Lee on July 25, 2014 – more than seven months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that YL presented with problems of low to moderate severity.

(vi)   On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YL by Hong on June 9, 2014 – more than five months after the accident – Hong, S. Lee, and The One Acupuncture billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HL presented with problems of low to moderate severity.

(vii)  On February 1, 2014, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident. To the extent that MH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MH by S. Lee on June 17, 2014 – more than four months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MH presented with problems of low to moderate severity.

(viii) On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that although SG complained of neck pain and body, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so,

following a purported follow up examination of HL by Hong on December 4, 2014 – more than five months after the accident – Hong, S. Lee, and The One Acupuncture billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HL presented with problems of low to moderate severity.

(ix)     On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision. The police report further indicated that SG complained of neck pain and lower-back. However, in keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SG by Desai on May 4, 2016– nearly two years after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that SG presented with problems of moderate to high severity.

(x)      On June 22, 2014, an Insured named YJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured and did not complain of any pain at the scene. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YJ by S. Lee on January 13, 2015 – more than seven months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that YJ presented with problems of low to moderate severity.

(xi)     On October 31, 2014, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. The police report further indicated that although SK complained of head pain, SK refused medical attention at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SK by S. Lee on August 6, 2014 – more than nine months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code

99213, and thereby falsely represented that SK presented with problems of low to moderate severity.

(xii)   On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of SL by Desai on December 14, 2016 – two years after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that SL presented with problems of moderate to high severity.

(xiii)  On January 30, 2015, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YC by Desai on March 16, 2016 – more than one year after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99213, and thereby falsely represented that YC presented with problems of low to moderate severity.

(xiv)   On February 13, 2015, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SH by Desai on February 3, 2016 – one year after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that SH presented with problems of moderate to high severity.

(xv)    On February 19, 2015, an Insured named EK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, and that EK's vehicle was drivable following the accident. The police report further indicated that EK was not injured and did not complain of any pain at the scene. In keeping with the fact that EK was not seriously injured, EK did not visit any hospital emergency room following the accident. To the extent that EK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EK by S. Lee on November 11, 2015 – more than eight months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EK presented with problems of low to moderate severity.

(xvi)   On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. The police report further indicated that although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on October 12, 2015 – more than seven months after the accident – Hong, S. Lee, and The One Acupuncture billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HL presented with problems of low to moderate severity.

(xvii)   On July 16, 2015, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JK on January 22, 2016 – more than six after the accident – S. Lee and Choice Total Pain billed GEICO for the initial examination using CPT code 99213, and thereby falsely represented that JK presented with problems of low to moderate severity.

(xviii)   On May 7, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any

pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JL by Desai on March 29, 2017 – more than ten months after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that JL presented with problems of moderate to high severity.

(xix)   On September 2, 2016, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MK by Desai on February 8, 2017 – more than five months after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that MK presented with problems of moderate to high severity.

(xx)    On November 16, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured and did not complain of any pain at the scene. In keeping with the fact that KS was not seriously injured, KS did not visit any hospital emergency room following the accident. To the extent that KS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of KS by S. Lee on September 15, 2017 – more than nine months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that KS presented with problems of low to moderate severity.

(xxi)   On February 13, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain of any pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely

resolved within two to three months of the accident. Even so, following a purported follow up examination of EL by S. Lee on January 17, 2018 – more than eleven months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EL presented with problems of low to moderate severity.

(xxii) On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of TL by S. Lee on January 26, 2018 – more than ten months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that TL presented with problems of low to moderate severity.

(xxiii) On April 10, 2017, an Insured named WK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that WK's vehicle was drivable following the accident. The police report further indicated that WK was not injured and did not complain of any pain at the scene.  In keeping with the fact that WK was not seriously injured, WK did not visit any hospital emergency room following the accident. To the extent that WK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of WK by Chong on November 14, 2018 – more than one year after the accident – Chong, Desai, and Prime Pain Management billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that WK presented with problems of low to moderate severity.

(xxiv) On April 27, 2017, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MK by S. Lee on January 12, 2018 – more than eight months after the accident – S. Lee and Choice Total Pain billed GEICO

for the follow-up examination using CPT code 99213, and thereby falsely represented that MK presented with problems of low to moderate severity.

(xxv) On May 8, 2017, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that DL's vehicle was drivable following the accident. The police report further indicated that although DL complained of neck pain, DL refused medical attention at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. To the extent that DL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of DL by Desai on August 2, 2017, Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that DL presented with problems of moderate to high severity.

(xxvi) On May 15, 2017, an Insured named XS was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that XS's vehicle was drivable following the accident. The police report further indicated that XS was not injured and did not complain of any pain at the scene. In keeping with the fact that XS was not seriously injured, XS did not visit any hospital emergency room following the accident. To the extent that XS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of XS by Desai on December 6, 2017 – more than six months after the accident – Desai and Fort Lee Pain billed GEICO for the follow-up examination using CPT codes 99214, and thereby falsely represented that XS presented with problems of moderate to high severity.

(xxvii) On June 8, 2017, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SH by Desai on September 17, 2018 – more than one year after the accident – Desai and Prime Pain Management billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that SH presented with problems of low to moderate severity.

(xxviii) On July 6, 2017, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-

impact collision, and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene.  In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of IK by Desai on November 5, 2018 – more than one year after the accident – Desai and Prime Pain Management billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that IK presented with problems of low to moderate severity.

(xxix) On June 21, 2017, an Insured named HO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that HO's vehicle was drivable following the accident. The police report further indicated that HO was not injured and did not complain of any pain at the scene. In keeping with the fact that HO was not seriously injured, HO did not visit any hospital emergency room following the accident. To the extent that HO experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HO by S. Lee on October 18, 2017 – more than three months after the accident – S. Lee and Choice Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HO presented with problems of low to moderate severity.

(xxx) On July 30, 2017, an Insured named OK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that OK's vehicle was drivable following the accident. The police report further indicated that OK was not injured and did not complain of any pain at the scene. In keeping with the fact that OK was not seriously injured, OK did not visit any hospital emergency room following the accident. To the extent that OK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of OK by Yoo on January 10, 2018 – more than five months after the accident – S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that OK presented with problems of low to moderate severity.

(xxxi) On December 6, 2017, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene.  In keeping with the fact that EC was not seriously injured, EC did not visit any hospital emergency room following the

accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EC by Chong on December 12, 2018 – more than <u>one year</u> after the accident – Chong, Desai, and Prime Pain Management billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that EC presented with problems of low to moderate severity.

(xxxii) On January 6, 2018, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene.  In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of CS by Desai on November 19, 2018 – more than ten months after the accident – Desai and Prime Pain Management billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that CS presented with problems of low to moderate severity.

(xxxiii) On March 27, 2018, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not seriously injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of WL by Yoo on October 3, 2018 – more than six months after the accident – S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that WL presented with problems of low to moderate severity.

(xxxiv) On September 15, 2018, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of IK by Yoo on December 12, 2018, S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examination using CPT code 99213,

and thereby falsely represented that IK presented with problems of low to moderate severity.

(xxxv) On November 10, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of MB by J. Lee on December 20, 2018, S. Lee, J. Lee, and Prime Total Pain billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MB presented with problems of low to moderate severity.

266.    These are only representative examples. In virtually all of the claims for follow-up examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations – which often were many months or even years after the minor accidents – or else their presenting problems were minimal.

267.    In the claims for follow-up examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely falsely represented that the Insureds presented with problems of low to moderate or moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99213 and 99214, because examinations billable under CPT codes 99213 and 99214 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no

severity.

268.    In the claims for follow-up examinations identified in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong also routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for the laundry list of other Fraudulent Services that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong purported to provide to the Insureds, including additional, medically unnecessary chiropractic, physical therapy, acupuncture treatments, electrodiagnostic testing, and pain management injections.

**b.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

269.    What is more, pursuant to the Fee Schedule, when Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Desai, Chong, Fort Lee Pain, and Prime Pain Management billed for their putative follow-up examinations under CPT code 99213, they represented that they performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

270.    Moreover, pursuant to the Fee Schedule, when Desai, Chong, Fort Lee Pain, and Prime Pain Management submitted charges for the follow-up examinations under CPT code 99214, they represented that they performed at least two of the following three components:  (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

271.    In actuality, however, in the claims for follow-up examinations identified in in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

272.    Rather, following their purported follow-up examinations, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds continue to return to Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, and/or Prime Pain Management for additional, medically unnecessary chiropractic, physical therapy, acupuncture treatments, electrodiagnostic testing, and pain management injections.

273.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatments by the Defendants, and to provide a false justification for the medically unnecessary treatments that the Defendants already had purported to provide, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

274.    For example:

(i)     On December 16, 2012, an Insured named LK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, rear-end collision, and that LK's vehicle was drivable following the accident. The police report further indicated that although LK complained of neck pain, LK refused medical attention at the scene. In keeping with the fact that LK was not seriously injured, LK did not visit any hospital emergency room following the accident. To the extent that LK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of LK by S. Lee on March 5, 2013, S. Lee falsely reported that LK continued to suffer from high levels of pain and range of motion deficits as the result of the accident, and recommended that LK return to Choice Total Pain for the continued provision of the Fraudulent Services.

(ii)     On May 10, 2013, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SL by S. Lee on November 12, 2013 – more than six months after the accident – S. Lee falsely reported that SL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that SL return to Choice Total Pain for the continued provision of the Fraudulent Services.

(iii)    On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YL by S. Lee on July 25, 2014 – more than seven months after the accident – S. Lee falsely reported that YL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that YL return to Choice Total Pain for the continued provision of the Fraudulent Services.

(iv)     On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured,

133

YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on June 9, 2014 – more than two months after the accident – Hong falsely reported that HL continued to suffer from high levels of pain as the result of the minor accident, and recommended that HL return to The One Acupuncture for the continued provision of the Fraudulent Services.

(v)    On January 2, 2014, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene.  In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JC by S. Lee on July 21, 2014 – more than six months after the accident – S. Lee falsely reported that JC continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that JC return to Choice Total Pain for the continued provision of the Fraudulent Services.

(vi)    On February 3, 2014, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on August 14, 2014 – more than six months after the accident – Hong falsely reported that HL continued to suffer from high levels of pain as the result of the minor accident, and recommended that HL return to The One Acupuncture for the continued provision of the Fraudulent Services.

(vii)    On February 7, 2014, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the

134

result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on August 27, 2014 – more than six months after the accident – Hong falsely reported that HL continued to suffer from high levels of pain as the result of the minor accident, and recommended that HL return to The One Acupuncture for the continued provision of the Fraudulent Services.

(viii)   On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that although SG complained of neck pain and body, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on December 4, 2014 – more than five months after the accident – Hong falsely reported that HL continued to suffer from high levels of pain as the result of the minor accident, and recommended that HL return to The One Acupuncture for the continued provision of the Fraudulent Services.

(ix)   On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision. The police report further indicated that although SG complained of neck pain and lower-back, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SG by Desai on May 4, 2016 – nearly two years after the accident – Desai and Fort Lee Pain falsely reported that SG continued to suffer from serious symptoms as the result of the minor accident, and recommended that SG return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that SG continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Choice Total Pain.

(x)   On June 22, 2014, an Insured named YJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured and did not complain of any pain at the scene. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the

135

accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YJ by S. Lee on January 13, 2015 – more than s months after the accident – S. Lee falsely reported that YJ continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that YJ return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xi)     On October 31, 2014, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. The police report further indicated that although SK complained of head pain, SK refused medical attention at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SK by S. Lee on August 6, 2014 – more than nine months after the accident – S. Lee falsely reported that SK continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that SK return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xii)    On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SL by S. Lee on October 30, 2015 – more than ten months after the accident – S. Lee falsely reported that SL continued to suffer from high levels of pain and range of motion deficits a as the result of the minor accident, and recommended that SL return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xiii)   On February 13, 2015, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the

accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SH by Desai on February 3, 2016 – nearly one year after the accident – Desai and Fort Lee Pain falsely reported that SH continued to suffer from serious symptoms as the result of the minor accident, and recommended that SH return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that SH continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Choice Total Pain.

(xiv)   On February 19, 2015, an Insured named EK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EK's vehicle was drivable following the accident. The police report further indicated that EK was not injured and did not complain of any pain at the scene. In keeping with the fact that EK was not seriously injured, EK did not visit any hospital emergency room following the accident. To the extent that EK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EK by S. Lee on November 11, 2015 – more than eight months after the accident – S. Lee falsely reported that EK continued to suffer from high levels of pain and range of motion as the result of the minor accident, and recommended that EK return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xv)   On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that although YL complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of YL by S. Lee on October 13, 2015 – more than seven months after the accident – S. Lee falsely reported that YL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that YL return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xvi)   On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. The police report further indicated that although YL

complained of neck pain, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HL by Hong on October 12, 2015 – more than seven months after the accident – Hong falsely reported that HL continued to suffer from high levels of pain as the result of the minor accident, and recommended that HL return to The One Acupuncture for the continued provision of the Fraudulent Services.

(xvii)   On July 16, 2015, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JK by Desai on July 13, 2016 – nearly one year after the accident – Desai and Fort Lee Pain falsely reported that JK continued to suffer from serious symptoms as the result of the minor accident, and recommended that JK return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that JK continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Choice Total Pain.

(xviii)  On March 15, 2016, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KG's vehicle was drivable following the accident. The police report further indicated that KG was not injured and did not complain of any pain at the scene. In keeping with the fact that KG was not seriously injured, KG did not visit any hospital emergency room following the accident. To the extent that KG experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of KG by S. Lee on June 29, 2016 – more than seven months after the accident – S. Lee falsely reported that KG continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that KG return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xix)    On May 7, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any

138

pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of JL by Desai on March 29, 2017 – more than ten months after the accident – Desai and Fort Lee Pain falsely reported that JL continued to suffer from serious symptoms as the result of the minor accident, and recommended that JL return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that JL continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Choice Total Pain.

(xx)     On September 2, 2016, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, rear-end collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MK by Desai on February 8, 2017 – more than five months after the accident – Desai and Fort Lee Pain falsely reported that MK continued to suffer from serious symptoms as the result of the minor accident, and recommended that MK return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that MK continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Choice Total Pain.

(xxi)    On November 16, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured and did not complain of any pain at the scene. In keeping with the fact that KS was not seriously injured, KS did not visit any hospital emergency room following the accident. To the extent that KS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of KS by S. Lee on September 15, 2017 – more than nine months after the accident – S. Lee falsely reported that KS continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that KS return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxii)   On February 13, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain of any pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EL by S. Lee on January 17, 2018 – more than eleven months after the accident – S. Lee falsely reported that EL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that EL return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxiii) On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of TL by S. Lee on January 26, 2018 – more than ten months after the accident – S. Lee falsely reported that TL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that TL return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxiv) On April 10, 2017, an Insured named WK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that WK's vehicle was drivable following the accident. The police report further indicated that WK was not injured and did not complain of any pain at the scene.  In keeping with the fact that WK was not seriously injured, WK did not visit any hospital emergency room following the accident. To the extent that WK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of WK by Chong on November 14, 2018 – more than one year after the accident – Chong, Desai, and Prime Pain Management falsely reported that WK continued to suffer from serious symptoms as the result of the minor accident, and recommended that WK return to Prime Pain Management for the continued provision of the Fraudulent Services, and recommended that WK continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Prime Total Pain.

(xxv)   On April 27, 2017, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of MK by S. Lee on January 12, 2018 – more than eight months after the accident – S. Lee falsely reported that MK continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that MK return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxvi)  On May 8, 2017, an Insured named DL was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that DL's vehicle was drivable following the accident. The police report further indicated that although DL complained of neck pain, DL refused medical attention at the scene. In keeping with the fact that DL was not seriously injured, DL did not visit any hospital emergency room following the accident. To the extent that DL experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of DL by Desai on August 2, 2017, Desai and Fort Lee Pain falsely reported that DL continued to suffer from serious symptoms as the result of the minor accident, and recommended that DL return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that DL continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Choice Total Pain.

(xxvii) On June 8, 2017, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of SH by S. Lee on March 16, 2018 – more than nine months after the accident – S. Lee falsely reported that SH continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that SH return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxviii) On June 21, 2017, an Insured named HO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that HO's vehicle was drivable following the accident. The police report further indicated that HO was not injured and did not complain of any pain at the scene. In keeping with the fact that HO was not seriously injured, HO did not visit any hospital emergency room following the accident. To the extent that HO experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of HO by S. Lee on October 18, 2017 – more than three months after the accident – S. Lee falsely reported that HO continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that HO return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxix) On July 6, 2017, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of IK by Desai on July 18, 2018 – more than one year after the accident – Desai and Fort Lee Pain falsely reported that IK continued to suffer from serious symptoms as the result of the minor accident, and recommended that IK return to Fort Lee Pain for the continued provision of the Fraudulent Services, and recommended that IK continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Prime Total Pain.

(xxx) On July 30, 2017, an Insured named OK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that OK's vehicle was drivable following the accident. The police report further indicated that OK was not injured and did not complain of any pain at the scene. In keeping with the fact that OK was not seriously injured, OK did not visit any hospital emergency room following the accident. To the extent that OK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of OK by Yoo on January 10, 2018 – more than five months after the accident – Yoo falsely reported that OK continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that OK return to Prime Total Pain for the continued provision of the Fraudulent Services.

(xxxi) On January 6, 2018, an Insured named CS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that CS's vehicle was drivable following the accident. The police report further indicated that CS was not injured and did not complain of any pain at the scene. In keeping with the fact that CS was not seriously injured, CS did not visit any hospital emergency room following the accident. To the extent that CS experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of CS by S. Lee on March 16, 2018 – more than two months after the accident – S. Lee falsely reported that CS continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that CS return to Choice Total Pain for the continued provision of the Fraudulent Services.

(xxxii) On December 6, 2017, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene.  In keeping with the fact that EC was not seriously injured, EC did not visit any hospital emergency room following the accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of EC by Chong on December 12, 2018 – more than one year after the accident – Chong and Prime Pain Management falsely reported that EC continued to suffer from serious symptoms as the result of the minor accident, and recommended that EC return to Prime Pain Management for the continued provision of the Fraudulent Services, and recommended that EC continue to receive medically unnecessary, chiropractic, physical therapy, and/or acupuncture treatments at Prime Total Pain.

(xxxiii) On March 27, 2018, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not seriously injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow up examination of WL by Yoo on October 3, 2018 – more than six months after the accident – Yoo falsely reported that WL continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that WL return to Prime Total Pain for the continued provision of the Fraudulent Services.

(xxxiv) On September 15, 2018, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of IK by Yoo on December 12, 2018, Yoo falsely reported that IK continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that IK return to Prime Total Pain for the continued provision of the Fraudulent Services.

(xxxv) On November 10, 2018, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, MB did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as the result of the accident, they were of low severity. Even so, following a purported follow up examination of MB by J. Lee on December 20, 2018, J. Lee falsely reported that MB continued to suffer from high levels of pain and range of motion deficits as the result of the minor accident, and recommended that MB return to Prime Total Pain for the continued provision of the Fraudulent Services.

275.   These are only representative examples. In the substantial majority of the claims for follow-up examinations identified in in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, and J. Lee falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their minor automobile accidents, often long after the minor accidents occurred.

276.   In the claims for follow-up examinations identified in in Exhibits  "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a

144

false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations and continued referrals for long-term, medically unnecessary chiropractic, physical therapy, pain management, and acupuncture services.

**c.      Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations**

277.    What is more, every claim for follow-up examinations identified in Exhibits "1", "2", "4", "5", and "6" that was billed under CPT codes 99213 and 99214 misrepresented the amount of time that was spent on the follow-up examinations.

278.    Pursuant to the Fee Schedule, the use of CPT codes 99213 to bill for a follow-up examination represents that the physician, chiropractor, or acupuncturist who conducted the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

279.    Pursuant to the Fee Schedule, the use of CPT code 99214 to bill for a follow-up examination represents that the physician who conducted the examination spent at least 25 minutes of face-to-face time with the patient or the patient's family.

280.    As set forth in Exhibits "1", "2", "4", "5", and "6", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong frequently billed for their putative follow-up examinations using CPT code 99213, and thereby represented that the physician, chiropractors, or acupuncturist who conducted the examinations spent 15 minutes of face-to-face time with the Insureds or their families.

281.    Moreover, as set forth in Exhibits "5" and "6", Fort Lee Pain, Prime Pain Management, Desai, and Chong also frequently billed for their putative follow-up examinations

using CPT code 99214, and thereby represented that the physician, chiropractors, or acupuncturist who conducted the examinations spent 25 minutes of face-to-face time with the Insureds or their families.

282.    In fact, in the follow-up examinations identified in Exhibits  "1", "2", "4", "5", and "6", neither S. Lee, Hong, Yoo, J. Lee, Desai, Chong nor any other practitioner associated with Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, or Prime Pain Management ever spent 15 minutes of face-to-face time with the Insureds or their families when conducting the follow-up examinations, much less 25 minutes.

283.    Rather, in the follow-up examinations identified in Exhibits  "1", "2", "4", "5", and "6", the follow-up examinations rarely lasted more than 5-10 minutes, to the extent that they were provided at all.

284.    In keeping with the fact that the follow-up examinations in the claims identified in Exhibits  "1", "2", "4", "5", and "6" rarely lasted more than 5-10 minutes, to the extent that they were conducted at all, S. Lee, Hong, Yoo, J. Lee, Desai, and Chong used template forms in purporting to conduct the examinations.

285.    These template forms set forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations, many of which were simply reiterations of what had previously been documented in connection with the purported initial examinations of the patients.

286.    These interviews and examinations did not require any physician, chiropractor, physical therapist, or acupuncturist associated with Choice Total Pain, The One Acupuncture, Prime Total Pain, Fort Lee Pain, or Prime Pain Management to spend more than 10 minutes of face-to-face time with the Insureds during the putative follow-up examinations.

146

287. Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, J. Lee, Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely misrepresented the amount of time that was spent in conducting the follow-up examinations because lengthier examinations that are billable under CPT codes 99213 and 99214 are reimbursable at higher rates than shorter examinations that are billable under other CPT codes.

**d.    Misrepresentations Regarding the Reimbursability of the Follow-Up Examinations at Choice Total Pain and Prime Total Pain**

288.    Not only did Choice Total Pain, Prime Total Pain, S. Lee, Yoo, and J. Lee routinely falsely represent that their putative follow-up examinations involved presenting problems of low to moderate severity, and not only did they misrepresent the results of the follow-up examinations, but they also routinely misrepresented the reimbursable amount for the follow-up examinations.

289.    The No-Fault Laws provide that follow-up examinations may only be billed contemporaneously with chiropractic treatments if one of the following four circumstances is present:

(i)    there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

(ii)    the patient fails to respond to treatment, requiring a change in the treatment plan;

(iii)    the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

(iv)    it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n).

290.    Even so, Choice Total Pain, Prime Total Pain, S. Lee, Yoo, and J. Lee routinely billed for follow-up examinations contemporaneously with chiropractic services, despite: (i) the

147

absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

291.  For example:

(i)  S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named JC on February 28, 2014, April 5, 2014, May 6, 2014, June 20, 2014 and July 21, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii)  S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named YN on August 8, 2014, January 9, 2015, and February 12, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)  S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named EK on December 2, 2014, January 5, 2015, February 11, 2015, March 17, 2015, and October 27, 2014,  despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and

Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iv)     S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named EK on April 16, 2015, June 9, 2015, July 10, 2015, August 12, 2015, September 29, 2015, and November 11, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)      S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named YL on April 17, 2015, May 22, 2015, July 6, 2015, August 24, 2015, and October 13, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)     S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named HY on October 19, 2015, November 18, 2015, January 11, 2016, January 15, 2016, February 19, 2016, March 7, 2016, March 28, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)    S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named JJ on March 4, 2016, April 6, 2016, May 2, 2016, May 12, 2016, June 6, 2016, June 13, 2016, July 8, 2016, July 18, 2016, August 10, 2016,

September 12, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)   S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named KL on March 15, 2016, April 21, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ix)   S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named CC on April 6, 2016, May 5, 2015, June 10, 2016, June 17, 2016, July 14, 2016, and July 18, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x)   S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named DK on September 7, 2016, November 14, 2016, and December 2, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xi)   S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they

purported to provide contemporaneously with chiropractic treatments to an Insured named GP on September 26, 2016, December 12, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xii)    S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named BC on October 26, 2016, and February 8, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiii)   S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named EL on March 24, 2017, May 5, 2017, June 26, 2017, August 9, 2017, October 25, 2017, and January 17, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiv)    S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named DL on June 16, 2017, July 26, 2017, August 9, 2017, October 18, 2017, November, 9, 2017, December 13, 2017, January 5, 2018, and March 16, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was

medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xv)     S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named MK on June 26, 2017, August 17, 2017, September 21, 2017, November 6, 2017, November 8, 2017, December 21, 2017, and January 12, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xvi)    S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named SH on July 17, 2017, August 31, 2017, October 13, 2017, October 25, 2017, December 1, 2017, December 13, 2017, March 16, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xvii)   S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named XS on July 21, 2017, September 13, 2017, October 18, 2017, December 14, 2017, and December 15, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xviii)  S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments to an Insured named HO on July 28, 2017, September 6, 2017, October 11, 2017, October 19, 2017, December 1, 2017, December 4, 2017, February 20, 2018, and

February 23, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xix)   S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic and physical therapy treatments to an Insured named OK on October 25, 2017, December 1, 2017, and January 10, 2018 , despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Yoo and Prime Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xx)    S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic and physical therapy treatments to an Insured named JL on November 15, 2017 , despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Yoo and Prime Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxi)   S. Lee, Yoo, J. Lee, and Prime Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic and physical therapy treatments to an Insured named MY on January 30, 2018, March 16, 2018, and April 30, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Yoo, J. Lee,  and Prime Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxii)  S. Lee and Choice Total Pain billed GEICO for the follow-up examinations they

purported to provide contemporaneously with chiropractic treatments to an Insured named CS on March 16, 2018, May 4, 2018, June 11, 2018, and July 25, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which S. Lee and Choice Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxiii) S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic and physical therapy treatments to an Insured named IK on November 7, 2018, and December 12, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Yoo and Prime Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxiv) S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic, physical therapy, and acupuncture treatments to an Insured named WY on May 4, 2018, June 6, 2018, July 18, 2018, August 22, 2018, September 19, 2018, October 3, 2018, October 29, 2018, and December 7, 2018 , despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Yoo, Kim, and Prime Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxv) S. Lee, Yoo, and Prime Total Pain billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic and physical therapy treatments to an Insured named MB on December 20, 2018 , despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Yoo and Prime Total Pain were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the

therapeutic services.

292.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "4", Choice Total Pain, Prime Total Pain, S. Lee, Yoo, and J. Lee virtually always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which Choice Total Pain, Prime Total Pain, S. Lee, Yoo, and J. Lee were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

293.    Each and every time that Choice Total Pain, Prime Total Pain, S. Lee, Yoo, and J. Lee billed for a follow-up examination that they purported to provide contemporaneously with chiropractic services constituted a separate violation of N.J.S.A. § 39:6A–4.6, N.J.A.C. 11:3–29.6, and N.J.A.C. 11:3–29.4(n).

**3.    The Fraudulent Charges for Chiropractic Services and Physical Therapy Services at Choice Total Pain, A Plus Therapy, and Prime Total Pain**

294.    The Defendants' fraudulent scheme was aimed, among other things, at providing as many chiropractic and physical therapy services as possible to the Insureds, without regard for medical necessity or the Care Paths.

295.    Based upon the phony, fabricated "diagnoses" that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Yoo, J. Lee, H. Lee, H. Park, Desai, Chong, Fort Lee Pain, and Prime Pain Management provided during their fraudulent initial examinations and

follow-up examinations, S. Lee, H. Lee, H. Park, Choice Total Pain, A Plus Therapy, and Prime Total Pain purported to subject many Insureds to months of Medically Unnecessary chiropractic and/or physical therapy services.

296.    As set forth in Exhibit "1", S. Lee purported to perform virtually all of the chiropractic and physical therapy services that were billed to GEICO through Choice Total Pain.

297.    As set forth in Exhibit "3", H. Lee purported to perform virtually all of the physical therapy services that were billed to GEICO through A Plus Therapy.

298.    As set forth in Exhibit "4", Yoo purported to perform virtually all of the chiropractic services that were billed to GEICO through Prime Total Pain.

299.    As set forth in Exhibit "4", H. Park purported to perform virtually all of the physical therapy services that were billed to GEICO through Prime Total Pain.

300.    As set forth in in Exhibits "1", "3", and "4", these physical therapy and chiropractic charges included charges under CPT codes: (i) 97035, for ultrasound therapy; (ii) 97140, for manual therapy; (iii) 98941, for chiropractic manipulation; (iv) 97110, for therapeutic activities, as well as charges under Healthcare Common Procedure Coding System ("HCPCS") code G0283 for electrical stimulation.

301.    Like the charges for the other Fraudulent Services, the charges for the chiropractic services and physical therapy services were fraudulent in that the services were medically unnecessary and were performed – to the extent that they were performed at all – solely to financially enrich the Defendants, not to treat or otherwise benefit the Insureds who were subjected to them.

302.    S. Lee, H. Lee, H. Park, Yoo, Choice Total Pain, A Plus Therapy, and Prime Total Pain knew that – unless they could create a false basis to provide long-term, medically

unnecessary chiropractic and physical therapy services to the Insureds in the claims identified in in Exhibits "1", "3", and "4", their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

303.    Accordingly, S. Lee, H. Lee, H. Park, Yoo, Choice Total Pain, A Plus Therapy, and Prime Total Pain used the phony, fabricated "diagnoses" provided during the fraudulent initial and follow-up examinations as a false basis to bill for months and months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

304.    For example:

(i)    On May 10, 2013, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident To the extent that SL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over six months of chiropractic treatment. Even so, between May 2013 and December 2013, S. Lee and Choice Total Pain purported to provide SL with over six months of purported chiropractic "treatment".

(ii)    On January 2, 2014, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over ten months of chiropractic and physical therapy treatment. Even so, between January 2014 and March 2015, S. Lee, Choice Total Pain, H. Lee, and A Plus Therapy purported to provide JC with over seven months of purported chiropractic "treatment" and over three months of purported physical therapy "treatment".

(iii)    On February 1, 2014, an Insured named MH was involved in an automobile

accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured and did not complain of any pain at the scene. In keeping with the fact that MH was not seriously injured, MH did not visit any hospital emergency room following the accident.  To the extent that MH experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over three months of chiropractic and physical therapy treatment. Even so, between March 2014 and June 2014, S. Lee and Choice Total Pain purported to provide MH with over three months of purported chiropractic "treatment".

(iv)     On February 3, 2014, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over eleven months of chiropractic and physical therapy treatment. Even so, between February 2014 and February 2015, S. Lee, Choice Total Pain, H. Lee, and A Plus Therapy purported to provide JL with over seven months of purported chiropractic "treatment" and over four months of purported physical therapy "treatment".

(v)      On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that although SG complained of pain in his neck and body, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over sixteen months of chiropractic and physical therapy treatment. Even so, between June 2014 and June 2016, S. Lee, Choice Total Pain, H. Lee, and A Plus Therapy purported to provide SG with over nine months of purported chiropractic "treatment" and over seven months of purported physical therapy "treatment".

(vi)     On June 22, 2014, an Insured named YJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that YJ's vehicle was drivable following the accident. The police report further indicated that YJ was not injured and did not complain

of any pain at the scene. In keeping with the fact that YJ was not seriously injured, YJ did not visit any hospital emergency room following the accident. To the extent that YJ experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over nine months of chiropractic and physical therapy treatment. Even so, between July 2014 and May 2015, S. Lee, Choice Total Pain, H. Lee, and A Plus Therapy purported to provide YJ with over seven months of purported chiropractic "treatment" and over two months of purported physical therapy "treatment".

(vii) On October 31, 2014, an Insured named SK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. The police report further indicated that although SK complained of pain in her head, SK refused medical attention at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over four months of chiropractic treatment. Even so, between May 2014 and September 2014, S. Lee and Choice Total Pain purported to provide SK with over four months of purported chiropractic "treatment".

(viii) On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene. In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the accident. To the extent that SL was injured at all as a result of the minor accident, the injuries were soft tissue injuries that did not require over ten months of chiropractic treatment. Even so, following purported follow-up examinations of SL by S. Lee on April 8, 2015, May 26, 2015, July 10, 2015, August 21, 2015, and October 30, 2015, S. Lee and Choice Total Pain routinely directed that SL continue to receive chiropractic treatment at Choice Total Pain, despite the fact that the large amount of chiropractic and physical therapy services SL previously had received supposedly had not resolved SL's purported symptoms. As a result of the medically unnecessary chiropractic directives by S. Lee and Choice Total Pain, SL received over ten months of purported chiropractic "treatment" at Choice Total Pain. To the extent that SL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over twelve months of chiropractic treatment. Even so, between March 2015 and July 2016, S. Lee and Choice Total Pain purported to provide SL with over 12 months

of purported chiropractic "treatment".

(ix)    On February 19, 2015, an Insured named EK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EK's vehicle was drivable following the accident. The police report further indicated that EK was not injured and did not complain of any pain at the scene. In keeping with the fact that EK was not seriously injured, EK did not visit any hospital emergency room following the accident. To the extent that EK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over ten months of chiropractic treatment. Even so, between March 2015 and January 2016, S. Lee and Choice Total Pain purported to provide EK with over 10 months of purported chiropractic "treatment"

(x)    On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that although YL complained of pain in his neck, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over seven months of chiropractic treatment. Even so, between March 2015 and October 2015, S. Lee and Choice Total Pain purported to provide YL with over seven months of purported chiropractic "treatment"

(xi)    On April 24, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over six months of chiropractic treatment. Even so, between April 2016 and October 2016, S. Lee and Choice Total Pain purported to provide JL with over six months of purported chiropractic "treatment".

(xii)    On August 16, 2016, an Insured named GP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that GP's vehicle was drivable following the accident. The police report further indicated that GP was not injured and did not complain of any pain at the scene. In keeping with the fact that GP was not

seriously injured, GP did not visit any hospital emergency room following the accident. To the extent that GP experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over seven months of chiropractic and treatment. Even so, between August 2016 and March 2017, S. Lee and Choice Total Pain purported to provide GP with over seven months of purported chiropractic "treatment".

(xiii)   On September 17, 2016, an Insured named BC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that BC's vehicle was drivable following the accident. The police report further indicated that BC was not injured and did not complain of any pain at the scene. In keeping with the fact that BC was not seriously injured, BC did not visit any hospital emergency room following the accident. To the extent that BC experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over nine months of chiropractic treatment. Even so, between September 2016 and July 2017, S. Lee and Choice Total Pain purported to provide BC with over nine months of purported chiropractic "treatment".

(xiv)   On November 16, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured and did not complain of any pain at the scene. In keeping with the fact that KS was not seriously injured, KS did not visit any hospital emergency room following the accident. To the extent that KS experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over ten months of chiropractic treatment. Even so, between November 2016 and October 2017, S. Lee and Choice Total Pain purported to provide KS with over ten months of purported chiropractic "treatment".

(xv)   On February 13, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain of any pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over nine months of chiropractic and physical therapy   treatment. Even so, between February 2017 and February 2018, S. Lee and Choice Total Pain purported to provide EL with over nine months of purported chiropractic "treatment".

161

(xvi)   On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over eleven months of chiropractic treatment. Even so, between March 2017 and February 2018, S. Lee and Choice Total Pain purported to provide TL with over eleven months of purported chiropractic "treatment".

(xvii)  On March 28, 2017, an Insured named CP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that CP's vehicle was drivable following the accident. The police report further indicated that CP was not injured and did not complain of any pain at the scene. In keeping with the fact that CP was not seriously injured, CP did not visit any hospital emergency room following the accident. To the extent that CP experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over eleven months of chiropractic and physical therapy treatment. Even so, between July 2017 and August 2018, S. Lee, Choice Total Pain, H. Park, and Prime Total Pain purported to provide CP with over seven months of purported chiropractic "treatment" and over four months of purported physical therapy "treatment".

(xviii) On March 28, 2017, an Insured named HK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that HK's vehicle was drivable following the accident. The police report further indicated that HK was not injured and did not complain of any pain at the scene. In keeping with the fact that HK was not seriously injured, HK did not visit any hospital emergency room following the accident. To the extent that HK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over thirteen months of chiropractic and physical therapy treatment. Even so, between April 2017 and June 2018, S. Lee, Choice Total Pain, H. Park, and Prime Total Pain purported to provide HK with over eight months of purported chiropractic "treatment" and over five months of purported physical therapy "treatment".

(xix)   On April 5, 2017, an Insured named GK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that GK's vehicle was drivable following the accident. The police report further indicated that GK was not injured and did not complain

162

of any pain at the scene. In keeping with the fact that GK was not seriously injured, GK did not visit any hospital emergency room following the accident. To the extent that GK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over sixteen months of chiropractic and physical therapy treatment. Even so, between April 2017 and January 2019, S. Lee, Choice Total Pain, H. Park, and Prime Total Pain purported to provide GK with over nine months of purported chiropractic "treatment" and over seven months of purported physical therapy "treatment".

(xx)     On April 27, 2017, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over eleven months of chiropractic and physical therapy treatment. Even so, between May 2017 and June 2018, S. Lee, Choice Total Pain, H. Park, and Prime Total Pain purported to provide MK with over eight months of purported chiropractic "treatment" and over three months of purported physical therapy "treatment".

(xxi)    On May 15, 2017, an Insured named XS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that XS's vehicle was drivable following the accident. The police report further indicated that XS was not injured and did not complain of any pain at the scene. In keeping with the fact that XS was not seriously injured, XS did not visit any hospital emergency room following the accident. To the extent that XS experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over seven months of chiropractic treatment. Even so, between May 2017 and January 2018, S. Lee and Choice Total Pain purported to provide XS with over seven months of purported chiropractic "treatment".

(xxii)   On July 30, 2017, an Insured named OK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that OK's vehicle was drivable following the accident. The police report further indicated that OK was not injured and did not complain of any pain at the scene. In keeping with the fact that OK was not seriously injured, OK did not visit any hospital emergency room following the accident. To the extent that OK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over four months

163

of chiropractic treatment. Even so, between August 2017 and January 2018, Yoo and Prime Total Pain purported to provide OK with over four months of purported chiropractic "treatment".

(xxiii)   On March 27, 2018, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not seriously injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over seven months of chiropractic treatment. Even so, between March 2018 and November 2018, Yoo and Prime Total Pain purported to provide WL with over seven months of purported chiropractic "treatment".

(xxiv)   On September 15, 2018, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident over three months of purported chiropractic "treatment" at Prime Total Pain. To the extent that IK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over three months of chiropractic treatment. Even so, between September 2018 and January 2019, Yoo and Prime Total Pain purported to provide IK with over three months of purported chiropractic "treatment".

305.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

306.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

307.   As set forth above, in the claims identified in Exhibits "1" and "4", virtually all of the Insureds whom Choice Total Pain, Prime Total Pain, S. Lee, and Yoo purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in

any actual accidents at all.

308.     It is extremely improbable that any two Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" and "4" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

309.     It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at Choice Total Pain or Prime Total Pain with substantially identical injuries on or about the exact same dates after their accidents.

310.     Even so, in keeping with the fact that Choice Total Pain, Prime Total Pain, S. Lee, and Yoo's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, Hong, Yoo, Fort Lee Pain, Prime Pain Management, and Desai frequently recommended and provided a substantially identical course of medically unnecessary "treatment" to more than one Insured involved in a single accident,.

(i)     On October 2, 2012, two Insureds – JK and AS – were involved in the same automobile accident. Thereafter, JK and AS both presented – incredibly, on the exact same date, October 19, 2012 – to Choice Total Pain for purported initial examinations by S. Lee. JK and AS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between October 2013, and January 2013 S. Lee provided JK and AS with a substantially identical course of purported "chiropractic treatment".

(ii)     On April 21, 2013, two Insureds – BK and WK – were involved in the same automobile accident. Thereafter, BK and WK both presented – incredibly, on the exact same date, April 29, 2013 – to Choice Total Pain for purported initial examinations by S. Lee. BK and WK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between April 2013 and November 2013 S. Lee

provided BK and WK with a substantially identical course of purported "chiropractic treatment".

(iii)     On May 10, 2013, two Insureds – SL and YS – were involved in the same automobile accident. Thereafter, SL and YS both presented – incredibly, on the exact same date, May 16, 2013 – to Choice Total Pain for purported initial examinations by S. Lee. SL and YS were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between May 2013 and December 2013, S. Lee provided SL and YS with a substantially identical course of purported "chiropractic treatment".

(iv)     On January 2, 2014, two Insureds – JC and HK – were involved in the same automobile accident. Thereafter, JC and HK both presented – incredibly, on the exact same date, January 9, 2014 – to Choice Total Pain for purported initial examinations by S. Lee. JC and HK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between January 2014 and August 2014, S. Lee provided JC and HK with a substantially identical course of purported "chiropractic treatment".

(v)      On January 17, 2015, two Insureds – MS and JB – were involved in the same automobile accident. Thereafter, MS and JB both presented – incredibly, on the exact same date, June 22, 2015 – to Choice Total pain for purported initial examinations by S. Lee. MS and JB were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between June 2015 and November 2016, S. Lee provided MS and JB with a substantially identical course of purported "chiropractic treatment".

(vi)     On January 25, 2016, two Insureds – KL and JU – were involved in the same automobile accident. Thereafter, KL and JU both presented – incredibly, on the exact same date, January 27, 2016 – to Choice Total Pain for purported initial examinations by S. Lee. KL and JU were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between January 2016 and May 2016, S. Lee provided KL and JU with a substantially identical course of purported "chiropractic treatment".

(vii)    On March 15, 2016, two Insureds – KG and BR – were involved in the same automobile accident. Thereafter, KG and BR both presented – incredibly, on the exact same date, March 16, 2016 – to Choice Total Pain for purported initial

166

examinations by S. Lee. KG and BR were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between March 2016 and June 2016, S. Lee provided KG and BR with a substantially identical course of purported "chiropractic treatment".

(viii)   On September 24, 2017, two Insureds – SK and JL – were involved in the same automobile accident. Thereafter, SK and JL both presented – incredibly, on the exact same date, September 27, 2017 – to Prime Total Pain for purported initial examinations by Yoo. SK and JL were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between September 2017 and December 2017, Yoo provided SK and JL with a substantially identical course of purported "chiropractic treatment".

(ix)   On March 23, 2018, two Insureds – SK and GP – were involved in the same automobile accident. Thereafter, SK and GP both presented – incredibly, on the exact same date, April 6, 2018 – to Choice Total Pain for purported initial examinations by S. Lee. SK and GP were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between April 2018 and January 2019, S. Lee provided SK and GP with a substantially identical course of purported "chiropractic treatment".

(x)   On April 10, 2018, two Insureds – HK and JK – were involved in the same automobile accident. Thereafter, HK presented on April 9, 2018 to Prime Total Pain for a purported initial examination by Yoo. Later, JK presented on April 11, 2018, to Prime Total Pain for a purported initial examination by Yoo. HK and JK were different ages, in different physical condition, experienced the impact from different locations in the vehicle, and suffered different, minor injuries in the accident, to the extent that they suffered any injuries at all. Even so, between April 2018 and May 2018, Yoo provided HK and JK with a substantially identical course of purported "chiropractic treatment".

311.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" and "4", Choice Total Pain, Prime Total Pain, S. Lee, and Yoo frequently recommended a substantially identical course of medically unnecessary "chiropractic treatment" to more than one Insured involved in a single accident, despite the fact that the Insureds were differently situated and in any case did not require the treatment.

4.      **The Fraudulent Charges for Acupuncture at Choice Total Pain, The One Acupuncture, and Prime Total Pain**

312.    As set forth in Exhibits "1", "2", and "4", based upon the phony, boilerplate "diagnoses" that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, H. Lee, Yoo, Hong, Desai, Fort Lee Pain, and Prime Pain Management provided during their fraudulent initial examinations and follow up examinations, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, Kim, An, J. Park, Hong, Kang, and Yu  purported to subject many Insureds to a series of medically unnecessary acupuncture treatments.

313.    In particular, and as set forth in Exhibits "1", "2", and "4", these acupuncture treatments typically were billed to GEICO under CPT codes 97810 and 97811.

314.    S. Lee, C. Lee, Kim, An, and J. Park purported to personally administer virtually all of the acupuncture treatments at Choice Total Pain in the claims identified in Exhibit "1".

315.    Hong purported to personally administer virtually all of the acupuncture treatments at The One Acupuncture in the claims identified in Exhibit "2".

316.    Kang, Yu, and Kim purported to personally administer the acupuncture treatments at Prime Total Pain in the claims identified in Exhibit "3".

317.    Like the charges for the other Fraudulent Services, the charges for the acupuncture treatments identified in Exhibits "1", "2", and "4" were fraudulent in that the treatments were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the phony, boilerplate "diagnoses" that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, H. Lee, Yoo, Hong, Desai, Fort Lee Pain, and Prime Pain Management provided to the Insureds at the conclusion of the putative initial examinations and follow up examinations.

318.    Moreover, in the claims for acupuncture treatments identified in Exhibits "1", "2",

and "4", the charges for the acupuncture treatments were fraudulent in that they misrepresented Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, An, Kim, Chung, J. Park, and Hong's eligibility to collect PIP Benefits in the first instance.

319.    In fact, Choice Total Pain, The One Acupuncture, S. Lee, C. Lee, An, Kim, J. Park, and Hong never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1", "2", and "4", because, as a result of the fraudulent scheme described herein, neither they nor the treatments were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

a.    **Legitimate Use of Acupuncture**

320.    Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi" or "Qi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma.  When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

321.    The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity. Since every individual has a unique Chi, acupuncture treatment should be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

322.    Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous

treatments. Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and to eventually return the patient to maximum health.

323.    Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) acupuncture examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) patient's  progress throughout the course of treatment.

324.    In contrast to legitimate acupuncture practices, Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, Kim, An, J. Park, Hong, Kang, and Yu treated each patient without regard to any individualized treatment strategies, without regard to any necessary adjustments in treatment as treatment progressed over time, and without meaningful, genuine, and individualized documentation of the course of acupuncture treatment.

325.    In fact, no genuine effort was made to treat the Insureds' actual injuries, to properly assess their condition, to monitor their improvement or lack thereof, or to adjust the treatment to reflect the patients' improvement or lack of improvement.

326.    At best, the purported "acupuncture" services provided Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, Kim, An, J. Park, Hong, Kang, and Yu consisted of inserting needles into Insureds in an assembly-line fashion that bore little, if any, relation to the Insured's condition, and instead reflected a predetermined protocol designed to maximize the amount of fraudulent charges the Defendants could submit to GEICO and other insurers.

**b.    The Medically Unnecessary Acupuncture Treatments**

327.    By the time the Insureds in the claims identified in Exhibits "1", "2", and "4" presented to Choice Total Pain, Prime Total Pain, or The One Acupuncture for acupuncture, they

either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of resolving.

328.    In keeping with the fact that the acupuncture "treatments" were not predicated on medical necessity, Choice Total Pain, Prime Total Pain, and The One Acupuncture's own records frequently indicated that the previous, extensive acupuncture "treatments" that the Insureds had received had not been effective in resolving the Insureds' purportedly persistent and severe symptoms and complaints.

329.    For example:

(i)     On December 19, 2013, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over three months of acupuncture treatment. Even so, between March 2014 and July 2014, Hong and The One Acupuncture purported to provide YL with over three months of purported acupuncture "treatment".

(ii)    On January 2, 2014, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC was not injured and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over three months of acupuncture treatment. Even so, between March 2014 and July 2014, Hong and The One Acupuncture purported to provide JC with over three months of purported acupuncture "treatment".

(iii)   On February 3, 2014, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not

complain of any pain at the scene. In keeping with the fact that JL was not seriously injured, JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between March 2014 and September 2014, Hong and The One Acupuncture purported to provide JL with over five months of purported acupuncture "treatment".

(iv)     On February 7, 2014, an Insured named YM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YM's vehicle was drivable following the accident. The police report further indicated that YM was not injured and did not complain of any pain at the scene. In keeping with the fact that YM was not seriously injured, YM did not visit any hospital emergency room following the accident. To the extent that YM experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between May 2014 and September 2014, Hong and The One Acupuncture purported to provide YM with over five months of purported acupuncture "treatment".

(v)      On June 9, 2014, an Insured named SG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that SG's vehicle was drivable following the accident. The police report further indicated that although SG complained of pain in his neck and body, SG refused medical attention at the scene. In keeping with the fact that SG was not seriously injured, SG did not visit any hospital emergency room following the accident. To the extent that SG experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between July 2014 and January 2015, Hong and The One Acupuncture purported to provide SG with over five months of purported acupuncture "treatment".

(vi)     On March 3, 2015, an Insured named YL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that YL's vehicle was drivable following the accident. The police report further indicated that YL was not injured and did not complain of any pain at the scene. The police report further indicated that although YL complained of pain in his neck, YL refused medical attention at the scene. In keeping with the fact that YL was not seriously injured, YL did not visit any hospital emergency room following the accident. To the extent that YL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over four months of acupuncture

172

treatment. Even so, between May 2015 and October 2015, Hong and The One Acupuncture purported to provide YL with over four months of purported acupuncture "treatment".

(vii)  On September 2, 2016, an Insured named MK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that MK's vehicle was drivable following the accident. The police report further indicated that MK was not injured and did not complain of any pain at the scene. The police report further indicated that although MK complained of pain in his shoulder/upper arm, MK refused medical attention at the scene. In keeping with the fact that MK was not seriously injured, MK did not visit any hospital emergency room following the accident. To the extent that MK experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between February 2017 and August 2017, An, C. Lee, and Choice Total Pain purported to provide MK with over five months of purported acupuncture "treatment".

(viii)  On November 16, 2016, an Insured named KS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that KS's vehicle was drivable following the accident. The police report further indicated that KS was not injured and did not complain of any pain at the scene. In keeping with the fact that KS was not seriously injured, KS did not visit any hospital emergency room following the accident. To the extent that KS experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over six months of acupuncture treatment. Even so, between January 2017 and July 2017, Kim, Park, An, and Choice Total Pain purported to provide KS with over six months of purported acupuncture "treatment".

(ix)  On March 17, 2017, an Insured named KB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that KB's vehicle was drivable following the accident. The police report further indicated that although KB complained of pain in his neck, KB refused medical attention at the scene. In keeping with the fact that KB was not seriously injured, KB did not visit any hospital emergency room following the accident. To the extent that KB experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between September 2017 and January 2018, Yu and Prime Total Pain purported to provide KB with over five months of purported acupuncture "treatment".

(x)    On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between July 2017 and January 2018, Park, C. Lee, and Choice Total Pain purported to provide TL with over five months of purported acupuncture "treatment".

(xi)    On June 8, 2017, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over three months of acupuncture treatment. Even so, between September 2017 and January 2018, Park, C. Lee, and Choice Total Pain purported to provide SH with over three months of purported acupuncture "treatment".

(xii)    On November 14, 2017, an Insured named GH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that GH's vehicle was drivable following the accident. The police report further indicated that GH was not injured and did not complain of any pain at the scene. In keeping with the fact that GH was not seriously injured, GH did not visit any hospital emergency room following the accident. To the extent that GH experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over five months of acupuncture treatment. Even so, between July 2018 and January 2019, Kim and Prime Total Pain purported to provide GH with over five months of purported acupuncture "treatment".

(xiii)    On November 14, 2017, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the

174

result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over four months of acupuncture treatment. Even so, between March 2018 and November 2018, Kim and Prime Total Pain purported to provide SH with over four months of purported acupuncture "treatment".

(xiv) On March 27, 2018, an Insured named WL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WL's vehicle was drivable following the accident. The police report further indicated that WL was not injured and did not complain of any pain at the scene. In keeping with the fact that WL was not seriously injured, WL did not visit any hospital emergency room following the accident. To the extent that WL experienced any health problems at all as the result of the minor accident, they were minor soft tissue injuries that would have resolved within two to three months of the accident, and did not require over four months of acupuncture treatment. Even so, between August 2018 and January 2019, Kim and Prime Total Pain purported to provide WL with over four months of purported acupuncture "treatment".

**c.     Misrepresentations Regarding the Reimbursable Amount for the Acupuncture Treatments**

330.     Not only did Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, An, Kim, J. Park, Hong, Kang, and Yu routinely falsely represent the insureds' need for acupuncture treatments, but they also virtually always misrepresented the reimbursable amount for the acupuncture treatments themselves.

331.     Specifically, as set forth above and in Exhibits "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, An, Kim, J. Park, Hong, Kang, and Yu routinely virtually always billed for their putative acupuncture services using CPT codes 97810 and 97811.

332.     The maximum reimbursable amount for CPT code 97810 in northern New Jersey, where Choice Total Pain, The One Acupuncture, and Prime Total Pain operated, was $43.74, pursuant to the Fee Schedule that was in effect after January 4, 2013.

175

333.   The maximum reimbursable amount for CPT code 97811 in northern New Jersey, where Choice Total Pain, The One Acupuncture, and Prime Total Pain operated, was $37.49, pursuant to the Fee Schedule that was in effect after January 4, 2013.

334.   Even so, in the claims for acupuncture treatments identified in in Exhibits "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, An, Kim, J. Park, Hong, Kang, and Yu routinely falsely represented that they were entitled to be paid in excess of the maximum reimbursable amount established by the Fee Schedule for each initial examination that they billed to GEICO under CPT codes 97810 and 97811.

335.   In the claims for acupuncture treatments identified in in Exhibit "1" , Choice Total Pain, S. Lee, C. Lee, An, Kim, and J. Park, routinely billed GEICO for their purported treatments as follows:

      (i)     CPT code 97810 – $80.00 per treatment.

      (ii)    CPT code 97811 – $60.00 per treatment.

336.   In the claims for acupuncture treatments identified in Exhibit "2", Hong, S. Lee, and The One Acupuncture routinely billed GEICO for their purported treatments as follows:

      (i)     CPT code 97810 –$80.00 per treatment.

      (ii)    CPT code 97811 – $60.00 per treatment.

337.   In the claims for acupuncture treatments identified in Exhibit "4", Kang, Yu, Kim, S. Lee, and Prime Total routinely billed GEICO for their purported treatments as follows:

      (i)     CPT code 97810 – between $55.00 and $60.00 per treatment.

      (ii)    CPT code 97811 – between $45.00 and $50.00 per treatment.

338.   Each and every time in the claims identified in Exhibits "1", "2", and "4" that Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, An, Kim, J. Park,

Hong, Kang, and Yu falsely represented that they were entitled to be paid in excess of the maximum reimbursable amount established by the Fee Schedule for their putative acupuncture treatments constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

339.     In the claims identified in Exhibits "1", "2", and "4", Choice Total Pain, The One Acupuncture, Prime Total Pain, S. Lee, C. Lee, An, Kim, J. Park, Hong, Kang, and Yu routinely falsely represented that they were entitled to be paid in excess of the maximum reimbursable amount established by the Fee Schedule for their putative acupuncture treatments in order to maximize the fraudulent billing that they could submit to GEICO.

**5.    The Fraudulent Charges for Electrodiagnostic Testing at Fort Lee Pain and Prime Pain Management**

340.     Based upon the fraudulent, pre-determined findings and diagnoses provided during the initial examinations, Desai, Fort Lee Pain, and Prime Pain Management purported to subject most Insureds in the claims identified in Exhibits "5" and "6" to a series of medically unnecessary EDX tests, specifically nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests.

341.     As set forth in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management then billed the EDX tests to GEICO under CPT codes 95886, 95911, 95912, and/or 95913.

342.     In the claims for EDX tests identified in Exhibits "5" and "6", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony boilerplate "findings" and "diagnoses" that Desai, Fort Lee Pain, and Prime Pain Management purported to provide during their phony initial and follow-up examinations.

343.     Moreover, in the claims for EDX tests identified in Exhibits "5" and "6", the

charges for the EDX tests were fraudulent in that they misrepresented Desai, Fort Lee Pain, and Prime Pain Management's eligibility to collect PIP Benefits in the first instance.

344.    In fact, Desai, Fort Lee Pain, and Prime Pain Management never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "5" and "6", because – as a result of the fraudulent conduct described herein – Desai, Fort Lee Pain, Prime Pain Management and the EDX tests were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**a.      The Human Nervous System and Electrodiagnostic Testing**

345.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

346.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves. They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

347.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve

root is called a radiculopathy, and can cause various symptoms including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

348.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by Desai, Fort Lee Pain, and Prime Pain Management because they were medically necessary to determine whether the Insureds had radiculopathies.

349.    The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

350.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**b.      The Fraudulent NCV Tests**

351.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

352.   In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

353.   There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

354.   F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

355.   According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

356.   In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Desai, Fort Lee Pain, and Prime Pain Management routinely purported to test far more nerves than recommended by the Recommended Policy. Specifically, to maximize the fraudulent charges that they could submit to GEICO and other insurers, Desai, Fort Lee Pain, and Prime Pain Management routinely purported to perform and/or provide: (i) NCV tests of 8 or more motor nerves; (ii) NCV tests of 10 sensory nerves; (iii) multiple F-wave studies; as well as (iv) multiple H-reflex studies.

357.    For example:

(i)     On July 8, 2015, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named YL, supposedly to determine whether YL suffered from a radiculopathy.

(ii)    On July 8, 2015, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SL, supposedly to determine whether SL suffered from a radiculopathy.

(iii)   On October 14, 2015, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JK, supposedly to determine whether JK suffered from a radiculopathy.

(iv)    On October 14, 2015, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SH, supposedly to determine whether SH suffered from a radiculopathy.

(v)     On February 3, 2016, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 7 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SH, supposedly to determine whether SH suffered from a radiculopathy.

(vi)    On May 4, 2016, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JJ, supposedly to determine whether JJ suffered from a radiculopathy.

(vii)   On October 19, 2016, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named RK, supposedly to determine whether RK suffered from a radiculopathy.

(viii)  On February 8, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named MK, supposedly to determine whether MK suffered from a radiculopathy.

(ix)    On June 21, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named TL, supposedly to determine whether TL suffered from a radiculopathy.

181

(x)     On August 23, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named CP, supposedly to determine whether CP suffered from a radiculopathy.

(xi)    On September 18, 2017, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JK, supposedly to determine whether JK suffered from a radiculopathy.

(xii)   On October 11, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named ML, supposedly to determine whether ML suffered from a radiculopathy.

(xiii)  On October 11, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named HO, supposedly to determine whether HO suffered from a radiculopathy.

(xiv)   On October 25, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JK, supposedly to determine whether JK suffered from a radiculopathy.

(xv)    On October 30, 2017, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named WK, supposedly to determine whether WK suffered from a radiculopathy.

(xvi)   On November 8, 2017, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named IK, supposedly to determine whether IK suffered from a radiculopathy.

(xvii)  On December 13, 2017, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JY, supposedly to determine whether JY suffered from a radiculopathy.

(xviii) On January 8, 2018, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named WX, supposedly to determine whether SH suffered from a radiculopathy.

(xix)   On February 21, 2018, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named HK, supposedly to determine whether HK suffered from a radiculopathy.

(xx)   On February 21, 2018, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named GH, supposedly to determine whether GH suffered from a radiculopathy.

(xxi)   On April 4, 2018, Desai and Fort Lee Pain purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named EC, supposedly to determine whether EC suffered from a radiculopathy.

(xxii)   On June 18, 2018, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named SR, supposedly to determine whether SR suffered from a radiculopathy.

(xxiii)  On November 19, 2018, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named JL, supposedly to determine whether JL suffered from a radiculopathy.

(xxiv)  On November 19, 2018, Desai and Prime Pain Management purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named RK, supposedly to determine whether RK suffered from a radiculopathy.

(xxv)   On December 17, 2018, Desai and Prime Pain Management purported to provide 9 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and multiple H-reflex studies to an Insured named IK, supposedly to determine whether IK suffered from a radiculopathy.

358.   These are only representative examples. In the substantial majority of the claims for NCV tests identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely purported to perform and/or provide an excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

359.   Desai, Fort Lee Pain, and Prime Pain Management routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy so as

183

to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

360.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

361.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

362.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

363.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

364.    Desai, Fort Lee Pain, and Prime Pain Management did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

365.    Instead, Desai, Fort Lee Pain, and Prime Pain Management applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same exact peripheral nerves and nerve fibers in virtually all of the claims identified in Exhibits "5" and "6".

366.    Specifically, in virtually every claim for NCV testing identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management purported to test some combination

of the following peripheral nerves and nerve fibers – and, in the substantial majority of cases, all of them – in each Insured to whom they purported to provide NCV tests:

(i)     left and right median motor nerves;

(ii)    left and right peroneal motor nerves;

(iii)   left and right tibial motor nerves;

(iv)    left and right ulnar motor nerves;

(v)     left and right median sensory nerves;

(vi)    left and right radial sensory nerves;

(vii)   left and right superficial peroneal sensory nerves;

(viii)  left and right sural sensory nerves; and

(ix)    left and right ulnar sensory nerves

367.    The cookie-cutter approach to the NCVs that Desai, Fort Lee Pain, and Prime Pain Management purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that Desai, Fort Lee Pain, and Prime Pain Management could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**c.     The Fraudulent EMG Tests**

368.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

369.    There are many different muscles in the arms and legs that can be tested using

EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

370.   Desai, Fort Lee Pain, and Prime Pain Management did not tailor the EMGs they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentation.

371.   According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

372.   Even if there were any need for any of the EMG tests that Desai, and Fort Lee Pain purported to provide, the nature and number of the EMGs that Desai, Fort Lee Pain, and Prime Pain Management purported to provide frequently grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

373.   In the substantial majority of the claims for EMG tests identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management purported to provide and/or perform EMGs on four limbs on a single date of service, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit to GEICO.

374.   For example:

(i)   On July 8, 2015, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named SL, supposedly to determine whether SL suffered from

186

radiculopathy.

(ii)    On July 8, 2015, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named YL, supposedly to determine whether YL suffered from radiculopathy.

(iii)   On October 14, 2015, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named JK, supposedly to determine whether JK suffered from radiculopathy.

(iv)    On October 14, 2015, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named SH, supposedly to determine whether SH suffered from radiculopathy.

(v)     On February 3, 2016, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named SH, supposedly to determine whether SH suffered from radiculopathy.

(vi)    On May 4, 2016, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named JJ, supposedly to determine whether JJ suffered from radiculopathy.

(vii)   On October 19, 2016, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named RK, supposedly to determine whether RK suffered from radiculopathy.

(viii)  On February 8, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named MK, supposedly to determine whether MK suffered from radiculopathy.

(ix)    On June 21, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named TL, supposedly to determine whether TL suffered from radiculopathy.

(x)     On August 23, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named CP, supposedly to determine whether CP suffered from radiculopathy.

(xi)    On September 18, 2017, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named JK, supposedly to determine whether JK suffered from radiculopathy.

(xii)   On October 11, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named ML, supposedly to determine whether ML suffered from radiculopathy.

(xiii)   On October 11, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named HO, supposedly to determine whether HO suffered from radiculopathy.

(xiv)   On October 25, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named JK, supposedly to determine whether JK suffered from radiculopathy.

(xv)   On October 30, 2017, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named WK, supposedly to determine whether WK suffered from radiculopathy.

(xvi)   On November 8, 2017, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named IK, supposedly to determine whether IK suffered from radiculopathy.

(xvii)   On December 13, 2017, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named JY, supposedly to determine whether JY suffered from radiculopathy.

(xviii)   On January 8, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named WX, supposedly to determine whether WX suffered from radiculopathy.

(xix)   On February 21, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named GH, supposedly to determine whether GH suffered from radiculopathy.

(xx)   On February 21, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named HK, supposedly to determine whether HK suffered from radiculopathy.

(xxi)   On April 4, 2018, Desai and Fort Lee Pain purported to provide a four–limb EMG to an Insured named EC, supposedly to determine whether EC suffered from radiculopathy.

(xxii)   On June 18, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named SR, supposedly to determine whether SR suffered from radiculopathy.

(xxiii)   On November 19, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named JL, supposedly to determine whether JL suffered from radiculopathy.

(xxiv)   On November 19, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named RK, supposedly to determine whether RK

suffered from radiculopathy.

(xxv)  On December 17, 2018, Desai and Prime Pain Management purported to provide a four–limb EMG to an Insured named IK, supposedly to determine whether IK suffered from radiculopathy.

375.   In the substantial majority of the EMG claims identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

**d.   The Fraudulent Radiculopathy Diagnoses**

376.   Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

377.   Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom Desai, Fort Lee Pain, and Prime Pain Management purported to treat.

378.   As a result, the frequency of radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

379.   As set forth above, the substantial majority of the Insureds whom Desai, Fort Lee Pain, and Prime Pain Management purportedly treated did not suffer any serious medical problems as the result of any automobile accident, much less any radiculopathies.

189

380.    Even so, in the EMG and NCV claims identified in Exhibits "5" and "6", Desai purported to identify radiculopathies in the substantial majority of the Insureds to whom they purported to provide EMG and NCV testing.

381.    Desai, Fort Lee Pain, and Prime Pain Management purported to arrive at their pre-determined radiculopathy "diagnoses" in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

**e.     Misrepresentations Regarding the Reimbursable Amount for the EDX Testing**

382.    Not only did Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represent that their excessive EDX testing was medically necessary, and routinely falsely represent the results of the EDX tests, but they also routinely misrepresented the reimbursable amount for the EDX tests.

Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare providers in the northern New Jersey area to submit maximum charges of: (i) $1,228.32 for an 8 motor nerve NCV (including any F-wave studies); (ii) $1,356.40 for an 10 sensory nerve NCV; (iii) $311.86 for two H-reflex studies; and (iv) $434.98 for a four-limb EMG.

383.    Thus, a healthcare provider that provided an 8 motor nerve NCV with F-wave studies, an 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG would be entitled to recover a maximum of $3,331.56 for the combined testing – assuming that the testing was medically necessary in the first instance.

384.    However, to maximize their fraudulent billing for their medically unnecessary EDX testing, Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represented

that they were entitled to recover at least $5,600.00 for an 8 motor nerve NCV with F-wave studies, an 10 sensory nerve NCV, two H-reflex studies, and a four-limb EMG.

385.    Each and every time that Desai, Fort Lee Pain, and Prime Pain Management falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

386.    In the claims identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

**5.    The Fraudulent Charges for Trigger Point Injections**

387.    As set forth in Exhibits "5" and "6", based upon the phony, boilerplate "diagnoses" that Desai, Fort Lee Pain, and Prime Pain Management provided during their fraudulent initial and follow-up examinations, Desai, Fort Lee Pain, and Prime Pain Management purported to subject many Insureds to a series of medically unnecessary trigger point injections.

388.    Desai purported to perform the trigger point injections on behalf of Fort Lee Pain and Prime Pain Management, which then were billed to GEICO through either Fort Lee Pain or Prime Pain Management under CPT code 20553, typically resulting in a total charge of between $600.00 and $2,500.00 per Insured per date of service.

389.    Like the charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that the trigger point injections were medically unnecessary and were provided – to the extent that they were provided at all – pursuant to the phony, boilerplate "diagnoses" that the Defendants provided during their fraudulent examinations and

electrodiagnostic testing.

390.    Desai, Fort Lee Pain, and Prime Pain Management purported to provide a standard battery of trigger point injections over the course of many weeks and months, regardless of the Insureds' individual circumstances or presentation.

391.    Moreover, in the claims for trigger point injections identified in Exhibits "1" and "2", the charges for the trigger point injections were fraudulent in that they misrepresented Fort Lee Pain and Prime Pain Management's eligibility to collect PIP Benefits in the first instance.

392.    In fact, Fort Lee Pain and Prime Pain Management never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "5" and "6", because – as a result of the fraudulent scheme described herein – neither they nor the trigger point injections were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**a.      Standards for the Legitimate Use of Trigger Point Injections**

393.    Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

394.    Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

395.    In a legitimate clinical setting, trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling

modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

396.    Moreover, in a legitimate clinical setting, trigger point injections should not be administered more than once every two months, or more than six times in any given year.

397.    This is because: (i) properly administered trigger point injections should provide pain relief lasting for at least two months; (ii) a proper interval between trigger point injections is necessary to determine whether or not the initial trigger point injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.     The Medically Unnecessary Trigger Point Injections**

398.    Even so, in the claims for trigger point injections identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely purported to provide multiple rounds of trigger point injections to the Insureds within a span of weeks, or even days, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

399.    For example:

(i)     Desai and Fort Lee Pain purported to provide trigger point injections to an Insured named JB on March 9, 2016 and then again just two weeks later, on March 23, 2016.

(ii)    Desai and Fort Lee Pain purported to provide trigger point injections to an Insured named YK on October 5, 2016, and again less than two months later, on November 30, 2016.

(iii)   Desai and Fort Lee Pain purported to provide trigger point injections to an Insured named JJ on February 15, 2017, the next day, February 16, 2017, and just one month later, on March 22, 2017.

(iv)   Desai and Fort Lee Pain purported to provide trigger point injections to an Insured named SY on May 31, 2017, and again just three weeks later, on June 21, 2017.

(v)   Desai and Fort Lee Pain purported to provide trigger point injections to an Insured named RK on August 2, 2017, and again less than one month later, on August 30, 2017.

(vi)   Desai and Prime Pain Management purported to provide trigger point injections to an Insured named GH on July 16, 2018, August 27, 2018, September 17, 2018, October 29, 2018, and November 7, 2018.

(vii)   Desai and Prime Pain Management purported to provide trigger point injections to an Insured named JK on July 30, 2018, and again less than one month later, on August 27, 2018.

(viii)   Desai and Fort Lee Pain purported to provide trigger point injections to an Insured named NC on August 8, 2018, and then less than two months later, on September 26, 2018.

(ix)   Desai and Prime Pain Management purported to provide trigger point injections to an Insured named HC on October 22, 2018, and then again less than one month later, on November 19, 2018.

400.   These are only representative examples. In the claims for trigger point injections identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely purported to provide multiple rounds of trigger point injections to the Insureds within a span of weeks, or even days.

401.   Desai, Fort Lee Pain, and Prime Pain Management purported to provide a large amount of Medically Unnecessary trigger point injections to the Insureds in the claims identified in Exhibits "5" and "6" despite the fact that such injections – to the extent that they actually occurred – placed the Insureds at risk.

402.   Even when performed correctly, the injections that Desai, Fort Lee Pain, and Prime Pain Management purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, or even death.

403.    To the extent that Desai, Fort Lee Pain, and Prime Pain Management actually provided injections to Insureds with the frequency set forth in their billing, they increased these risks exponentially.

404.    Desai, Fort Lee Pain, and Prime Pain Management's pre-determined treatment protocol, including subjecting patients to multiple rounds of trigger point injections over the course of a few weeks and even days was designed and employed by Desai, Fort Lee Pain, and Prime Pain Management solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the injections.

**c.    The Fraudulent Charges for Ultrasonic Guidance Attendant to the Charges for Trigger Point Injections**

405.    As set forth in Exhibits "5" and "6", when billing GEICO for trigger point injections, Desai, Fort Lee Pain, and Prime Pain Management typically submitted separate charges of between $500.00 and $1,600.00 under CPT code 96742 for purported ultrasonic guidance of the injections.

406.    The charges for "ultrasonic guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasonic guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize Desai, Fort Lee Pain, and Prime Pain Management's billing rather than to treat the Insureds who supposedly were subjected to it.

407.    In a legitimate clinical setting, ultrasonic guidance is not required to properly administer an in-office trigger point injection.

408.    Even so, in order to maximize the amount of fraudulent billing they could submit to GEICO and other insurers, in the claims identified in Exhibits "5" and "6", Desai, Fort Lee

Pain, and Prime Pain Management virtually always purported to provide the medically unnecessary trigger point injections under ultrasonic guidance.

409.    In the claims for ultrasonic guidance identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management falsely represented that the putative ultrasonic guidance services were medically necessary, when in fact they were not.

**6.    The Fraudulent Charges for MUA Services**

410.    Based upon the fraudulent, pre-determined diagnoses they purported to provide to virtually every Insured at the conclusion of their putative initial examinations and follow-up examinations, S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management purported to subject many Insureds to chiropractic manipulation under anesthesia ("MUA"), often attendant to the injections provided through Fort Lee Pain and Prime Pain Management.

411.    S. Lee purported to perform virtually all of the MUA services billed to GEICO through Choice Total Pain under CPT codes 22505, 23700, and 27198.

412.    Desai purported to perform virtually all of the MUA services billed to GEICO through Fort Lee Pain and Prime Pain Management under CPT codes 22505, 23700, and 27198.

413.    As set forth in Exhibits "1", "5", and "6", for each day of purported MUA services GEICO would receive two bills:

(i)     one bill from S. Lee and Choice Total Pain, typically seeking combined reimbursement of more than $4,000.00 for S. Lee's purported service as the "primary" physician during the MUA services; and

(ii)    a second bill from Desai and either Fort Lee Pain or Prime Pain Management, typically seeking combined reimbursement of more than $6,000.00 for Desai's service as the "assistant" physician during the MUA Services.

414.    Like the charges for the other Fraudulent Services, the charges for the MUA services were fraudulent in that the MUA services were medically unnecessary and were

performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit, rather than to treat or otherwise benefit the Insureds.

a.      **The Medically Unnecessary MUA Services**

415.    MUA involves a series of mobilization, stretching, and traction procedures performed on a patient's musculoskeletal system, while the patient is under sedation.

416.    Anesthesia is purportedly used to reduce pain, spasms, and muscle guarding that otherwise might occur in a non-sedated patient.

417.    MUA is a moderately accepted treatment for a limited set of isolated joint conditions, such as arthrofibrosis of the knee and adhesive capsulitis, as well as to reduce displaced fractures.

418.    By contrast, there is a dearth of quality supportive scientific evidence for the use of MUA on most other areas of the body, including the spine, pelvis, and shoulder. There are no randomized controlled trials or published cohort studies on management of specific diagnoses of the spine, pelvis, or shoulder via MUA.

419.    Virtually no reliable evidence exists showing the long-term benefits of MUA.

420.    As set forth in Exhibits "1", "5", and "6", virtually every Insured who purportedly received MUA services from S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management supposedly had their cervical, lumbar, and/or thoracic spine manipulated, as well as their pelvis and/or shoulder.

421.    Given the lack of quality scientific evidence supporting the use of MUA on the spine, pelvis, or shoulder, the MUA services purportedly provided by S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management plainly were not medically necessary.

422.    What is more, procedures requiring anesthesia – including MUA – involve a level of risk to the patient that is not present in conservative forms of treatment that do not require anesthesia.

423.    Even so, S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management routinely provided medically unnecessary MUA services to Insureds who had been involved in very minor accidents – and who had not suffered any injury more serious than a sprain or strain – months after the underlying accidents, long after the Insureds' minor soft tissue injuries, to the extent that they ever had any, had resolved, and despite the fact that the MUA services exposed the patients to considerable, unnecessary risk.

424.    For example:

(i)     On April 5, 2017, an Insured named GK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that GK's vehicle was drivable following the accident. The police report further indicated that GK was not injured and did not complain of any pain at the scene. In keeping with the fact that GK was not seriously injured, GK did not visit any hospital emergency room following the accident. To the extent that GK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, S. Lee, Choice Total Pain, Desai, and Fort Lee Pain purported to provide – with S. Lee purporting to serve as the "primary" physician and Desai as the "assistant" physician – GK with medically unnecessary MUA services on June 16, 2018 – more than one year after the accident, and long after any legitimate symptoms GK may have experienced as the result of the accident had resolved.

(ii)    On April 10, 2017, an Insured named WK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that WK's vehicle was drivable following the accident. The police report further indicated that WK was not injured and did not complain of any pain at the scene. In keeping with the fact that WK was not seriously injured, WK did not visit any hospital emergency room following the accident. To the extent that WK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, S. Lee, Choice Total Pain, Desai, and Prime Pain Management purported to provide – with S. Lee purporting to serve as the "primary" physician and Desai as the "assistant"

198

physician – WK with medically unnecessary MUA services on June 16, 2018 – more than <u>one year</u> after the accident, and long after any legitimate symptoms WK may have experienced as the result of the accident had resolved.

(iii)    On March 23, 2018, an Insured named SK as involved in an automobile accident. The contemporaneous police report indicated that SK's vehicle was drivable following the accident. The police report further indicated that SK was not injured and did not complain of any pain at the scene. In keeping with the fact that SK was not seriously injured, SK did not visit any hospital emergency room following the accident. To the extent that SK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, S. Lee, Choice Total Pain, Desai, and Fort Lee Pain purported to provide – with S. Lee purporting to serve as the "primary" physician and Desai as the "assistant" physician – SK with medically unnecessary MUA services on December 15, 2018 – nearly nine months after the accident, and long after any legitimate symptoms SK may have experienced as the result of the accident had resolved.

(iv)    On March 23, 2018, an Insured named GP as involved in an automobile accident. The contemporaneous police report indicated that GP's vehicle was drivable following the accident. The police report further indicated that PG was not injured and did not complain of any pain at the scene. In keeping with the fact that GP was not seriously injured, GP did not visit any hospital emergency room following the accident. To the extent that GP experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, S. Lee, Choice Total Pain, Desai, and Fort Lee Pain purported to provide – with S. Lee purporting to serve as the "primary" physician and Desai as the "assistant" physician – GP with medically unnecessary MUA services on December 8, 2018 – nearly nine months after the accident, and long after any legitimate symptoms GP may have experienced as the result of the accident had resolved.

425.    These are only representative examples. In the claims for MUA identified in Exhibits "1", "5", and "6", S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management routinely purported to provide medically unnecessary MUA services to Insureds, typically long after any symptoms the Insureds experienced as the result of their minor accidents would have resolved.

**b.**    **Misrepresentations Regarding the Reimbursable Amount for the MUA Services**

426.    As set forth above, the No-Fault Laws specifically prohibit healthcare services

providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

427. Not only did S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management falsely represent that the MUA services were medically necessary, but they also routinely misrepresented the reimbursable amount for the MUA services.

428. Specifically, as set forth in Exhibits "1", "5", and "6", S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management virtually always billed for the putative MUA services using CPT codes 22505, 23700, and 27198.

429. Pursuant to the Fee Schedule, the maximum reimbursable amount for CPT code 22505 was $214.24.

430. Pursuant to the Fee Schedule, the maximum reimbursable amount for CPT code 23700 was 470.07.

431. Even so, and as set forth in Exhibit "1", in the claims for MUA services, S. Lee and Choice Total Pain falsely represented that they were entitled to be paid: (i) $450.00 for each charge under CPT code 22505; and (ii) $1,000.00 for each charge under CPT code 23700.

432. Similarly, and as set forth in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management falsely represented that they were entitled to be paid: (i) between $1,700.00 and $10,000.00 for each charge under CPT code 22505; and (ii) between $3,000.00 and $3,800.00 for each charge under CPT code 23700.

433. Each and every time that S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management falsely represented that they were entitled to be reimbursed for their putative initial examinations in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

434.    In the claims identified in Exhibits "1", "5", and "6", S. Lee, Choice Total Pain, Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represented that they were entitled to be reimbursed for their putative MUA services in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

### 7.    The Fraudulent Charges for Pain Management Injections

435.    As set forth in Exhibits "5" and "6", based upon the phony, boilerplate "diagnoses" that Desai, Chong, Fort Lee Pain, and Prime Pain Management provided during their fraudulent initial examinations and follow up examinations, Desai, Fort Lee Pain, and Prime Pain Management purported to subject many Insureds to a series of medically unnecessary pain management injections, including but not limited to epidural injections and medial branch blocks, often purportedly performed under fluoroscopic guidance or with epidurography.

436.    As set forth in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management then billed the pain management injections to GEICO under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

437.    Desai purported to personally administer virtually all of the pain management injections in the claims identified in Exhibits "5" and "6".

438.    Like the charges for the other Fraudulent Services, the charges for the pain management injections identified in Exhibits "5" and "6" were fraudulent in that the injections were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the phony, boilerplate "diagnoses" that Desai, Fort Lee Pain, and Prime Pain Management provided to the Insureds at the conclusion of the putative initial examinations and follow up examinations.

439.    Moreover, in the claims for pain management injections identified in Exhibits "5" and "6", the charges for the pain management injections were fraudulent in that they misrepresented Desai, Fort Lee Pain, and Prime Pain Management's eligibility to collect PIP Benefits in the first instance.

440.    As set forth above, Desai and Fort Lee Pain never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "5" and "6", because – as a result of the fraudulent scheme described herein – neither they nor the injections were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

a.    **Basic, Legitimate Use of Pain Management Injections**

441.    Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

442.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

443.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

444.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

445.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive pain management injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

**b.    The Medically Unnecessary Pain Management Injections**

446.    As set forth above, virtually all of the Insureds in the claims identified in Exhibits "5" and "6" were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

447.    To the limited extent that the Insureds in the claims identified in Exhibits "5" and "6" experienced any injuries at all in their minor accidents, the injuries virtually always were minor soft tissue injuries such as sprains and strains.

448.    By the time the Insureds in the claims identified in Exhibits "5" and "6" presented to Desai, Fort Lee Pain, and Prime Pain Management for treatment, they either had no presenting problems at all, or their presenting problems consisted of minor sprains and strains that were in the process of being resolved through conservative treatment, or without any treatment at all.

449.    Even so, in the claims for pain management injections identified in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely provided pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections.

450.    For example:

(i)    On December 24, 2014, an Insured named SL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SL's vehicle was drivable following the accident. The police report further indicated that SL was not injured and did not complain of any pain at the scene.  In keeping with the fact that SL was not seriously injured, SL did not visit any hospital emergency room following the

accident. To the extent that SL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide SL with multiple medial branch blocks on October 10, 2015, multiple medial branch blocks on January 16, 2016, multiple medial branch blocks on August 22, 2016, and multiple medial branch blocks on January 21, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered between nine months and <u>nearly two years</u> after SL's accident, long after any legitimate symptoms SL may have experienced as the result of the accident had resolved.

(ii)     On February 13, 2015, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that SH's vehicle was drivable following the accident. The police report further indicated that SH was not injured and did not complain of any pain at the scene. In keeping with the fact that SH was not seriously injured, SH did not visit any hospital emergency room following the accident. To the extent that SH experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide SH with multiple medial branch blocks on March 12, 2016, all of which were medically unnecessary. The medically unnecessary injections were administered <u>more than one year</u> after SH's accident, long after any legitimate symptoms SH may have experienced as the result of the accident had resolved.

(iii)    On July 16, 2015, an Insured named JK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JK's vehicle was drivable following the accident. The police report further indicated that JK was not injured and did not complain of any pain at the scene. In keeping with the fact that JK was not seriously injured, JK did not visit any hospital emergency room following the accident. To the extent that JK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide JK with multiple medial branch blocks on February 11, 2016, and multiple medial branch blocks on April 25, 2016, all of which were medically unnecessary. The medically unnecessary injections were administered between six and nine months after JK's accident, long after any legitimate symptoms JK may have experienced as the result of the accident had resolved.

(iv)     On May 7, 2016, an Insured named JL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that JL's vehicle was drivable following the accident. The police report further indicated that JL was not injured and did not complain of any pain at the scene. In keeping with the fact that JL was not seriously injured,

JL did not visit any hospital emergency room following the accident. To the extent that JL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide JL with multiple medial branch blocks on February 4, 2017, multiple medial branch blocks on February 25, 2017, and multiple medial branch blocks on April 22, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered between eight and eleven months after JL's accident, long after any legitimate symptoms JL may have experienced as the result of the accident had resolved.

(v)     On March 25, 2017, an Insured named TL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision, and that TL's vehicle was drivable following the accident. The police report further indicated that TL was not injured and did not complain of any pain at the scene. In keeping with the fact that TL was not seriously injured, TL did not visit any hospital emergency room following the accident. To the extent that TL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide TL with multiple medial branch blocks on January 13, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered over ten months after TL's accident, long after any legitimate symptoms TL may have experienced as the result of the accident had resolved.

(vi)    On July 6, 2017, an Insured named IK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that IK's vehicle was drivable following the accident. The police report further indicated that IK was not injured and did not complain of any pain at the scene. In keeping with the fact that IK was not seriously injured, IK did not visit any hospital emergency room following the accident. To the extent that IK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Prime Pain Management purported to provide IK with multiple medial branch blocks on August 18, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered <u>more than one year</u> after IK's accident, long after any legitimate symptoms IK may have experienced as the result of the accident had resolved.

(vii)   On December 6, 2017, an Insured named EC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EC's vehicle was drivable following the accident. The police report further indicated that EC was not injured and did not complain of any pain at the scene. In keeping with the fact that EC was not

205

seriously injured, EC did not visit any hospital emergency room following the accident. To the extent that EC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide EC with multiple medial branch blocks on May 19, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered over five months after EC's accident, long after any legitimate symptoms EC may have experienced as the result of the accident had resolved.

(viii)   On December 27, 2016, an Insured named HC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision, and that HC's vehicle was drivable following the accident. The police report further indicated that HC was not injured and did not complain of any pain at the scene. In keeping with the fact that HC was not seriously injured, HC did not visit any hospital emergency room following the accident. To the extent that HC experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide HC with multiple medial branch blocks on July 22, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered over six months after HC's accident, long after any legitimate symptoms HC may have experienced as the result of the accident had resolved.

(ix)   On February 13, 2017, an Insured named EL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that EL's vehicle was drivable following the accident. The police report further indicated that EL was not injured and did not complain of any pain at the scene. In keeping with the fact that EL was not seriously injured, EL did not visit any hospital emergency room following the accident. To the extent that EL experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Fort Lee Pain purported to provide EL with multiple epidural injections on January 27, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered nearly one year after EL's accident, long after any legitimate symptoms HC may have experienced as the result of the accident had resolved.

(x)   On February 13, 2017, an Insured named KL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that KL's vehicle was drivable following the accident. The police report further indicated that KL complained of back pain, and that KL was treated by EMS at the scene.  In keeping with the fact that KL was not seriously injured, KL did not visit any hospital emergency room following the accident. To the extent that WK experienced any health problems at all as the

206

result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Prime Pain Management purported to provide KL with multiple epidural injections on August 5, 2017, all of which were medically unnecessary. The medically unnecessary injections were administered over seven months after KL's accident, long after any legitimate symptoms KL may have experienced as the result of the accident had resolved.

(xi)     On April 10, 2017, an Insured named WK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, rear-end collision and that WK's vehicle was drivable following the accident. The police report further indicated that WK was not injured and did not complain of any pain at the scene. In keeping with the fact that WK was not seriously injured, WK did not visit any hospital emergency room following the accident. To the extent that WK experienced any health problems at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, Desai and Prime Pain Management purported to provide WK with multiple epidural injections on June 16, 2018, all of which were medically unnecessary. The medically unnecessary injections were administered over fourteen months after WK's accident, long after any legitimate symptoms WK may have experienced as the result of the accident had resolved.

**c.     Misrepresentations Regarding the Reimbursable Amount for the Pain Management Injections**

451.     As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

452.     Not only did Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represent that their purported pain management injections were medically necessary, but they also routinely misrepresented the reimbursable amount for the injections.

453.     As set forth above, and in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management virtually always billed for their putative pain management injections using CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

454.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64483 was $611.76.

455.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64484 was $268.13.

456.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64490 was $494.93.

457.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64491 was $241.80.

458.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64492 was $244.49.

459.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64493 was $442.52.

460.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64494 was $218.85.

461.    Pursuant to the Fee Schedule that was in effect after January 4, 2013, the maximum reimbursable amount in northern New Jersey for CPT code 64495 was $222.43.

462.    Nonetheless, and as set forth in Exhibits "5" and "6", in order to maximize their fraudulent charges for the medically unnecessary pain management injections, Desai, Fort Lee Pain, and Prime Pain Management routinely falsely represented that they were entitled to recover:

(i)       Between $2,500.00 and $6,000.00 per injection under CPT code 64483;

(ii)      Between $2,000.00 and $7,400.00 per injection under CPT code 64484;

(iii)     Between $1,800.00 and $5,800.00 per injection under CPT code 64490;

(iv)    Between $900.00 and $3,600.00 per injection under CPT code 64491;

(v)     Between $$900.00 and $7,400.00 per injection under CPT code 64492;

(vi)    Between $1,200.00 and $2,400.00 per injection under CPT code 64493;

(vii)   Between $800.00 and $3,700.00 per injection under CPT code 64494; and

(viii)  Between $800.00 and $1,600.00 per injection under CPT code 64495.

463.    Each and every time that Desai and Fort Lee Pain falsely represented that they were entitled to be reimbursed for their putative initial examinations in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

464.    In the claims identified in Exhibits "5" and "6", Desai and Fort Lee Pain routinely falsely represented that they were entitled to be reimbursed for their putative pain management injections in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

**d.      The Fraudulent Charges for Fluoroscopic Guidance and Epidurography**

465.    Not only did Desai, Fort Lee Pain, and Prime Pain Management routinely bill GEICO for medically unnecessary pain management injections, but Desai, Fort Lee Pain, and Prime Pain Management also routinely and fraudulently unbundled separate charges for fluoroscopic guidance from the underlying injection charges, in a calculated effort to increase their billing for the injections.

466.    For example, and as set forth in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely unbundled separate charges of at least $575.00, for fluoroscopic guidance under CPT code 77003 from their underlying injection charges under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

467.    Pursuant to the CPT Assistant, fluoroscopic guidance is a component part of, and included in, charges for pain management injections under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

468.    As a result, healthcare services providers are not entitled to be reimbursed separately for fluoroscopic guidance under CPT code 77003 when billing for pain management injections under CPT codes 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

469.    Nevertheless, Desai, Fort Lee Pain, and Prime Pain Management routinely unbundled billing for fluoroscopic guidance from the underlying injection charges so as to maximize the amount of fraudulent billing they could submit to GEICO.

470.    For example:

(i)     Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named JK on February 19, 2016.

(ii)    Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named JK on April 25, 2016.

(iii)   Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for epidural injections that they purported to provide to an Insured named SA on December 12, 2016.

(iv)    Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named YM on February 4, 2017.

(v)     Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named DY on June 24, 2017.

(vi)    Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes

64483 and 64484 for injections purportedly provided to an Insured named SC on July 22, 2017.

(vii)    Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named HC on July 29, 2017.

(viii)   Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named DL on July 29, 2017.

(ix)     Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64493, 64494, and 64495 for injections purportedly provided to an Insured named HP on August 25, 2017.

(x)      Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named SC on August 25, 2017.

(xi)     Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named HK on October 28, 2017.

(xii)    Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for epidural injections that they purported to provide to an Insured named CP on October 28, 2017.

(xiii)   Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured KL on November 4, 2017.

(xiv)    Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named JC on December 9, 2017.

(xv)     Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named SL on January 29, 2018.

(xvi)   Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named SP on March 3, 2018.

(xvii)   Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named HP on March 3, 2018.

(xviii)   Desai and Prime Pain Management unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for injections purportedly provided to an Insured named HL on March 24, 2018.

(xix)   Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64483 and 64484 for epidural injections that they purported to provide to an Insured named HL on March 24, 2018.

(xx)   Desai and Fort Lee Pain unbundled a separate charge of $575.00 for fluoroscopic guidance under CPT code 77003 from charges under CPT codes 64490, 64491, and 64492 for injections purportedly provided to an Insured named ML on March 26, 2018.

471.   Each of the unbundled charges for fluoroscopic guidance constituted a misrepresentation that Desai, Fort Lee Pain, and Prime Pain Management were entitled to be reimbursed for the charge, when in fact they were not.

472.   Each of the unbundled charges for fluoroscopic guidance constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

473.   Similarly, in order to maximize their fraudulent charges for the medically unnecessary pain management injections, Desai, Fort Lee Pain, and Prime Pain Management frequently submitted separate charges for fluoroscopic guidance and epidurography that supposedly was necessary to perform the injections.

474.   As set forth in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management submitted their charges for epidurography under CPT code 72275, typically

212

resulting in a charge   of between $1,200.00 and $1,900.00 for each instance when the epidurography supposedly was provided.

475.    Epidurography involves the injection of contrast dye under fluoroscopic guidance into the epidural space.

476.    Pursuant to the CPT Assistant, if epidurography is performed and billed under CPT code 72275, fluoroscopic guidance is considered to be included in the epidurography charges under CPT code 72275, and may not be billed separately under CPT code 77003.

477.    As a result, healthcare services providers are not entitled to be reimbursed separately for fluoroscopic guidance under CPT code 77003 when billing for epidurography under CPT code 72275.

478.    Even so, and as set forth in Exhibits "5" and "6", Desai, Fort Lee Pain, and Prime Pain Management routinely unbundled billing for fluoroscopic guidance under CPT code 77003 from the underlying epidurography charges under CPT code 72275 so as to maximize the amount of fraudulent billing they could submit to GEICO.

479.    For example:

(i)     Desai and Fort Lee Pain billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named KK on September 12, 2015.

(ii)    Desai and Fort Lee Pain billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named JJ on September 24, 2016.

(iii)   Desai and Fort Lee Pain billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SA on November 12, 2016.

(iv)    Desai and Prime Pain Management billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named HC on July 20, 2017.

(v)     Desai and Prime Pain Management billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SC on July 22, 2017.

(vi)    Desai and Prime Pain Management billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named KL on August 5, 2017.

(vii)   Desai and Prime Pain Management billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named SC on August 25, 2017.

(viii)  Desai and Fort Lee Pain billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named KL on November 17, 2017.

(ix)    Desai and Fort Lee Pain billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named HL on March 24, 2018.

(x)     Desai and Fort Lee Pain billed GEICO for fluoroscopic guidance under CPT code concurrently with epidurography under CPT code 72275 purportedly provided to an Insured named JL on April 2, 2018.

480.    Each such charge constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.6.

### III.    The Fraudulent Billing Submitted to GEICO

481.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA–1500 forms and treatment reports through Choice Total Pain, A Plus Therapy, The One Acupuncture, Prime Total Pain, Fort Lee Pain, and Prime Pain Management, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

482.    The HCFA–1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were

214

in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Choice Total Pain, The One Acupuncture, and A Plus Therapy were engaged in an illegal self-referral scheme; (c) The One Acupuncture had an illegal corporate structure; (d) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (e) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Choice Total Pain, The One Acupuncture, and A Plus Therapy were engaged in an illegal self-referral scheme; (c) The One Acupuncture had an illegal corporate structure; (d) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (e) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)    The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    GEICO's Justifiable Reliance

483.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

484.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

485.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

486.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

487.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to illegal referral arrangements between and among the Defendants.

488.    The Defendants operated the scheme through several different entities with different tax identification numbers in order to reduce the volume of fraudulent billing submitted through any one entity, avoid detection, and thereby perpetuate the scheme.

489.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full.

490.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent

charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,270,000.00.

491.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

492.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

493.    There is an actual case in controversy between GEICO and Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management as to whether Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management were in compliance with all significant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO.

494.    Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management were not in compliance with all significant laws and regulations governing healthcare practice because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Choice Total Pain, The One Acupuncture, and A Plus Therapy were engaged in an illegal self-referral scheme; (c) The One Acupuncture had an illegal corporate structure; (d) the Defendants purported to provide, and billed for, the

217

medically unnecessary and in some cases illusory Fraudulent Services; and (e) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

495.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that from 2011 through the present, Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

<u>SECOND CAUSE OF ACTION</u>
**Against Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A–1 <u>et seq.</u>))**

496.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

497.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibits "1" – "4", Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An knowingly submitted or caused to be submitted HCFA–1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An were not in compliance with all applicable statutory and regulatory requirements governing

218

healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Choice Total Pain, The One Acupuncture, A Plus Therapy, and S. Lee were engaged in an unlawful self-referral scheme; (c) The One Acupuncture had an illegal corporate structure; (d) Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (e) Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services

(ii)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Choice Total Pain, The One Acupuncture, A Plus Therapy, and S. Lee were engaged in an unlawful self-referral scheme; (c) The One Acupuncture had an illegal corporate structure; (d) Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (e) Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)    The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

498.     Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

499.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,570,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRD CAUSE OF ACTION
### Against S. Lee
### (Violation of RICO, 18 U.S.C. § 1962(c))

500.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

501.     Choice Total Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

502.     S. Lee has knowingly conducted and/or participated, directly or indirectly, in the conduct of Choice Total Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Choice Total Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the

billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral and self-referral scheme; and (vi) neither Choice Total Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

503.    Choice Total Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which S. Lee has operated Choice Total Pain, inasmuch as Choice Total Pain is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Choice Total Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that S. Lee continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Choice Total Pain to the present day.

504.    Choice Total Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Choice Total Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

505.    GEICO has been injured in its business and property by reason of the above–

described conduct in that it has paid at least $1,380,000.00 pursuant to the fraudulent bills submitted through Choice Total Pain.

506.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against S. Lee, C. Lee, An, J. Park, Kim, Desai, and Fort Lee Pain**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

507.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

508.    Choice Total Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

509.    S. Lee, C. Lee, An, J. Park, Kim, Desai, and Fort Lee Pain were employed by and/or associated with Choice Total Pain.

510.    S. Lee, C. Lee, An, J. Park, Kim, Desai, and Fort Lee Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Choice Total Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over seven years seeking payments that Choice Total Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the

services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral and self-referral scheme; and (vi) neither Choice Total Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

511.    S. Lee, C. Lee, An, J. Park, Kim, Desai, and Fort Lee Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

512.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,380,000.00 pursuant to the fraudulent bills submitted through Choice Total Pain.

513.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim
### (Common Law Fraud)

514.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

515.    Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed

material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

516.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "1", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

517.    Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Choice Total Pain that were not compensable under New Jersey's No-Fault Laws.

518.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $1,380,000.00 pursuant to

the fraudulent bills submitted by Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim through Choice Total Pain.

519.    Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

520.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**Against Desai and Fort Lee Pain**
**(Aiding and Abetting Fraud)**

521.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

522.    Desai and Fort Lee Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim.

523.    The acts of Desai and Fort Lee Pain in furtherance of the fraudulent scheme involve referring Insureds back to Choice Total Pain for continued chiropractic and physical therapy treatment in exchange for unlawful compensation from Choice Total Pain and S. Lee.

524.    The conduct of Desai and Fort Lee Pain was significant and material. The conduct of Desai and Fort Lee Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim to obtain payment from GEICO and from other insurers.

525.     Desai and Fort Lee Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Choice Total Pain for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

526.     The conduct of Desai and Fort Lee Pain caused GEICO to pay more than $1,380,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Choice Total Pain.

527.     Desai and Fort Lee Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

528.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim**
**(Unjust Enrichment)**

529.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

530.     As set forth above, Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

531.     When GEICO paid the bills and charges submitted or caused to be submitted through Choice Total Pain by Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim's improper, unlawful, and/or unjust acts.

532.    Choice Total Pain, S. Lee, C. Lee, An, J. Park, Kim, Desai, Chong, Fort Lee Pain, and Prime Pain Management have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

533.    Choice Total Pain, S. Lee, C. Lee, An, Park, and Kim's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

534.    By reason of the above, Choice Total Pain, S. Lee, C. Lee, An, Park, and Kim have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,380,000.00.

### EIGHTH CAUSE OF ACTION
**Against S. Lee**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

535.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

536.    The One Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

537.    S. Lee have knowingly conducted and/or participated, directly or indirectly, in the conduct of The One Acupuncture's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that The One Acupuncture was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants;

(iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an unlawful self-referral scheme; (v) The One Acupuncture had an illegal corporate structure; and (vi) neither The One Acupuncture nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

538.    The One Acupuncture's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which S. Lee has operated The One Acupuncture, inasmuch as The One Acupuncture is not engaged in a legitimate physical therapy practice, and acts of mail fraud therefore are essential in order for The One Acupuncture to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that The One Acupuncture continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through The One Acupuncture to the present day.

539.    The One Acupuncture is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by The One Acupuncture in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

540.    GEICO has been injured in its business and property by reason of the above–

described conduct in that it has paid at least $100,000.00 pursuant to the fraudulent bills submitted through The One Acupuncture.

541.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against S. Lee, Hong, Choice Total Pain, Desai, and Fort Lee Pain
### (Violation of RICO, 18 U.S.C. § 1962(d))

542.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

543.   The One Acupuncture is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

544.   S. Lee, Hong, Choice Total Pain, Desai, and Fort Lee Pain are employed by and/or associated with The One Acupuncture.

545.   S. Lee, Hong, Choice Total Pain, Desai, and Fort Lee Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of The One Acupuncture's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that The One Acupuncture was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used

for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an unlawful self-referral scheme; (v) The One Acupuncture had an illegal corporate structure; and (vi) neither The One Acupuncture nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

546.    S. Lee, Hong, Choice Total Pain, Desai, and Fort Lee Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

547.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $100,000.00 pursuant to the fraudulent bills submitted through The One Acupuncture.

548.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against The One Acupuncture, S. Lee, and Hong**
**(Common Law Fraud)**

549.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

550.    The One Acupuncture, S. Lee, and Hong intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

551.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "2", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice in New Jersey, and were eligible for PIP reimbursement, when in fact they were not.

552.    The One Acupuncture, S. Lee, and Hong intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through The One Acupuncture that were not compensable under New Jersey's No-Fault Laws.

553.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $100,000.00 pursuant to the fraudulent bills submitted by The One Acupuncture, S. Lee, and Hong through The One Acupuncture.

554.    The One Acupuncture, S. Lee, and Hong's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

555.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Desai and Fort Lee Pain
### (Aiding and Abetting Fraud)

556.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

557.    Desai and Fort Lee Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by The One Acupuncture, S. Lee, and Hong.

558.    The acts of Desai and Fort Lee Pain in furtherance of the fraudulent scheme involve referring Insureds back to The One Acupuncture for continued acupuncture treatment in exchange for unlawful compensation from The One Acupuncture and S. Lee.

559.    The conduct of Desai and Fort Lee Pain was significant and material. The conduct of Desai and Fort Lee Pain was a necessary part of and was critical to the success of the

fraudulent scheme because without their actions, there would be no opportunity for The One Acupuncture, S. Lee, and Hong to obtain payment from GEICO and from other insurers.

560.    Desai and Fort Lee Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to The One Acupuncture for non-reimbusable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

561.    The conduct of Desai and Fort Lee Pain caused GEICO to pay more than $100,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through The One Acupuncture.

562.    Desai and Fort Lee Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

563.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against The One Acupuncture, S. Lee, and Hong
### (Unjust Enrichment)

564.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

565.    As set forth above, The One Acupuncture, S. Lee, and Hong have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

566.    When GEICO paid the bills and charges submitted or caused to be submitted by The One Acupuncture, S. Lee, and Hong for PIP Benefits, it reasonably believed that it was

legally obligated to make such payments based on the One Acupuncture, S. Lee, and Hong's improper, unlawful, and/or unjust acts.

567. The One Acupuncture, S. Lee, and Hong have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that The One Acupuncture voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

568. The One Acupuncture, S. Lee, and Hong's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

569. By reason of the above, The One Acupuncture, S. Lee, and Hong have been unjustly enriched in an amount to be determined at trial, but in no event less than $100,000.00.

## THIRTEENTH CAUSE OF ACTION
### Against S. Lee
### (Violation of RICO, 18 U.S.C. § 1962(c))

570. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

571. A Plus Therapy is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

572. S. Lee has knowingly conducted and/or participated, directly or indirectly, in the conduct of A Plus Therapy's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that A Plus Therapy was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the

billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an unlawful self-referral scheme; and (vi) neither A Plus Therapy nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

573.    A Plus Therapy's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which S. Lee has operated A Plus Therapy, inasmuch as A Plus Therapy is not engaged in a legitimate acupuncture practice, and acts of mail fraud therefore are essential in order for A Plus Therapy to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that S. Lee continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through A Plus Therapy to the present day.

574.    A Plus Therapy is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by A Plus Therapy in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

575.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted

through A Plus Therapy.

576.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTEENTH CAUSE OF ACTION
**Against S. Lee, H. Lee, Choice Total Pain, Desai, and Fort Lee Pain**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

577.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

578.     A Plus Therapy is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

579.     S. Lee, H. Lee, Choice Total Pain, Desai, and Fort Lee Pain were employed by and/or associated with A Plus Therapy.

580.     S. Lee, H. Lee, Choice Total Pain, Desai, and Fort Lee Pain knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of A Plus Therapy's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that A Plus Therapy was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in

order to inflate the charges that could be submitted; (v) the Defendants were engaged in an unlawful self-referral scheme; and (vi) neither A Plus Therapy nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

581.    S. Lee, H. Lee, Choice Total Pain, Desai, and Fort Lee Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

582.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted through The One Acupuncture.

583.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against A Plus Therapy, S. Lee, and H. Lee
### (Common Law Fraud)

584.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

585.    A Plus Therapy, S. Lee, and H. Lee intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the

course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

586.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "3", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

587.    A Plus Therapy, S. Lee, and H. Lee intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through A Plus Therapy that were not compensable under New Jersey's No-Fault Laws.

588.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property

by reason of the above–described conduct in that it has paid at least $50,000.00 pursuant to the fraudulent bills submitted by A Plus Therapy, S. Lee, and H. Lee through A Plus Therapy.

589.   A Plus Therapy, S. Lee, and H. Lee's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

590.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<strong><u>SIXTEENTH CAUSE OF ACTION</u><br>Against Desai and Fort Lee Pain<br>(Aiding and Abetting Fraud)</strong>

591.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

592.   Desai and Fort Lee Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by A Plus Therapy, S. Lee, and H. Lee.

593.   The acts of Desai and Fort Lee Pain in furtherance of the fraudulent scheme involve referring Insureds back to A Plus Therapy for continued physical therapy treatment in exchange for unlawful compensation from A Plus Therapy, S. Lee, and H. Lee.

594.   The conduct of Desai and Fort Lee Pain was significant and material. The conduct of Desai and Fort Lee Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for A Plus Therapy, S. Lee, and H. Lee to obtain payment from GEICO and from other insurers.

595.   Desai and Fort Lee Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to A Plus Therapy for non-reimbusable and

medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

596.    The conduct of Desai and Fort Lee Pain caused GEICO to pay more than $50,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Prime Total Pain.

597.    Desai, Chong, Fort Lee Pain, and Prime Pain Management's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

598.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**Against A Plus Therapy, S. Lee, and H. Lee**
**(Unjust Enrichment)**

599.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

600.    As set forth above, A Plus Therapy, S. Lee, and H. Lee have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

601.    When GEICO paid the bills and charges submitted or caused to be submitted through A Plus Therapy by A Plus Therapy, S. Lee, and H. Lee for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on A Plus Therapy, S. Lee, and H. Lee's improper, unlawful, and/or unjust acts.

602.     A Plus Therapy, S. Lee, and H. Lee have been enriched at GEICO's expense by GEICO's payments which constituted a benefit A Plus Therapy, S. Lee, and H. Lee voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

603.     A Plus Therapy, S. Lee, and H. Lee's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

604.     By reason of the above, A Plus Therapy, S. Lee, and H. Lee have been unjustly enriched in an amount to be determined at trial, but in no event less than $50,000.00.

### EIGHTEENTH CAUSE OF ACTION
**Against S. Lee**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

605.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

606.     Prime Total Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

607.     S. Lee has knowingly conducted and/or participated, directly or indirectly, in the conduct of Prime Total Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Prime Total Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in

order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral scheme; and (vi) neither Prime Total Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

608.    Prime Total Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which S. Lee has operated Prime Total Pain, inasmuch as Prime Total Pain is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Prime Total Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that S. Lee continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Prime Total Pain to the present day.

609.    Prime Total Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Prime Total Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

610.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $190,000.00 pursuant to the fraudulent bills submitted through Prime Total Pain.

611.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### NINETEENTH CAUSE OF ACTION
**Against S. Lee, H. Park, Yoo, Yu, Kang, Kim, Desai, and Prime Pain Management**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

612.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

613.    Prime Total Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

614.    S. Lee, H. Park, Yoo, Yu, Kang, Kim, Desai, and Prime Pain Management were employed by and/or associated with Prime Total Pain.

615.    S. Lee, H. Park, Yoo, Yu, Kang, Kim, Desai, and Prime Pain Management knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Prime Total Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Prime Total Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral scheme; and (vi) neither Prime Total Pain nor the underlying services

were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

616.    S. Lee, H. Park, Yoo, Yu, Kang, Kim, Desai, and Prime Pain Management knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

617.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $190,000.00 pursuant to the fraudulent bills submitted through Prime Total Pain.

618.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTIETH CAUSE OF ACTION
**Against Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim**
**(Common Law Fraud)**

619.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

620.    Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

621.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "4", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "4", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "4", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "4", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

622.   Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Prime Total Pain that were not compensable under New Jersey's No-Fault Laws.

623.   GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $190,000.00 pursuant to the fraudulent bills submitted by Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim through Prime Total Pain.

624.    Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

625.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

<u>**TWENTY-FIRST CAUSE OF ACTION**</u>
**Against Desai, Chong, and Prime Pain Management**
**(Aiding and Abetting Fraud)**

626.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

627.    Desai, Chong, and Prime Pain Management knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim.

628.    The acts of Desai, Chong, and Prime Pain Management in furtherance of the fraudulent scheme involve referring Insureds back to Prime Total Pain for continued chiropractic and physical therapy treatment in exchange for unlawful compensation from Prime Total Pain and S. Lee.

629.    The conduct of Desai, Chong, and Prime Pain Management was significant and material. The conduct of Desai, Chong, and Prime Pain Management was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim to obtain payment from GEICO and from other insurers.

630.    Desai, Chong, and Prime Pain Management aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Prime Total Pain for non-reimbusable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

631.    The conduct of Desai, Chong, and Prime Pain Management caused GEICO to pay more than $190,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Prime Total Pain.

### TWENTY-SECOND CAUSE OF ACTION
**Against Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim**
**(Unjust Enrichment)**

632.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

633.    As set forth above, Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

634.    When GEICO paid the bills and charges submitted or caused to be submitted through Prime Total Pain by Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim's improper, unlawful, and/or unjust acts.

635.    Prime Total Pain, S. Lee, C. Lee, An, J. Park, Kim, Desai, Chong, Prime Pain Management, and Prime Pain Management have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

636.   Prime Total Pain, S. Lee, C. Lee, An, Park, and Kim's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

637.   By reason of the above, Prime Total Pain, S. Lee, C. Lee, An, Park, and Kim have been unjustly enriched in an amount to be determined at trial, but in no event less than $190,000.00.

**TWENTY-THIRD CAUSE OF ACTION**
**Against Desai**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

638.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

639.   Fort Lee Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

640.   Desai has knowingly conducted and/or participated, directly or indirectly, in the conduct of Fort Lee Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Fort Lee Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral scheme; and (vi) neither Fort Lee Pain nor the underlying services were in

compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

641.    Fort Lee Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Desai has operated Fort Lee Pain, inasmuch as Fort Lee Pain is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Fort Lee Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Desai continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Fort Lee Pain to the present day.

642.    Fort Lee Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Fort Lee Pain in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

643.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $390,000.00 pursuant to the fraudulent bills submitted through Fort Lee Pain.

644.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWENTY-FOURTH CAUSE OF ACTION**
**Against Desai, S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy,**
**and H. Lee**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

645.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

646.    Fort Lee Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

647.    Desai, S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee were employed by and/or associated with Fort Lee Pain.

648.    Desai, S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Prime Total Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over four years seeking payments that Fort Lee Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral scheme; and (vi) neither Fort Lee Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

250

activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

649.    Desai, S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

650.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $390,000.00 pursuant to the fraudulent bills submitted through Fort Lee Pain.

651.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### TWENTY-FIFTH CAUSE OF ACTION
**Against Fort Lee Pain and Desai**
**(Common Law Fraud)**

652.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

653.    Fort Lee Pain and Desai intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

654.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "5", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "5",

the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "5", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "5", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "5", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

655.    Fort Lee Pain and Desai intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fort Lee Pain that were not compensable under New Jersey's No-Fault Laws.

656.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $390,000.00 pursuant to the fraudulent bills submitted by Fort Lee Pain and Desai through Fort Lee Pain.

657.    Fort Lee Pain and Desai's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

658.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-SIXTH CAUSE OF ACTION
**Against S. Lee, Choice Total Pain, The One Acupuncture,
Hong, A Plus Therapy, and H. Lee
(Aiding and Abetting Fraud)**

659.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

660.     S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Fort Lee Pain and Desai.

661.     The acts of S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee in furtherance of the fraudulent scheme involve referring Insureds to Fort Lee Pain for medically unnecessary initial and follow-up examinations, EDX testing, and pain management injections, in exchange for unlawful compensation from Fort Lee Pain and Desai, in the form of referring the Insureds back to Choice Total Pain, A Plus Therapy, and The One Acupuncture for continued chiropractic, physical therapy, and/or acupuncture services.

662.     The conduct of S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee was significant and material. The conduct of S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Fort Lee Pain and Desai to obtain payment from GEICO and from other insurers.

663.     S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying

charges to Fort Lee Pain for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

664.    The conduct of S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee caused GEICO to pay more than $390,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Fort Lee Pain.

665.    S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

666.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-SEVENTH CAUSE OF ACTION
### Against Fort Lee Pain and Desai
### (Unjust Enrichment)

667.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

668.    As set forth above, Fort Lee Pain and Desai have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

669.    When GEICO paid the bills and charges submitted or caused to be submitted through Fort Lee Pain and Desai for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Fort Lee Pain and Desai's improper, unlawful, and/or unjust acts.

670.    Fort Lee Pain and Desai have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Fort Lee Pain and Desai voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

671.    Fort Lee Pain and Desai's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

672.    By reason of the above, Fort Lee Pain and Desai have been unjustly enriched in an amount to be determined at trial, but in no event less than $390,000.00.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Against Desai**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

673.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

674.    Prime Pain Management is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

675.    Desai has knowingly conducted and/or participated, directly or indirectly, in the conduct of Prime Pain Management's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Prime Pain Management was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were

provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal referral scheme; and (vi) neither Prime Pain Management nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

676.    Prime Pain Management's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Desai has operated Prime Pain Management, inasmuch as Prime Pain Management is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Prime Pain Management to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Desai continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Prime Pain Management to the present day.

677.    Prime Pain Management is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Prime Pain Management in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

678.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted through Prime Pain Management.

679.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-NINTH CAUSE OF ACTION
### Against Desai, Chong, S. Lee, and Prime Total Pain
### (Violation of RICO, 18 U.S.C. § 1962(d))

680.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

681.     Prime Pain Management is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

682.     Desai, Chong, S. Lee, and Prime Total Pain were employed by and/or associated with Prime Pain Management.

683.     Desai, Chong, S. Lee, and Prime Total Pain knowingly has agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Prime Total Pain's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Prime Pain Management was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) the Defendants were engaged in an illegal patient referral scheme;

and (vi) neither Prime Pain Management nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

684.    Desai, Chong, S. Lee, and Prime Total Pain knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

685.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted through Prime Pain Management.

686.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRTIETH CAUSE OF ACTION**
**Against Prime Pain Management, Desai, and Chong**
**(Common Law Fraud)**

687.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

688.    Prime Pain Management, Desai, and Chong intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

258

689.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "6", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "6", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "6", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; and (iv) in many of the claims identified in Exhibit "6", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "6", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

690.    Prime Pain Management, Desai, and Chong intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Prime Total Pain that were not compensable under New Jersey's No-Fault Laws.

691.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted by Prime Pain Management, Desai, and Chong through Prime Pain Management.

692.     Prime Pain Management, Desai, and Chong's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

693.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THIRTY-FIRST CAUSE OF ACTION**
**Against S. Lee and Prime Total Pain**
**(Aiding and Abetting Fraud)**

694.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

695.     S. Lee and Prime Total Pain knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Prime Pain Management and Desai.

696.     The acts of S. Lee and Prime Total Pain in furtherance of the fraudulent scheme involve referring Insureds to Prime Pain Management for medically unnecessary initial and follow-up examinations, EDX testing, and pain management injections, in exchange for unlawful compensation from Prime Pain Management and Desai, in the form of referring the Insureds back to Prime Total Pain for continued chiropractic, physical therapy, and/or acupuncture services.

697.     The conduct of S. Lee and Prime Total Pain was significant and material. The conduct of S. Lee and Prime Total Pain was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Prime Pain Management, Desai, and Chong to obtain payment from GEICO and from other insurers.

698.    S. Lee and Prime Total Pain aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Prime Pain Management for non-reimbursable and medically unnecessary Fraudulent Services, because they sought to continue profiting through the fraudulent scheme.

699.    The conduct of S. Lee and Prime Total Pain caused GEICO to pay more than $160,000.00 pursuant to the fraudulent bills submitted or caused to be submitted through Prime Pain Management.

700.    S. Lee and Prime Total Pain's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

701.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTY-SECOND CAUSE OF ACTION
**Against Prime Pain Management, Desai, and Chong**
**(Unjust Enrichment)**

702.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

703.    As set forth above, Prime Pain Management, Desai, and Chong have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

704.    When GEICO paid the bills and charges submitted or caused to be submitted through Prime Pain Management by Prime Pain Management, Desai, and Chong for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Prime Pain Management, Desai, and Chong's improper, unlawful, and/or unjust acts.

705.    Prime Pain Management, Desai, and Chong have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Prime Pain Management, Desai, and Chong voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

706.    Prime Pain Management, Desai, and Chong's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

707.    By reason of the above, Prime Pain Management, Desai, and Chong have been unjustly enriched in an amount to be determined at trial, but in no event less than $160,000.00.

**THIRTY-THIRD CAUSE OF ACTION**
**Against Fort Lee Pain, Prime Pain Management, Desai, and Chong**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A–1 et seq.))**

708.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 485 above.

709.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibits "5" and "6", Fort Lee Pain, Prime Pain Management, Desai, and Chong knowingly submitted or caused to be submitted HCFA–1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

> (i)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Fort Lee Pain, Prime Pain Management, Desai, and Chong were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Fort Lee Pain, Prime Pain Management, Desai, and Chong were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Fort Lee Pain, Prime Pain Management, Desai, and Chong purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Fort Lee Pain, Prime Pain Management, Desai, and Chong

262

routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii) The HCFA–1500 forms and treatment reports submitted or caused to be submitted by Fort Lee Pain, Prime Pain Management, Desai, and Chong uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) Fort Lee Pain, Prime Pain Management, Desai, and Chong purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Fort Lee Pain, Prime Pain Management, Desai, and Chong routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii) The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

710. Fort Lee Pain, Prime Pain Management, Desai, and Chong's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

711. As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $540,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## JURY DEMAND

712.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Choice Total Pain, The One Acupuncture, A Plus Therapy, Prime Total Pain, Fort Lee Pain, and Prime Pain Management were not in compliance with all relevant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO;

B.      On the Second Cause of Action against Choice Total Pain, Prime Total Pain, The One Acupuncture, A Plus Therapy, S. Lee, Hong, H. Park, H. Lee, C. Lee, J. Park, Yu, Kang, Yoo, Kim, and An, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,570,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.      On the Third Cause of Action against S. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,380,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against S. Lee, C. Lee, An, J. Park, Kim, Desai, and Fort Lee Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,380,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,380,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Choice Total Pain, S. Lee, C. Lee, An, J. Park, and Kim, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,380,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Choice Total Pain, S. Lee, C. Lee, An, Park, and Kim, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,380,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against S. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $100,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against S. Lee, Hong, Choice Total Pain, Desai, and Fort Lee Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $100,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against The One Acupuncture, S. Lee, and Hong, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $100,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Desai and Fort Lee Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $100,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

L.      On the Twelfth Cause of Action against The One Acupuncture, S. Lee, and Hong, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $100,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against S. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

N.      On the Fourteenth Cause of Action against S. Lee, H. Lee, Choice Total Pain, Desai, and Fort Lee Pain compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $50,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.      On the Fifteenth Cause of Action against A Plus Therapy, S. Lee, and H. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $50,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action Desai and Fort Lee Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $50,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against The One Acupuncture, S. Lee, and Hong, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $50,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against S. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $190,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.      On the Nineteenth Cause of Action against S. Lee, H. Park, Yoo, Yu, Kang, Kim, Desai, and Prime Pain Management, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $190,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $190,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper

U.      On the Twenty-First Cause of Action against Desai, Chong, and Prime Pain Management, compensatory damages in favor of GEICO an amount to be determined at trial but

in excess of $190,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper

V.  On the Twenty-Second Cause of Action against Prime Total Pain, S. Lee, H. Park, Yoo, Yu, Kang, and Kim, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $190,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper

W.  On the Twenty-Third Cause of Action against Desai, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $390,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.  On the Twenty-Fourth Cause of Action against D Desai, S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $390,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.  On the Twenty-Fifth Cause of Action against Fort Lee Pain and Desai, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $390,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Z.  On the Twenty-Sixth Cause of Action against S. Lee, Choice Total Pain, The One Acupuncture, Hong, A Plus Therapy, and H. Lee, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $390,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

AA.     On the Twenty-Seventh Cause of Action against Fort Lee Pain and Desai, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $390,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

BB.     On the Twenty-Eighth Cause of Action against Desai, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

CC.     On the Twenty-Ninth Cause of Action against Desai, Chong, S. Lee, and Prime Total Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

DD.     On the Thirtieth Cause of Action against Prime Pain Management, Chong, and Desai, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against S. Lee and Prime Total Pain, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $160,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

FF.     On the Thirty-Second of Action against Prime Pain Management, Desai, and Chong, compensatory damages in favor of GEICO an amount to be determined at trial but in

excess of $160,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

GG.     On the Thirty-Third Cause of Action against Fort Lee Pain, Prime Pain Management, Desai, and Chong, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $540,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7.

Dated: December 5, 2019

RIVKIN RADLER LLP

By: _____
John Robertelli, Esq.
Gene Y. Kang, Esq.
Timothy J. Bang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Steven Henesy, Esq. (to be admitted *pro hac vice*)
25 Main Street, Suite 501
Court Plaza North
Hackensack, New Jersey 07601
(201) 287–2460